UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

U.S. BANK NATIONAL ASSOCIATION, as
securities intermediary

                  Plaintiff,

v.

PHL VARIABLE INSURANCE COMPANY
and PHOENIX LIFE INSURANCE
COMPANY,

                  Defendants.

No. _____

**JURY TRIAL DEMANDED**

*RECEIVED*
*MAR 08 2013*
*U.S.D.C. S.D. N.Y.*
*CASHIERS*

## COMPLAINT

Plaintiff U.S. Bank National Association, as securities intermediary ("Plaintiff"), by and through its attorneys, files this complaint against Defendants PHL Variable Insurance Company and Phoenix Life Insurance Company (together, "Phoenix" or "Defendants"), and alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on Phoenix's unlawful increases of the cost of insurance rates on a targeted group of its in-force Phoenix Accumulator Universal Life ("PAUL") insurance policies. Phoenix began sending letters notifying policyholders about the cost of insurance rate increases on or after March 8, 2010. Phoenix's conduct amounts to breaches of contract and other wrongdoing, including unlawful rate discrimination and unlawful, misleading, and unfair practices in connection with the marketing and selling of flexible premium universal life insurance.

2.      Universal life insurance is a form of permanent life insurance also known as "flexible premium" adjustable life insurance. Unlike whole life insurance, which requires fixed monthly premium payments, universal life insurance allows policyholders to pay as much money as they want into their policy account (subject to certain limitations), and each month, the account accrues interest as provided under the policy. Various charges and fees are then deducted from the policy account, including a "cost of insurance charge" that reflects the price that the insurance company charges for the actual insurance – *i.e.*, the cost to bear the mortality risk. Although there is no fixed monthly premium payment that is due, if the balance in the account is insufficient to cover the policy charges, including the cost of insurance charge, the policy will enter a grace period and lapse unless additional premiums are paid.

3.      Universal life insurance is designed to give policyholders flexibility, both in the payment of premiums and the adjustment of death benefits. With respect to premium payments, policyholders can pay more into their account if they wish to accumulate tax-deferred interest, or they can pay just enough to cover their monthly policy charges if they wish to invest their funds elsewhere. Universal life insurance is less expensive than whole life insurance because there is no guaranteed fixed rate of growth on funds in the policy account and no guaranteed fixed death benefit. The rate of growth and death benefit may vary based on a number of factors, including how the policyholder funds the account, the interest rate under the policy (which is a variable rate), and the policy charges. In a whole life insurance policy, the death benefit is guaranteed and fixed at the time the policy is issued, and a fixed monthly premium payment is set based on the guaranteed death benefit and a projected fixed rate of growth.

4.      Although universal life insurance permits an insurer to adjust the cost of insurance rates (by an increase or a decrease), Plaintiff's policies only allow Phoenix to change cost of

2

insurance rates based on certain specific factors, the most important of which is a change in Phoenix's expectation of future mortality. However, it is well-known in the life insurance industry that, since Phoenix issued Plaintiff's policies several years ago, mortality has *improved*, not *worsened*, and this has resulted in new life insurance mortality tables that would, if anything, support a *decrease* in cost of insurance rates. Despite this fact, Phoenix has instead attempted to *increase* cost of insurance rates in blatant breach of its obligations under the policies.

5. Moreover, Phoenix has based its cost of insurance rate increases on a policyholder's account value, which is a function of how much premium the policyholder chooses to pay, as opposed to the insured's life expectancy. Not only is a policyholder's account value not a permissible basis for raising cost of insurance rates, Phoenix's rate increases are specifically designed to discriminate against policyholders who choose to pay only enough premiums to cover their policy charges and not use the savings (or "cash accumulation") feature of their policies. Phoenix's rate increases thus violate policy provisions and applicable law prohibiting discrimination in rates.

6. Phoenix's conduct is also especially egregious given that Phoenix marketed and sold its PAUL policies as insurance "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs." Phoenix described these products as appropriate for insurance buyers who wished to "minimize long term insurance costs while seeking competitive returns." Phoenix also represented that these products would allow policyholders "to lower premiums, as well as adjust the amount and timing of premium payments," and would give them "increased choice and policy design flexibility to meet [their] needs."

7.     Having thereby lured policyholders into purchasing such policies, once policyholders like Plaintiff in fact adjusted "the amount and timing of premium payments" to fund their accounts simply to cover their policy charges, as they were expressly allowed to do, Phoenix improperly raised the cost of insurance rates on these policyholders.  To make matters worse, Phoenix did not even make clear the amount of the increase or how it would be applied, or provide any contractual, factual, or documentary basis for increasing the cost of insurance rates.

8.     In fact, Phoenix raised the cost of insurance rates to induce, in its own words, "shock lapses" by policyholders.  That is, Phoenix raised the cost of insurance rates to make some policies so expensive that policyholders would be shocked into lapsing or surrendering their policies, and Phoenix timed its rate increases to maximize its premium revenue before inducing such "shock lapses."  As a result, if Phoenix's unlawful scheme succeeds, Phoenix will never have to pay hundreds of millions, if not billions, of dollars in death benefits on those policies, after having already collected millions of dollars in premiums on them.

9.     Phoenix's misconduct thus constitutes not only express breaches of Plaintiff's policies, but breaches of the implied covenant of good faith and fair dealing and unlawful, unfair, and deceptive business practices.  Plaintiff therefore seeks compensatory and punitive damages, as well as equitable relief and attorneys' fees.

## THE PARTIES

10.     Plaintiff U.S. Bank National Association is a national banking association with its principal place of business and nerve center in Ohio, and is the securities intermediary for Lima Acquisition LP.

11.     Upon information and belief, Defendant PHL Variable Insurance Company ("PHL") is a Connecticut corporation with its principal place of business and nerve center located in Hartford, Connecticut, and, according to PHL, PHL does business in the State of New York, including within this judicial district. *See U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811 (CM) (JCF) (S.D.N.Y.) (the "Related Action"), Defendant's Memorandum of Points and Authorities in Support of Motion for Transfer Pursuant to 28 U.S.C. § 1404 [Dkt. No. 61-1, at 8-9] (hereinafter, the "Transfer Motion").

12.     Upon information and belief, Defendant Phoenix Life Insurance Company ("PLIC") is a New York corporation with its principal place of business and nerve center located in East Greenbush, New York, and Phoenix does business in the State of New York, including within this judicial district.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action involves parties of diverse citizenship, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over PLIC because PLIC is found in this judicial district and because PLIC regularly conducts and transacts business in this district.

15.     This Court has personal jurisdiction over PHL because, according to PHL, PHL is found in this judicial district and because PHL regularly conducts and transacts business in this district. *See* Transfer Motion at 8-9.

16.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) because Phoenix resides in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.

# FACTUAL BACKGROUND

## A.    Plaintiff Acquires The Policies

17.    Plaintiff is the owner and beneficiary of several universal life insurance policies (the "Policies") that were issued by Phoenix between 2004 and 2009, including policies issued in New York. The Policies are listed on the attached **Exhibit 1**.

18.    As is typical of universal life insurance policies, the Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover certain monthly deductions, described in the Policies. The monthly deductions consist of various charges (*e.g.*, a sales charge, issue charge, and service charge), including a cost of insurance charge. Any balance in the policy account that is left after the deductions are taken reflects the "policy value," which accrues interest as provided for under the Policies. If in any month there are insufficient funds in the account to cover the deductions, the policy will enter a grace period. If additional premiums are not paid within the grace period, Phoenix will terminate, or lapse, the policy.

19.    The largest and most significant charge under the Policies is the cost of insurance charge. This charge, also known as the mortality charge, reflects the price that Phoenix charges to cover the risk of paying the amount it would have to pay upon a mortality event (*i.e.*, the "death benefit," which is the net amount at risk). The cost of insurance charge is determined by multiplying the cost of insurance rate times the net amount at risk.

20.    The cost of insurance rates under a policy initially are based on certain characteristics of the insured, including her or his gender, age, and risk classification (*i.e.*, smoker or non-smoker). The applicable rate increases every year as the insured ages.

21.     The Policies allow Phoenix to change the applicable cost of insurance rates, but the ability to do so is subject to several strict limitations. Specifically, one form of the Policies provides:[1]

> No more frequent than once per year and no less frequent than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:
>
> 1.     Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.
>
> 2.     Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.
>
> 3.     Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.
>
> 4.     Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

**Exhibit 2**, p. 11.

22.     Accordingly, under the clear language of this policy, any change in the cost of insurance rates can only be based on a change in Phoenix's expectations of future investment earnings, mortality, persistency, and expense/administrative costs. Moreover, any change in the cost of insurance rates must be made on a uniform basis for all insureds in the same class and cannot be used to recoup prior losses by Phoenix.

23.     Furthermore, in 2003, Phoenix began marketing and selling PAUL policies as "flexible premium" policies that would appeal to people who sought a competitive return for

---

[1] Among the policies at issue here, there are at least two versions of the provisions that address cost of insurance rates, and they differ only slightly. Attached hereto as **Exhibit 2** and **Exhibit 3** are two of the Policies that provide examples of the two cost of insurance provisions. *See* **Exhibit 2**, pp. 10-11; **Exhibit 3**, p. 12. Some of the policy information is redacted for privacy reasons.

their assets, wished to minimize their long-term life insurance expenses, and needed flexibility to adjust their policies to their changing needs. Among other things, in marketing and selling the policies, Phoenix represented that:

(a)     Phoenix's universal life products give policyholders the "opportunity to lower premiums, as well as adjust the amount and timing of premium payments." (Press Release dated April 3, 2006);

(b)     Phoenix's universal life products are "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs." (Press Release dated April 3, 2006);

(c)     Phoenix's universal life products "offer increased choice and policy design flexibility to meet the needs of the high net worth." (Press Release dated June 19, 2003); and

(d)     Phoenix's universal life products are "appropriate for those looking to minimize long term insurance costs while seeking competitive returns." (Press Release dated June 19, 2003).

24.     Phoenix's universal products were also marketed under the trademark, "Phoenix Accumulator UL," which Phoenix describes in its U.S. Patent & Trademark Office registration dated February 25, 2003 as "Underwriting and administration of single life universal insurance policies featuring flexible premiums and adjustable-death-benefits."

25.     Phoenix made the representations described above continuously, in marketing and sales materials distributed through its sales force and on its website, beginning in 2003 and throughout 2010.

26.     Based on the language of the policies, Phoenix's rates, and representations like those above, Lima LS plc, the general partner of Lima Acquisition LP, purchased the ownership interests in the Policies in the secondary market for life insurance and began making premium payments through Plaintiff, who held the Policies as securities intermediary for Lima Acquisition LP. As expressly permitted under the Policies, Plaintiff generally paid only the minimum monthly charges.

## B. Phoenix Initiates Project X To Raise COI Rates

27.     In 2008, Phoenix began suffering serious financial difficulties as a result of the national economic crisis. These losses were reflected in the 2008 annual report of The Phoenix Companies, Inc., which stated:

> The value of our investment portfolio has declined which has resulted in, and may continue to result in, higher realized and/or unrealized losses. For example, in 2008 the value of our ***general account investments decreased by $1.3 billion***, before offsets, due to net unrealized losses on investments. A widening of credit spreads, such as the market has experienced recently, increases the net unrealized loss position of our investment portfolio and may ultimately result in increased realized losses. The value of our investment portfolio can also be affected by illiquidity and by changes in assumptions or inputs we use in estimating fair value. Further, certain types of securities in our investment portfolio, such as ***asset-backed securities supported by residential and commercial mortgages, have been disproportionately affected***. Continued adverse capital market conditions could result in further realized and/or unrealized losses. (Emphasis added.)

28.     By the close of 2008, The Phoenix Companies, Inc. reported a loss of nearly ***$1.5 billion*** in shareholder equity – from $2.279 billion in 2007 to $865 million in 2008.

29.     In the midst of these staggering losses, Phoenix initiated "Project X," which was a highly confidential project to raise COI rates on all PAUL policies, and was to be disclosed only to persons on a "need to know" basis.

30.     Phoenix, however, did not implement the COI rate increases immediately – because, upon information and belief, Phoenix would have had to have told policyholders that their rates would be going up. Such an announcement would have caused many policyholders to lapse their policies instantly and put a fast halt to Phoenix's sales. Thus, instead of announcing its planned rate increases, upon information and belief, beginning in 2009, Phoenix began issuing fraudulent policy illustrations (*i.e.*, policy statements that describe how a policy will perform in the future) that falsely illustrated a policy's future performance based on COI rates that were higher than a policyholder's actual COI rates. Because policyholders determine how much

premium to pay based on these illustrations, Phoenix's fraudulent illustrations had the same effect as raising COI rates, but without disclosing an increase in rates.

### C.  Phoenix Raises COI Rates On The Policies

31.     Approximately two years after initiating Project X, on or after March 8, 2010, Phoenix began sending letters to policyholders notifying them that Phoenix was raising the cost of insurance rates on their policies, including the Policies listed on **Exhibit 1**. These letters advised policyholders that if they did not maintain sufficient "accumulated policy values," their cost of insurance rates would go up. An example of these letters is attached hereto as **Exhibit 4**. In other words, Phoenix told policyholders that if they did not *overfund* their policies with premium payments, thereby maintaining a positive policy value (which would also have the effect of reducing the amount that Phoenix would have to pay upon a mortality event, *i.e.*, the net amount at risk), Phoenix would penalize them by increasing their cost of insurance rates.

32.     Phoenix's letters did not tell policyholders how much the increase would be or what accumulated value would trigger a policy increase, but threatened, "Should your accumulated policy value fall below a certain level, the amount of the increase will vary based on the accumulated amount of your policy value. In general, maintaining higher levels of policy value in relation to the face amount will reduce or even eliminate any increase." Phoenix also did not identify any factors that supported an increase in the cost of insurance rates or explain how it determined that an increase in the rates could be justified given the recent decreases in mortality. But, as discussed above, one of the primary factors relied upon by Phoenix was the funding levels chosen by policyholders.

33.     By basing its COI rate increases on funding levels and increasing the cost of insurance only on those policyholders who exercised their right to maintain lower accumulated policy values, Phoenix has breached the Policies in a number of ways. First, Phoenix breached

the express terms of the Policies, which provide that the cost of insurance rates will be based only on certain enumerated factors that include Phoenix's expectations of future mortality and persistency. "Accumulated value" is not a factor on which the cost of insurance rates can be based. Funding level also is not a factor that permits Phoenix to change cost of insurance rates.

34.     Second, Phoenix breached the express terms of the Policies because the increase in the cost of insurance rates clearly does not apply to an entire class of insureds. Even within the group of people who received a cost of insurance rate increase, Phoenix discriminated by raising the cost of insurance rates only on those who chose to maintain lower accumulated policy values. Phoenix's rate increase also violates applicable state anti-rate-discrimination laws, which prohibit an insurer from discriminating among individuals with the same life expectancy. Here, Phoenix's rates discriminate against people, not based on their life expectancy, but on how they choose to fund their policies.

35.     Third, Phoenix breached the Policies by increasing the cost of insurance rates when life expectancy is now greater. The cost of insurance rates represent the rates that Phoenix charges to cover the risk of paying the death benefit upon a mortality event. These rates should be driven primarily by Phoenix's expectations of future mortality, and those expectations could not possibly justify an increase in the cost of insurance rates.

36.     It is apparent that by increasing the cost of insurance rates based on accumulated values, Phoenix wants to force Plaintiff and other policyholders either to (a) pay exorbitant premiums that Phoenix knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the premiums they have paid, as evidenced by Phoenix's "shock lapse" analyses. Phoenix, in turn, will make a huge profit – either through higher

premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date.

37.　　In short, when policyholders like Plaintiff exercised their right to fund premiums at their discretion and only as needed to cover their monthly charges, Phoenix singled out those policyholders by raising the cost of insurance rates on them. This rate increase renders the concept of "flexible premiums" illusory. Policyholders are forced to fund more premiums into their account than they otherwise would have, or else pay prohibitively high cost of insurance rates. Phoenix has thus deprived Plaintiff and other policyholders of one of the most essential rights of universal life insurance – the right to manage and fund their policies according to their needs and desires.

38.　　Phoenix's scheme also directly contradicts the representations Phoenix made when marketing and selling the Policies. Policyholders purchased their policies based on these representations, as well as the language of the policies and Phoenix's rates. By increasing the rates on policyholders after they had purchased their policies and when expectations of future mortality could not possibly justify such an increase, Phoenix has unequivocally repudiated these representations. The cost of insurance is designed for policyholders to share in the legitimate risks associated with life insurance, not to give the insurance company unilateral power to destroy all the value in its policies simply to guarantee itself future profits. Yet that is exactly what Phoenix is trying to do here.

39.　　Furthermore, by raising future cost of insurance rates on existing policies after inducing policyholders to purchase their policies based on lower rates, even as Phoenix planned to raise those rates in the future, Phoenix has engaged in fraudulent, unfair, and deceptive trade practices.

**D. Although The New York Department of Insurance Ordered Phoenix To Rescind The COI Rate Increases, Phoenix Has Continued To Implement Other Rate Increases**

40.     After implementing its rate increases, many Phoenix policyholders complained about the increases to the New York Department of Insurance, which is the home regulator for Defendant Phoenix Life Insurance Company (which is a parent company of Defendant PHL Variable Insurance Company).

41.     After investigating Phoenix's rate increases and justifications, on September 6, 2011, the New York Department of Insurance determined that Phoenix's rate increases were illegal because Phoenix based the rate increase on a policy's "accumulated value." A copy of the Department's September 6, 2011 letter is attached hereto as **Exhibit 5**. In particular, the Department concluded that "by increasing COI rates in a manner that is inconsistent with the terms of the Accumulator UL II, Phoenix violated Insurance Law § 3201." The Department further found that "Phoenix violated Insurance Law § 3204(a)(1), because it used the funding ratio as a factor for a change in the COI rates even though the Accumulator II does not include the funding ratio as a factor for any change in COI rates." The Department also stated that "it would be unreasonable to expect a policyholder to conclude that the funding ratio of his or her policy is a factor that Phoenix may use in a new formula developed after policy issuance to increase COI rates." Thus, the Department also concluded that "the Accumulator UL violates Insurance Law §§ 3102(c)(1)(A) and (B), which require that insurers write insurance policies in a clear and coherent manner and that whenever practicable, insurers use words with common and everyday meanings to facilitate readability and to aid the insured or policyholder with

understanding the coverage provided." The Department also concluded that Accumulator UL is "inconsistent with Insurance Law § 3201(c)(1) because it is misleading to the policyholder."[2]

42.     The Department also found that Phoenix's advertising materials "are misleading and misrepresent the benefits and advantages of the Polices in violation of Insurance Law §§ 2123(a)(1) and 4226(a)(1) and 11 NYCRR Part 219 (Regulation 34-A)." In particular, the Department found that Phoenix's "advertising materials make numerous statements emphasizing premium payment flexibility, but *do not make any statements to the effect that a person's failure to fund the policy at a certain level may affect expectations with regard to future mortality, persistency, investment earnings, and expenses, thereby resulting in a COI rate increase*." (Emphasis added.)

43.     Upon information and belief, in response to the Department's findings, Phoenix agreed to rescind its rate increases for policies issued in New York only. Phoenix, however, has continued to implement its unlawful rate increases in every other state.

44.     In addition, in 2011, Phoenix implemented a second round of cost of insurance rate increases. This time, Phoenix did not tell policyholders that the rate increase was based on "accumulated policy values." In fact, Phoenix said very little at all about the increase. Again, Phoenix did not say how much the increase would be or provide any factual or contractual basis for the increase, nor did it provide any documentary support for the increase.

45.     Moreover, upon information and belief, these 2011 cost of insurance rate increases were part and parcel of Phoenix's scheme to jack up the cost of insurance rates to induce "shock lapses" of policyholders who exercised their right to maintain low policy values

---

[2] The Department also determined that "the Accumulator UL violates Insurance Law § 4232(b)(2)" because it states that Phoenix can base COI rates, in part, on capital and reserve requirements and tax assumptions, which section 422(b)(2) does not permit.

by paying only enough premiums to cover their monthly policy charges. In other words, Phoenix continued to try to deprive policyholders, including Plaintiff, of one of the essential benefits of their policies in clear violation of the express and implied terms of the policies and applicable law.

46. Moreover, as before, Phoenix did not implement the COI rate increases immediately. Instead, Phoenix again began issuing fraudulent policy illustrations that falsely illustrated a policy's future performance based on COI rates that were higher than a policyholder's actual COI rates. And, again, because policyholders determine how much premium to pay based on these illustrations, Phoenix's fraudulent illustrations had the same effect as raising COI rates, but without disclosing an increase in rates.

**COUNT I**

**(Breach of Contract – Express)**

**Against All Defendants**

47. Plaintiff realleges the allegations contained in paragraphs 1 through 46, inclusive, as if set forth fully herein.

48. The Policies are binding and enforceable contracts.

49. Defendants materially breached the Policies in several respects, including but not limited to the following:

50. Defendants breached the Policies by increasing the cost of insurance rates based on a policy's accumulated value because accumulated value is not one of the permissible and enumerated bases for increasing the cost of insurance rates.

51. Defendants also breached the Policies by increasing the cost of insurance rates based on purported changes in expected funding levels because funding level is not one of the permissible and enumerated bases for increasing the cost of insurance rates.

52. Defendants also breached the Policies by increasing the cost of insurance rates only on certain policyholders and not others because such increases do not apply uniformly to a class of insureds and/or discriminate unfairly within a class of insureds.

53. Defendants also breached the Policies because Defendants' increases in the cost of insurance rates were not based on the permissible factors stated in the Policies, such as changes in Defendants' actual expectations of future mortality and persistency.

54. Defendants also breached the Policies because, upon information and belief, Defendants' increases in the cost of insurance rates were designed to recoup past losses.

55. Plaintiff has performed all of its obligations under the Policies, except to the extent that its obligations have been excused by Defendants' conduct as alleged herein.

56. As a direct and proximate cause of Defendants' material breaches of the Policies, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event exceeds $75,000, exclusive of interest.

**COUNT II**

**(Breach of Contract – Implied Covenant of Good Faith and Fair Dealing)**

**Against Defendant PHL**

57. Plaintiff realleges the allegations contained in paragraphs 1 through 56, inclusive, as if set forth fully herein.

58. The Policies are binding and enforceable contracts.

59.     Each of the Policies issued by Defendant PHL includes an implied covenant that Defendant PHL will act in good faith and deal fairly with Plaintiff.

60.     Defendant PHL materially breached the Policies in several respects, including but not limited to the following:

61.     Defendant PHL breached the implied covenant of good faith and fair dealing by undermining Plaintiff's right to pay premiums as needed to cover its monthly deductions, including the cost of insurance. By increasing the cost of insurance rates on policyholders who exercised their contractual right to pay only enough premiums to cover the policy's monthly charges (including by basing the cost of insurance rates on a policy's accumulated value), Defendant PHL is, in effect, penalizing and deterring policyholders from exercising their contractual rights and is, thus, frustrating policyholders' right to one of the essential benefits of the policies.

62.     Defendant PHL also breached the implied covenant of good faith and fair dealing by using the cost of insurance rates to induce "shock lapses" – that is, making the Policies prohibitively expensive and trying to cause Plaintiff and other policyholders to lapse or surrender their policies so that Defendant PHL can keep the premiums and never have to pay the death benefits.

63.     Defendant PHL also breached the implied covenant of good faith and fair dealing by failing to provide any meaningful disclosures about the cost of insurance rate increases, including Defendant PHL's failure to identify the specific contractual provisions on which it was relying to increase the cost of insurance rates, failing to describe the alleged factual circumstances for raising the cost of insurance rates, and refusing to provide or make available

the documents that Defendant PHL contended supported its alleged contractual and factual bases for raising the cost of insurance rates.

64.    Defendant PHL also breached the implied covenant of good faith and fair dealing because Defendant PHL intended to raise cost of insurance rates, but waited until after inducing people to purchase its policies before later raising the cost of insurance rates, as planned.

65.    Defendant PHL also breached the implied covenant of good faith and fair dealing by using the cost of insurance rates as a device to manage its own profitability at the expense of its policyholders, including Plaintiff, and by imposing excessively high rate increases to accomplish that improper objective.

66.    Plaintiff has performed all of its obligations under the Policies, except to the extent that its obligations have been excused by Defendant PHL's conduct as alleged herein.

67.    As a direct and proximate cause of Defendant PHL's breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event exceeds $75,000, exclusive of interest.

## COUNT III

### (Violations of Connecticut Unfair Trade Practices Act)

### Against Defendant PHL

68.    Plaintiff realleges the allegations contained in paragraphs 1 through 67, inclusive, as if set forth fully herein.

69.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

70. Defendant PHL is a Connecticut corporation with its principal place of business in Connecticut, engaged in "unfair or deceptive acts" as alleged herein, in the conduct of a "trade" or "commerce" as defined in Conn. Gen. Stat. §42-110a.

71. Among other unfair and deceptive acts alleged above, Defendant PHL, as part of its general business practices, regularly (i) made deceptive and misleading statements in connection with the promotion and marketing of its universal life insurance policies; (ii) misrepresented the "benefits, advantages, conditions or terms" of its policies; (iii) intentionally disseminated deceptive and misleading policy illustrations misrepresenting the amount of premium necessary to keep its policies in force; and (iv) made, disseminated, or otherwise placed before the public statements "with respect to the business of insurance" which were untrue, deceptive or misleading. In addition, Defendant PHL made or permitted a distinction or discrimination in favor of individuals between insureds of the same class and expectation of life in the amount or payment of premiums or rates charged.

72. In particular, in addition to false and misleading statements and other conduct described herein, Defendant PHL represented that its universal life policies offer flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that Defendant PHL would not raise the cost of insurance rates other than based on certain factors stated in the Policies, and that Defendant PHL would not raise the cost of insurance rates unless it did so for all insureds in a class. Defendants made those representations in the Policies, on its website, and in marketing materials and press releases continuously between 2003 and through 2011. Defendant PHL also represented to policyholders, including Plaintiff, that its cost of insurance increases were "in accordance with the terms" of their policies when, in fact, that was not the case. Beginning in 2009, Defendant PHL also knowingly and

19

intentionally issued false and misleading policy illustrations that inaccurately reported a policyholder's future cost of insurance charges. Upon information and belief, Defendant PHL issued these false and misleading illustrations to overstate the future costs of the policies in order to induce policyholders to lapse or surrender their policies. These and other statements made by the Defendant PHL were untrue, deceptive, and misleading, and Defendant PHL knew, or by the exercise of reasonable care, should have known that the statements were untrue, deceptive or misleading.

73.     Defendant PHL also engaged in unlawful rate discrimination by basing the payment or amount of premiums or cost of insurance rates and its rate increases on the way a policyholder funds his policy and by issue age and face amounts, as opposed to basing them on an insured's class and expectation of life.

74.     Plaintiff also seeks an injunction (a) prohibiting Defendant PHL from implementing its cost of insurance rate increases and requiring Defendants to rescind the increases, return all excess premiums received, and reinstating any lapsed or surrendered policies; and (b) prohibiting Defendant PHL from basing cost of insurance rates, or any changes to cost of insurance rates, on a policy's accumulated value, the ratio of a policy's accumulated value to its face amount, or on policy funding levels or funding patterns.

75.     Defendant PHL's conduct violates (among other applicable provisions of Connecticut law) the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, and the Connecticut Unfair Insurance Practices Act, including Conn. Gen. Stat. §§ 38a-816(1), 38a-816(2), 38a-816(9), and 38a-446.

76. As a direct and proximate cause of Defendant PHL's unfair and deceptive acts and practices, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event exceeds $75,000, exclusive of interest.

77. Because Defendant PHL acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, Defendant PHL also is liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

78. Plaintiff also is entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Stat. § 42-110g(d).

79. In compliance with Connecticut General Statutes § 42-110g(c), a copy of this Complaint is being mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

## COUNT IV

### (Declaratory Relief)

### Against All Defendants

80. Plaintiff realleges the allegations contained in paragraphs 1 through 79, inclusive, as if set forth fully herein.

81. For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiff and Defendants concerning Plaintiff's rights and Defendants' obligations under the Policies, including but not limited to how Defendants must implement any change in the cost of insurance rates and under what circumstances Defendants may change the cost of insurance rates.

82. Accordingly, Plaintiff seeks a declaration (a) that Defendants cannot base cost of insurance rates, or any changes to cost of insurance rates, on a policy's accumulated value, the

ratio of the accumulated value to its face amount, or on policy funding levels or funding patterns; (b) that Defendants' purported "class" of policies defined by issue age and face amount and/or accumulated value are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendants can raise the cost of insurance rates.

83.     Such a declaration will help prevent or limit any future controversies under the Policies by providing guidance as to when and how Defendants can change the cost of insurance rates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

### On The First Cause Of Action

1.     For damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other and further relief as the Court may deem proper.

### On The Second Cause Of Action

1.     For damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other and further relief as the Court may deem proper.

### On The Third Cause Of Action

1.     For damages in an amount to be determined at trial;

2.    For an award of prejudgment and post-judgment interest;

3.    For the costs of the suit herein incurred, including reasonable attorneys' fees;

4.    For an award of punitive damages;

5.    For an injunction (a) prohibiting Defendant PHL from implementing its cost of insurance rate increases and requiring Defendant PHL to rescind the increases, return all excess premiums received, and reinstating any lapsed or surrendered policies; and (b) prohibiting Defendant PHL from basing cost of insurance rates, or any changes to cost of insurance rates, on a policy's accumulated value, the ratio of a policy's accumulated value to its face amount, or on policy funding levels or funding patterns; and

6.    For such other and further relief as the Court may deem proper.

## On The Fourth Cause Of Action

1.    For a declaration (a) that Defendants cannot base cost of insurance rates, or any changes to cost of insurance rates, on a policy's accumulated value, the ratio of the accumulated value to its face amount, or on policy funding levels or funding patterns; (b) that Defendants' purported "class" of policies defined by issue age and face amount and/or accumulated value are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendants can raise the cost of insurance rates.

2.    For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.    For such other and further relief as the Court may deem proper.

Dated: March 8, 2013
　　　 New York, New York

*Of Counsel:*

Khai LeQuang
Steven K. Yoda
2050 Main Street, Suite 1100
Irvine, California 92614-8255
Tel. +1-949-567-6700
Fax +1-949-567-6710
klequang@orrick.com
syoda@orrick.com

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
　　　　　　 Steven J. Fink

Steven J. Fink
Stephen G. Foresta
Philipp Smaylovsky
51 West 52nd Street
New York, New York 10019-6142
Tel. +1-212-506-5000
Fax +1-212-506-5151
sforesta@orrick.com
psmaylovsky@orrick.com
*Attorneys for Plaintiff*
*U.S. Bank National Association, as securities*
*intermediary for Lima Acquisition LP*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.

Respectfully submitted,

*Of Counsel:*

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
              Steven J. Fink

Khai LeQuang
Steven K. Yoda
2050 Main Street, Suite 1100
Irvine, California 92614-8255
Tel. +1-949-567-6700
Fax +1-949-567-6710
klequang@orrick.com
syoda@orrick.com

Steven J. Fink
Stephen G. Foresta
Philipp Smaylovsky
51 West 52nd Street
New York, New York 10019-6142
Tel. +1-212-506-5000
Fax +1-212-506-5151
sforesta@orrick.com
psmaylovsky@orrick.com
*Attorneys for Plaintiff*
*U.S. Bank National Association, as securities*
*intermediary for Lima Acquisition LP*