UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as securities intermediary <br><br> Plaintiff, <br><br> v. <br><br> PHL VARIABLE INSURANCE COMPANY, <br><br> Defendant. | ECF Case <br><br> No. 13-CIV-1580 <br><br> **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiff U.S. Bank National Association, as securities intermediary ("Plaintiff"), by and through its attorneys, files this First Amended Complaint against Defendant PHL Variable Insurance Company ("Phoenix" or "Defendant"), and alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on Phoenix's unlawful increases of the cost of insurance rates on a targeted group of its in-force Phoenix Accumulator Universal Life ("PAUL") insurance policies.  Phoenix began sending letters notifying policyholders about the cost of insurance rate increases on or after March 8, 2010.  Phoenix's conduct amounts to breaches of contract and other wrongdoing, including unlawful rate discrimination, and unlawful, misleading and unfair practices in connection with the marketing and selling of flexible premium universal life insurance.

2.      Universal life insurance is a form of permanent life insurance also known as "flexible premium" adjustable life insurance.  Unlike whole life insurance, which requires fixed monthly premium payments, universal life insurance allows policyholders to pay as much money

as they want into their policy account (subject to certain limitations), and each month, the account accrues interest as provided under the policy.  Various charges and fees are then deducted from the policy account, including a "cost of insurance charge" that reflects the price that the insurance company charges for the actual insurance – *i.e.*, the cost to bear the mortality risk.  Although there is no fixed monthly premium payment that is due, if the balance in the account is insufficient to cover the policy charges, including the cost of insurance charge, the policy will enter a grace period and lapse unless additional premiums are paid.

3.      Universal life insurance is designed to give policyholders flexibility, both in the payment of premiums and the adjustment of death benefits.  With respect to premium payments, policyholders can pay more into their account if they wish to accumulate tax-deferred interest, or they can pay just enough to cover their monthly policy charges if they wish to invest their funds elsewhere.  Universal life insurance is less expensive than whole life insurance because there is no guaranteed fixed rate of growth on funds in the policy account and no guaranteed fixed death benefit.  The rate of growth and death benefit may vary based on a number of factors, including how the policyholder funds the account, the interest rate under the policy (which is a variable rate), and the policy charges.  In a whole life insurance policy, the death benefit is guaranteed and fixed at the time the policy is issued, and a fixed monthly premium payment is set based on the guaranteed death benefit and a projected fixed rate of growth.

4.      Although universal life insurance permits an insurer to adjust the cost of insurance rates (by an increase or a decrease), Plaintiff's policies only allow Phoenix to change cost of insurance rates based on certain specific factors, the most important of which is a change in Phoenix's expectation of future mortality.  However, it is well-known in the life insurance industry that, since Phoenix issued Plaintiff's policies several years ago, mortality has ***improved***,

not *worsened*, and this has resulted in new life insurance mortality tables that would, if anything, support a *decrease* in cost of insurance rates. Despite this fact, Phoenix has instead attempted to *increase* cost of insurance rates in blatant breach of its obligations under the policies.

5.      Moreover, Defendant has based its cost of insurance rate increases on a policyholder's account value, which is a function of how much premium the policyholder chooses to pay, as opposed to the insured's life expectancy. Not only is a policyholder's account value not a permissible basis for raising cost of insurance rates, Defendant's rate increases are specifically designed to discriminate against policyholders who choose to pay only enough premiums to cover their policy charges and not use the savings (or "cash accumulation") feature of their policies. Defendant's rate increases thus violate policy provisions and applicable law prohibiting discrimination in rates.

6.      Defendant's conduct is also especially egregious given that Phoenix marketed and sold its PAUL policies as insurance "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs." Phoenix described these products as appropriate for insurance buyers who wished to "minimize long term insurance costs while seeking competitive returns." Phoenix also represented that these products would allow policyholders "to lower premiums, as well as adjust the amount and timing of premium payments," and would give them "increased choice and policy design flexibility to meet [their] needs."

7.      Having thereby lured policyholders into purchasing such policies, once policyholders like Plaintiff in fact adjusted "the amount and timing of premium payments" to fund their accounts simply to cover their policy charges, as they were expressly allowed to do, Phoenix improperly raised the cost of insurance rates on these policyholders. To make matters

worse, Phoenix did not even make clear the amount of the increase or how it would be applied, or provide any contractual, factual, or documentary basis for increasing the cost of insurance rates.

8.      In fact, Phoenix raised the cost of insurance rates to induce, in its own words, "shock lapses" by policyholders.  That is, Phoenix raised the cost of insurance rates to make some policies so expensive that policyholders would be shocked into lapsing or surrendering their policies, and Phoenix timed its rate increases to maximize its premium revenue before inducing such "shock lapses."  As a result, if Phoenix's unlawful scheme succeeds, Phoenix will never have to pay hundreds of millions, if not billions, of dollars in death benefits on those policies, after having already collected millions of dollars in premiums on them.

9.      Phoenix's misconduct thus constitutes not only express breaches of Plaintiff's policies, but breaches of the implied covenant of good faith and fair dealing and unlawful, unfair, and deceptive business practices.  Plaintiff therefore seeks compensatory and punitive damages, as well as equitable relief and attorneys' fees.

## THE PARTIES

10.      Plaintiff U.S. Bank National Association is a national banking association with its principal place of business in Ohio, and is the securities intermediary for Lima Acquisition LP.

11.      Upon information and belief, Defendant PHL Variable Insurance Company is a Connecticut corporation with its principal place of business in Hartford, Connecticut, and, according to Phoenix, does business in the State of New York, including within this judicial district. *See U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811 (CM) (JCF) (S.D.N.Y.) (the "Related Action"), Defendant's Memorandum of Points and Authorities in

Support of Motion for Transfer Pursuant to 28 U.S.C. § 1404 [Dkt. No. 61-1, at 8-9] (hereinafter, the "Transfer Motion").

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action involves parties of diverse citizenship, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Phoenix because, according to Phoenix, Phoenix is found in this judicial district and because Phoenix regularly conducts and transacts business in this district.  *See* Transfer Motion at 8-9.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) because Phoenix resides in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.  *See* Transfer Motion at 8-9.

## FACTUAL BACKGROUND

### A.     Plaintiff Acquires The Policies

15.     Plaintiff is the owner and beneficiary of several universal life insurance policies (the "Policies") that were issued by Phoenix.  The Policies are listed on the attached **Exhibit 1**.

16.     As is typical of universal life insurance policies, the Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover certain monthly deductions, described in the Policies.  The monthly deductions consist of various charges (*e.g.*, a sales charge, issue charge, and service charge), including a cost of insurance charge.  Any balance in the policy account that is left after the deductions are taken reflects the "policy value," which accrues interest as provided for under the Policies.  If in any month there are insufficient funds in the account to cover the deductions, the policy will enter a grace period.

If additional premiums are not paid within the grace period, Phoenix will terminate, or lapse, the policy.

17.     The largest and most significant charge under the Policies is the cost of insurance charge.  This charge, also known as the mortality charge, reflects the price that Phoenix charges to cover the risk of paying the amount it would have to pay upon a mortality event (*i.e.*, the "death benefit," which is the net amount at risk).  The cost of insurance charge is determined by multiplying the cost of insurance rate times the net amount at risk.

18.     The cost of insurance rates under a policy initially are based on certain characteristics of the insured, including her or his gender, age, and risk classification (*i.e.*, smoker or non-smoker).  The applicable rate increases every year as the insured ages.

19.     The Policies allow Phoenix to change the applicable cost of insurance rates, but the ability to do so is subject to several strict limitations.  Specifically, one form of the Policies provides:[1]

> No more frequent than once per year and no less frequent than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed.  However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages.  Our right to change rates also is subject to the following terms:
>
> 1.     Any change in rates will be made on a uniform basis for all insureds in the same class.  No change in rates will occur due to any change in the Insured's health or occupation.
>
> 2.     Any change in rates will be determined prospectively.  We will not distribute past gains or recoup prior losses, if any, by changing the rates.
>
> 3.     Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

---

[1] Among the policies at issue here, there are at least two versions of the provisions that address cost of insurance rates, and they differ only slightly.  Attached hereto as **Exhibit 2** and **Exhibit 3** are two of the Policies that provide examples of the two cost of insurance provisions.  *See* **Exhibit 2**, pp. 10-11; **Exhibit 3**, p. 12.  Some of the policy information is redacted for privacy reasons.

4.      Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

**Exhibit 2**, p. 11.

20.      Accordingly, under the clear language of this policy, any change in the cost of insurance rates can only be based on a change in Phoenix's expectations of future investment earnings, mortality, persistency, and expense/administrative costs.  Moreover, any change in the cost of insurance rates must be made on a uniform basis for all insureds in the same class and cannot be used to recoup prior losses by Phoenix.

21.      Furthermore, in 2003, Phoenix began marketing and selling PAUL policies as "flexible premium" policies that would appeal to people who sought a competitive return for their assets, wished to minimize their long-term life insurance expenses, and needed flexibility to adjust their policies to their changing needs.  Among other things, in marketing and selling the policies, Phoenix represented that:

(a)      Phoenix's universal life products give policyholders the "opportunity to lower premiums, as well as adjust the amount and timing of premium payments." (Press Release dated April 3, 2006);

(b)      Phoenix's universal life products are "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business planning needs." (Press Release dated April 3, 2006);

(c)      Phoenix's universal life products "offer increased choice and policy design flexibility to meet the needs of the high net worth." (Press Release dated June 19, 2003); and

(d)      Phoenix's universal life products are "appropriate for those looking to minimize long term insurance costs while seeking competitive returns." (Press Release dated June 19, 2003).

22.      Phoenix's universal products were also marketed under the trademark, "Phoenix Accumulator UL," which Phoenix describes in its U.S. Patent & Trademark Office registration

dated February 25, 2003 as "Underwriting and administration of single life universal insurance policies featuring flexible premiums and adjustable-death-benefits."

23.     Phoenix made the representations described above continuously, in marketing and sales materials distributed through its sales force and on its website, beginning in 2003 and throughout 2010.

24.     Based on the language of the policies, Phoenix's rates, and representations like those above, Lima LS plc, the general partner of Lima Acquisition LP, purchased the ownership interests in the Policies in the secondary market for life insurance and began making premium payments through Plaintiff, who held the Policies as securities intermediary for Lima Acquisition LP.  As expressly permitted under the Policies, Plaintiff generally paid only the minimum monthly charges.

**B.     Phoenix Initiates Project X To Raise COI Rates**

25.     In 2008, Phoenix began suffering serious financial difficulties as a result of the national economic crisis.  These losses were reflected in the 2008 annual report of The Phoenix Companies, Inc., which stated:

> The value of our investment portfolio has declined which has resulted in, and may continue to result in, higher realized and/or unrealized losses.  For example, in 2008 the value of our **general account investments decreased by $1.3 billion**, before offsets, due to net unrealized losses on investments.  A widening of credit spreads, such as the market has experienced recently, increases the net unrealized loss position of our investment portfolio and may ultimately result in increased realized losses.  The value of our investment portfolio can also be affected by illiquidity and by changes in assumptions or inputs we use in estimating fair value.  Further, certain types of securities in our investment portfolio, such as **asset-backed securities supported by residential and commercial mortgages, have been disproportionately affected**.  Continued adverse capital market conditions could result in further realized and/or unrealized losses. (Emphasis added.)

26.     By the close of 2008, The Phoenix Companies, Inc. reported a loss of nearly **$1.5 billion** in shareholder equity – from $2.279 billion in 2007 to $865 million in 2008.

27.     In the midst of these staggering losses, Phoenix initiated "Project X," which was a highly confidential project to raise COI rates on all PAUL policies, and was to be disclosed only to persons on a "need to know" basis.

28.     Phoenix, however, did not implement the COI rate increases immediately – because, upon information and belief, Phoenix would have had to have told policyholders that their rates would be going up.  Such an announcement would have caused many policyholders to lapse their policies instantly and put a fast halt to Phoenix's sales.  Thus, instead of announcing its planned rate increases, upon information and belief, Phoenix began issuing fraudulent policy illustrations (*i.e.*, policy statements that describe how a policy will perform in the future) that falsely illustrated a policy's future performance based on COI rates that were higher than a policyholder's actual COI rates.  Because policyholders determine how much premium to pay based on these illustrations, Phoenix's fraudulent illustrations had the same effect as raising COI rates, but without disclosing an increase in rates.  Upon information and belief, Phoenix began issuing these false illustrations in 2009 and continued to do so at least into 2011.

**C.    Phoenix Raises COI Rates On The Policies**

29.     Approximately two years after initiating Project X, on or after March 8, 2010, Phoenix began sending letters to policyholders notifying them that Phoenix was raising the cost of insurance rates on their policies, including the Policies listed on **Exhibit 1**.  These letters advised policyholders that if they did not maintain sufficient "accumulated policy values," their cost of insurance rates would go up.  An example of these letters is attached hereto as **Exhibit 4**.  In other words, Phoenix told policyholders that if they did not *overfund* their policies with premium payments, thereby maintaining a positive policy value (which would also have the effect of reducing the amount that Phoenix would have to pay upon a mortality event, *i.e.*, the net amount at risk), Phoenix would penalize them by increasing their cost of insurance rates.

30.     Phoenix's letters did not tell policyholders how much the increase would be or what accumulated value would trigger a policy increase, but threatened, "Should your accumulated policy value fall below a certain level, the amount of the increase will vary based on the accumulated amount of your policy value.  In general, maintaining higher levels of policy value in relation to the face amount will reduce or even eliminate any increase."  Phoenix also did not identify any factors that supported an increase in the cost of insurance rates or explain how it determined that an increase in the rates could be justified given the recent decreases in mortality.  But, as discussed above, one of the primary factors relied upon by Phoenix was the funding levels chosen by policyholders.

31.     By basing its COI rate increases on funding levels and increasing the cost of insurance only on those policyholders who exercised their right to maintain lower accumulated policy values, Phoenix has breached the Policies in a number of ways.  First, Phoenix breached the express terms of the Policies, which provide that the cost of insurance rates will be based only on certain enumerated factors that include Phoenix's expectations of future mortality and persistency.  "Accumulated value" is not a factor on which the cost of insurance rates can be based.  Funding level also is not a factor that permits Phoenix to change cost of insurance rates.

32.     Second, Phoenix breached the express terms of the Policies because the increase in the cost of insurance rates clearly does not apply to an entire class of insureds.  Even within the group of people who received a cost of insurance rate increase, Phoenix discriminated by raising the cost of insurance rates only on those who chose to maintain lower accumulated policy values.  Phoenix's rate increase also violates applicable state anti-rate-discrimination laws, which prohibit an insurer from discriminating among individuals with the same life expectancy.  Here,

Phoenix's rates discriminate against people, not based on their life expectancy, but on how they choose to fund their policies.

33.     Third, Phoenix breached the Policies by increasing the cost of insurance rates when life expectancy is now greater.  The cost of insurance rates represent the rates that Phoenix charges to cover the risk of paying the death benefit upon a mortality event.  These rates should be driven primarily by Phoenix's expectations of future mortality, and those expectations could not possibly justify an increase in the cost of insurance rates.

34.     It is apparent that by increasing the cost of insurance rates based on accumulated values, Phoenix wants to force Plaintiff and other policyholders either to (a) pay exorbitant premiums that Phoenix knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the premiums they have paid, as evidenced by Phoenix's "shock lapse" analyses.  Phoenix, in turn, will make a huge profit – either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date.

35.     In short, when policyholders like Plaintiff exercised their right to fund premiums at their discretion and only as needed to cover their monthly charges, Phoenix singled out those policyholders by raising the cost of insurance rates on them.  This rate increase renders the concept of "flexible premiums" illusory.  Policyholders are forced to fund more premiums into their account than they otherwise would have, or else pay prohibitively high cost of insurance rates.  Phoenix has thus deprived Plaintiff and other policyholders of one of the most essential rights of universal life insurance – the right to manage and fund their policies according to their needs and desires.

36.     Phoenix's scheme also directly contradicts the representations Phoenix made when marketing and selling the Policies.  Policyholders purchased their policies based on these representations, as well as the language of the policies and Phoenix's rates.  By increasing the rates on policyholders after they had purchased their policies and when expectations of future mortality could not possibly justify such an increase, Phoenix has unequivocally repudiated these representations.  The cost of insurance is designed for policyholders to share in the legitimate risks associated with life insurance, not to give the insurance company unilateral power to destroy all the value in its policies simply to guarantee itself future profits.  Yet that is exactly what Phoenix is trying to do here.

37.     Furthermore, by raising future cost of insurance rates on existing policies after inducing policyholders to purchase their policies based on lower rates, even as Phoenix planned to raise those rates in the future, Phoenix has engaged in fraudulent, unfair, and deceptive trade practices.

**D.     Although The New York Department of Insurance Ordered Phoenix To Rescind The COI Rate Increases, Phoenix Has Continued To Implement Other Rate Increases**

38.     After implementing its rate increases, many Phoenix policyholders complained about the increases to the New York Department of Insurance, which is the home regulator for Phoenix's parent company, Phoenix Life Insurance Company.

39.     After investigating Phoenix's rate increases and justifications, on September 6, 2011, the New York Department of Insurance determined that Phoenix's rate increases were illegal because Phoenix based the rate increase on a policy's "accumulated value."  A copy of the Department's September 6, 2011 letter is attached hereto as **Exhibit 5**.  In particular, the Department concluded that "by increasing COI rates in a manner that is inconsistent with the terms of the Accumulator UL II, Phoenix violated Insurance Law § 3201."  The Department

further found that "Phoenix violated Insurance Law § 3204(a)(1), because it used the funding ratio as a factor for a change in the COI rates even though the Accumulator II does not include the funding ratio as a factor for any change in COI rates." The Department also stated that "it would be unreasonable to expect a policyholder to conclude that the funding ratio of his or her policy is a factor that Phoenix may use in a new formula developed after policy issuance to increase COI rates." Thus, the Department also concluded that "the Accumulator UL violates Insurance Law §§ 3102(c)(1)(A) and (B), which require that insurers write insurance policies in a clear and coherent manner and that whenever practicable, insurers use words with common and everyday meanings to facilitate readability and to aid the insured or policyholder with understanding the coverage provided." The Department also concluded that Accumulator UL is "inconsistent with Insurance Law § 3201(c)(1) because it is misleading to the policyholder."[2]

40.    The Department also found that Phoenix's advertising materials "are misleading and misrepresent the benefits and advantages of the Polices in violation of Insurance Law §§ 2123(a)(1) and 4226(a)(1) and 11 NYCRR Part 219 (Regulation 34-A)." In particular, the Department found that Phoenix's "advertising materials make numerous statements emphasizing premium payment flexibility, but *do not make any statements to the effect that a person's failure to fund the policy at a certain level may affect expectations with regard to future mortality, persistency, investment earnings, and expenses, thereby resulting in a COI rate increase*." (Emphasis added.)

---

[2] The Department also determined that "the Accumulator UL violates Insurance Law § 4232(b)(2)" because it states that Phoenix can base COI rates, in part, on capital and reserve requirements and tax assumptions, which section 422(b)(2) does not permit.

41.     Upon information and belief, in response to the Department's findings, Phoenix agreed to rescind its rate increases for policies issued in New York only.  Phoenix, however, has continued to implement its unlawful rate increases in every other state.

## COUNT I

### (Breach of Contract – Express)

42.     Plaintiff realleges the allegations contained in paragraphs 1 through 41, inclusive, as if set forth fully herein.

43.     The Policies are binding and enforceable contracts.

44.     Defendant materially breached the Policies in several respects, including but not limited to the following:

45.     Defendant breached the Policies by increasing the cost of insurance rates based on a policy's accumulated value because accumulated value is not one of the permissible and enumerated bases for increasing the cost of insurance rates.

46.     Defendant also breached the Policies by increasing the cost of insurance rates based on purported changes in expected funding levels because funding level is not one of the permissible and enumerated bases for increasing the cost of insurance rates.

47.     Defendant also breached the Policies by increasing the cost of insurance rates only on certain policyholders and not others because such increases do not apply uniformly to a class of insureds and/or discriminate unfairly within a class of insureds.

48.     Defendant also breached the Policies because Defendant's increases in the cost of insurance rates were not based on the permissible factors stated in the Policies, such as changes in Defendant's actual expectations of future mortality and persistency.

49.     Defendant also breached the Policies because, upon information and belief, Defendant's increases in the cost of insurance rates were designed to recoup past losses.

50.     Plaintiff has performed all of its obligations under the Policies, except to the extent that its obligations have been excused by Defendant's conduct as alleged herein.

51.     As a direct and proximate cause of Defendant's material breaches of the Policies, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event exceeds $75,000, exclusive of interest.

## COUNT II

### (Breach of Contract – Implied Covenant of Good Faith and Fair Dealing)

52.     Plaintiff realleges the allegations contained in paragraphs 1 through 51, inclusive, as if set forth fully herein.

53.     The Policies are binding and enforceable contracts.

54.     Each of the Policies issued by Defendant includes an implied covenant that Defendant will act in good faith and deal fairly with Plaintiff.

55.     Defendant materially breached the Policies in several respects, including but not limited to the following:

56.     Defendant breached the implied covenant of good faith and fair dealing by undermining Plaintiff's right to pay premiums as needed to cover its monthly deductions, including the cost of insurance.  By increasing the cost of insurance rates on policyholders who exercised their contractual right to pay only enough premiums to cover the policy's monthly charges (including by basing the cost of insurance rates on a policy's accumulated value), Defendant is, in effect, penalizing and deterring policyholders from exercising their contractual rights and is, thus, frustrating policyholders' right to one of the essential benefits of the policies.

57.     Defendant also breached the implied covenant of good faith and fair dealing by using the cost of insurance rates to induce "shock lapses" – that is, making the Policies prohibitively expensive and trying to cause Plaintiff and other policyholders to lapse or surrender their policies so that Defendant can keep the premiums and never have to pay the death benefits.

58.     Defendant also breached the implied covenant of good faith and fair dealing by failing to provide any meaningful disclosures about the cost of insurance rate increases, including Defendant's failure to identify the specific contractual provisions on which it was relying to increase the cost of insurance rates, failing to describe the alleged factual circumstances for raising the cost of insurance rates, and refusing to provide or make available the documents that Defendant contended supported its alleged contractual and factual bases for raising the cost of insurance rates.

59.     Defendant also breached the implied covenant of good faith and fair dealing because Defendant intended to raise cost of insurance rates, but waited until after inducing people to purchase its policies before later raising the cost of insurance rates, as planned.

60.     Defendant also breached the implied covenant of good faith and fair dealing by using the cost of insurance rates as a device to manage its own profitability at the expense of its policyholders, including Plaintiff, and by imposing excessively high rate increases to accomplish that improper objective.

61.     Plaintiff has performed all of its obligations under the Policies, except to the extent that its obligations have been excused by Defendant's conduct as alleged herein.

62.     As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event exceeds $75,000, exclusive of interest.

## COUNT III

### (Violations of Connecticut Unfair Trade Practices Act)

63.     Plaintiff realleges the allegations contained in paragraphs 1 through 62, inclusive, as if set forth fully herein.

64.     The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

65.     Defendant is a Connecticut corporation with its principal place of business in Connecticut, engaged in "unfair or deceptive acts" as alleged herein, in the conduct of a "trade" or "commerce" as defined in Conn. Gen. Stat. §42-110a.

66.     Among other unfair and deceptive acts alleged above, Defendant, as part of its general business practices, regularly (i) made deceptive and misleading statements in connection with the promotion and marketing of its universal life insurance policies; (ii) misrepresented the "benefits, advantages, conditions or terms" of its policies; (iii) intentionally disseminated deceptive and misleading policy illustrations misrepresenting the amount of premium necessary to keep its policies in force; and (iv) made, disseminated, or otherwise placed before the public statements "with respect to the business of insurance" which were untrue, deceptive or misleading.  In addition, Defendant made or permitted a distinction or discrimination in favor of individuals between insureds of the same class and expectation of life in the amount or payment of premiums or rates charged.

67.     In particular, in addition to false and misleading statements and other conduct described herein, Defendant represented that its universal life policies offer flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that Defendant would not raise the cost of insurance rates other than based on certain factors

stated in the Policies, and that Defendant would not raise the cost of insurance rates unless it did so for all insureds in a class. Defendant made those representations in the Policies, on its website, and in marketing materials and press releases continuously between 2003 and through 2011. Beginning in 2009, Defendant also knowingly and intentionally issued false and misleading policy illustrations that inaccurately reported a policyholder's future cost of insurance charges. Upon information and belief, Defendant issued these false and misleading illustrations to overstate the future costs of the policies in order to induce policyholders to lapse or surrender their policies. These and other statements made by the Defendant were untrue, deceptive, and misleading, and Defendant knew, or by the exercise of reasonable care, should have known that the statements were untrue, deceptive or misleading.

68.     Defendant also engaged in unlawful rate discrimination by basing the payment or amount of premiums or cost of insurance rates and its rate increases on the way a policyholder funds his policy and by issue age and face amounts, as opposed to basing them on an insured's class and expectation of life.

69.     Defendant's conduct violates (among other applicable provisions of Connecticut law) the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, and the Connecticut Unfair Insurance Practices Act, including Conn. Gen. Stat. §§ 38a-816(1), 38a-816(2), 38a-816(9), and 38a-446.

70.     As a direct and proximate cause of Defendant's unfair and deceptive acts and practices, Plaintiff has been damaged as alleged herein in an amount to be proven at trial, but in any event exceeds $75,000, exclusive of interest.

71.     Because Defendant acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, Defendant also is liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

72.     Plaintiff also is entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Stat. § 42-110g(d).

73.     In compliance with Connecticut General Statutes § 42-110g(c), a copy of this First Amended Complaint is being mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

## COUNT IV

### (Declaratory Relief)

74.     Plaintiff realleges the allegations contained in paragraphs 1 through 74, inclusive, as if set forth fully herein.

75.     For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiff and Defendant concerning Plaintiff's rights and Defendant's obligations under the Policies, including but not limited to how Defendant must implement any change in the cost of insurance rates and under what circumstances Defendant may change the cost of insurance rates.

76.     Accordingly, Plaintiff seeks a declaration (a) that Defendant cannot base cost of insurance rates, or any changes to cost of insurance rates, on a policy's accumulated value, the ratio of the accumulated value to its face amount, or on policy funding levels or funding patterns; (b) that Defendant's purported "class" of policies defined by issue age and face amount and/or accumulated value are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates.

77.     Such a declaration will help prevent or limit any future controversies under the Policies by providing guidance as to when and how Defendant can change the cost of insurance rates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

### On The First Cause Of Action

1.      For damages in an amount to be determined at trial, including but not limited to all overcharges or excessive charges;

2.      For an award of pre-judgment and post-judgment interest;

3.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.      For such other and further relief as the Court may deem proper.

### On The Second Cause Of Action

1.      For damages in an amount to be determined at trial, including but not limited to all overcharges or excessive charges;

2.      For an award of pre-judgment and post-judgment interest;

3.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.      For such other and further relief as the Court may deem proper.

### On The Third Cause Of Action

1.      For damages in an amount to be determined at trial, including but not limited to all overcharges or excessive charges;

2.      For an award of prejudgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees;

4.     For an award of punitive damages;

5.     For an injunction (a) prohibiting Defendant from implementing its cost of insurance rate increases and requiring Defendant to rescind the increases, return all excess premiums received, and reinstating any lapsed or surrendered policies; and (b) prohibiting Defendant from basing cost of insurance rates, or any changes to cost of insurance rates, on a policy's accumulated value, the ratio of a policy's accumulated value to its face amount, or on policy funding levels or funding patterns; and

6.     For such other and further relief as the Court may deem proper.

## On The Fourth Cause Of Action

1.     For a declaration (a) that Defendant cannot base cost of insurance rates, or any changes to cost of insurance rates, on a policy's accumulated value, the ratio of the accumulated value to its face amount, or on policy funding levels or funding patterns; (b) that Defendant's purported "class" of policies defined by issue age and face amount and/or accumulated value are improper classes; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates.

2.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.     For such other and further relief as the Court may deem proper.

Dated: May 14, 2013
New York, New York

Respectfully submitted,

GREGORY P. JOSEPH LAW OFFICES LLC

By: _____
          Gregory P. Joseph (GJ-1210)
Peter R. Jerdee (PJ-1240)
Rachel M. Cherington (RC-3673)
Courtney A. Solomon (CS-1289)
485 Lexington Avenue, 30th Floor
New York, New York  10017
Tel. +1-212-407-1200
Fax +1-212-407-1299
gjoseph@josephnyc.com
pjerdee@josephnyc.com
rcherington@josephnyc.com
csolomon@josephnyc.com

ORRICK, HERRINGTON & SUTCLIFFE LLP
Stephen G. Foresta
Philipp Smaylovsky
51 West 52nd Street
New York, New York 10019-6142
Tel. +1-212-506-5000
Fax +1-212-506-5151
sforesta@orrick.com
psmaylovsky@orrick.com

Khai LeQuang
Steven K. Yoda
2050 Main Street, Suite 1100
Irvine, California 92614-8255
Tel. +1-949-567-6700
Fax +1-949-567-6710
klequang@orrick.com
syoda@orrick.com

*Attorneys for Plaintiff*
*U.S. Bank National Association, as securities*
*intermediary for Lima Acquisition LP*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.

Respectfully submitted,

GREGORY P. JOSEPH LAW OFFICES LLC

By: _____
        Gregory P. Joseph (GJ-1210)
Peter R. Jerdee (PJ-1240)
Rachel M. Cherington (RC-3673)
Courtney A. Solomon (CS-1289)
485 Lexington Avenue, 30th Floor
New York, New York  10017
Tel. +1-212-407-1200
Fax +1-212-407-1299
gjoseph@josephnyc.com
pjerdee@josephnyc.com
rcherington@josephnyc.com
csolomon@josephnyc.com

ORRICK, HERRINGTON & SUTCLIFFE LLP
Stephen G. Foresta
Philipp Smaylovsky
51 West 52nd Street
New York, New York 10019-6142
Tel. +1-212-506-5000
Fax +1-212-506-5151
sforesta@orrick.com
psmaylovsky@orrick.com

Khai LeQuang
Steven K. Yoda
2050 Main Street, Suite 1100
Irvine, California 92614-8255
Tel. +1-949-567-6700
Fax +1-949-567-6710
klequang@orrick.com
syoda@orrick.com


*Attorneys for Plaintiff U.S. Bank National
Association, as securities intermediary for Lima
Acquisition LP*

# Exhibit 1

## Exhibit 1

| Policy No. | State of Issuance |
|------------|-------------------|
| 97515667  | CA                |
| 97516379  | CA                |
| 97516394  | CA                |
| 97516389  | CA                |
| 97513963  | CA                |
| 97513959  | CA                |
| 97516376  | CA                |
| 97515745  | CA                |
| 97515743  | CA                |
| 97516375  | GA                |
| 97518647  | MO                |
| 97519065  | MO                |
| 97519064  | MO                |
| 97514311  | RI                |
| 97535603  | RI                |
| 97519675  | WI                |
| 97519674  | WI                |
| 97519664  | WI                |
| 97518606  | WI                |
| 97518600  | WI                |
| 97519155  | WI                |

# Exhibit 2

# PHL Variable Insurance Company

| | |
|---|---|
| **Insured** | ▆▆▆▆▆▆▆▆▆ |
| **Age & Sex** | ▆▆▆▆▆▆ |
| **Policy Number** | 97516379 |
| **Face Amount** | $10,000,000.00 |
| **Policy Date** | JANUARY 25, 2006 |

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. For service or information on this policy, contract the agent who sold the policy, any of Our agency offices, Our Home Office or Our Customer Service Center.

YOU HAVE A RIGHT TO RETURN THIS POLICY. If for any reason You are not satisfied with this policy, You may return it at any time within 30 days after You receive it to either the agent through whom it was purchased or to Us at Our Main Administrative Office at the following address:

> PHL Variable Insurance Company
> Variable and Universal Life Administration
> P.O. Box 8027
> Boston, MA 02266-8027
> Telephone (800) 541-0171

If returned, the policy will be considered void from the beginning and any premium paid will be refunded to You less any partial withdrawals or any loans taken under the policy.

Signed for PHL Variable Insurance Company at its Home Office, One American Row, Hartford, Connecticut 06115.

Sincerely yours,

PHL Variable Insurance Company

*John M. Beers*

Secretary

*Dona D. Young*

Chairman, President
and Chief Executive Officer

**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
**Death benefit payable if Insured dies while the Policy is In Force**
**Not Eligible for Annual Dividends**

# SCHEDULE PAGE

The specifications shown below are those in effect initially. They may later be changed for reasons as stated in this policy. Coverage may end if premiums paid are not enough to continue coverage.

## BASIC INFORMATION

| | |
|---|---|
| **POLICY NUMBER:** | 97516379 |
| **POLICY DATE:** | JANUARY 25, 2006 |
| **FACE AMOUNT:** | $10,000,000.00 |
| **DEATH BENEFIT OPTION:** | A |
| **OWNER:** | OWNER AS STATED ON THE APPLICATION UNLESS LATER CHANGED. |
| **BENEFICIARY:** | AS STATED ON THE APPLICATION UNLESS LATER CHANGED. |

### INSURED

| INSURED | ISSUE AGE & SEX | RISK CLASSIFICATION |
|---|---|---|
| ███████ | ███████ | PREFERRED |

## PREMIUMS

**ISSUE PREMIUM:**      $67,500.00

**SUBSEQUENT PLANNED ANNUAL PREMIUM:**      $405,000.00

**TOTAL PREMIUM LIMIT:**      GREATER OF   $6,224,787.73   AND RESULT OF   $874,085.37 MULTIPLIED BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER JANUARY 25, 2006

The limit may decrease when monthly charges for any rider or any other monthly charges cease, and may be exceeded if additional premium is needed to prevent policy lapse.

**PREMIUM DUE DATES:**      The amount and time of premium payments following the Policy Date are flexible. Subsequent planned premiums are payable on the TWENTY-FIFTH day of each   JANUARY   thereafter until the Death of the Insured, but not beyond JANUARY 25, 2030

**POLICY VALUE BENCHMARK AMOUNT:**      $9,000,000.00      (See Part 5)

# SCHEDULE PAGE
## CONTINUED

POLICY NUMBER:     97516379

### POLICY CHARGES

SALES CHARGE:     10% of the first $405,000.00 of premium paid in the first policy year. 5% of any premium paid in excess of $405,000.00 in the first policy year.
5% of all premiums paid in policy years 2+.

MONTHLY DEDUCTION:     See Part 5, "Monthly Deduction". Includes cost of insurance, any rider charges, any flat extra mortality charges, and monthly service and expense charges.

MONTHLY SERVICE CHARGE:     $3.50 Guaranteed not to exceed $7.00.

MONTHLY EXPENSE CHARGE:     $50.00 deductible monthly during the first Policy Year.

PARTIAL WITHDRAWAL FEE FOR EACH WITHDRAWAL:     $25.00 (in addition to a partial Surrender Charge).

SURRENDER CHARGE:     See table on next page.

We will not charge any Policy charges after the Policy Anniversary which follows the Insured's 100th Birthday.

### OTHER RATES

GUARANTEED MINIMUM INTEREST RATE:  4%.

### LIMITATIONS

MINIMUM LOAN AMOUNT:     $100

PARTIAL WITHDRAWALS:     A Partial Withdrawal will not be permitted in an amount

- less than $500.00;

- which would reduce the Surrender Value to $0.00; or

- which would reduce the face amount below $250,000.

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:     97516379

## TABLE OF SURRENDER CHARGES

For an explanation of this table, see section entitled "Surrender Value" in Part 5.   The charges shown in this table are stated as of the beginning of the Policy Year indicated. The charge will be level for the first 10 Policy Years and will be prorated on an annual basis beginning in Policy Year 11, unless limited by legal maximums.   In all Policy Years after the 20th policy year, the Surrender Charge is zero.

| POLICY YEAR | CHARGE PER $1,000 OF FACE AMOUNT |
|:---:|:---:|
| 1 | 57.9150 |
| 2 | 55.3002 |
| 3 | 52.7316 |
| 4 | 50.2036 |
| 5 | 47.7153 |
| 6 | 45.2739 |
| 7 | 42.8917 |
| 8 | 40.5859 |
| 9 | 38.3743 |
| 10 | 36.2619 |
| 11 | 34.2499 |
| 12 | 32.3283 |
| 13 | 30.4868 |
| 14 | 22.4250 |
| 15 | 10.7250 |
| 16 | 0.0000 |
| 17 | 0.0000 |
| 18 | 0.0000 |
| 19 | 0.0000 |
| 20 | 0.0000 |
| 20+ | 0.0000 |

U606

U606ZZS3

# SCHEDULE PAGES (CONTINUED)

POLICY NUMBER:    97516379

### TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1000 OF NET AMOUNT AT RISK
### BASED ON 1980 CSO MORTALITY TABLE

| POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE |
|---|---|---|---|---|---|
| 01 | 3.50330 | 10 | 9.61500 | 19 | 23.27580 |
| 02 | 3.92580 | 11 | 10.71500 | 20 | 26.44330 |
| 03 | 4.37750 | 12 | 11.89250 | 21 | 31.31170 |
| 04 | 4.87080 | 13 | 13.13420 | 22 | 39.58080 |
| 05 | 5.42670 | 14 | 14.45920 | 23 | 54.65420 |
| 06 | 6.06330 | 15 | 15.86580 | 24 | 83.33330 |
| 07 | 6.79920 | 16 | 17.38170 | | |
| 08 | 7.64670 | 17 | 19.05000 | | |
| 09 | 8.58580 | 18 | 20.95000 | | |

Basis of Calculations: 1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table for each insured's sex and risk class, age nearest birthday, and 4% effective annual interest rate.

Monthly Factor used in determining Cost of Insurance: 1.0032737 (SEE PART 5)

U606

# SCHEDULE PAGE

## (CONTINUED)

POLICY NUMBER:     97516379

## TABLE OF FACE AMOUNTS OF INSURANCE

ISSUE DATE                                          FACE AMOUNT
JANUARY 25, 2006                                    $10,000,000.00

## RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE OF ISSUE | AMOUNT | RIDER TERMINATION DATE | MONTHLY CHARGE |
|---|---|---|---|---|
| UR11    LIVING BENEFIT RIDER | 01/25/2006 | | | NONE |
| UR69 - AGE 100+ | 01/25/2006 | NOT APPLICABLE | NONE | $0.00 |
| UR77 - EXCHANGE OF INSURED OPTION | 01/25/2006 - EXCHANGE OPTION RIDER | $0.00 | 01/25/2030 | $0 |
| UR73 - LIFEPLAN OPTIONS RIDER | 01/25/2006 | NOT APPLICABLE | NONE | $0.00 |

# BRIEF SUMMARY OF MAIN PROVISIONS

This is only a summary to help You understand the basics of Your policy. The policy provisions spell out the full details of the rights and obligations of the parties to this policy. The policy provisions and not this brief summary are binding on Us. We will pay the benefits of this policy as set forth on the policy Schedule Pages.

There are two Death Benefit Options to choose from, as described in Part 7. Option A is the Face Amount. Option B is the Face Amount plus Policy Value. Under either Option, the Death Benefit must be at least the Minimum Death Benefit as described in Part 7.

The premiums You pay are added to the Policy Value after We deduct any applicable premium expense charges. We make a monthly deduction from the Policy Value to pay the cost of insurance, the cost of any additional benefit riders and certain monthly charges. We determine cost of insurance rates from time to time, with the guarantee that they will never be higher than the maximum provided on the Schedule Pages. The Policy Value is credited with interest at a current rate which We set from time to time but which will not be less per year than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

The Subsequent Planned Premium shown on the Schedule Pages is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. However, You may generally pay premiums when and in the amount You choose provided sufficient premium is paid to maintain the policy In Force. The amount and timing of premium payments will affect the accumulation of Policy Value.

This policy gives You a number of other options. Under stated conditions, You may change the Death Benefit Option, withdraw part of the Surrender Value or surrender the policy for its full Surrender Value. The Surrender Value is based on the Policy Value, minus any applicable Surrender Charges, unpaid issue charges, loans and loan interest.

We pay the insurance proceeds, as described in Part 3, to the beneficiary when We receive due proof that the Insured's death has occurred while this policy is In Force.

We pay the Surrender Value, as described in Part 5, to You if the Insured is living on the surrender date and this policy is then In Force.

You may change the premiums and Death Benefit Option, subject to Our approval. Certain changes may require evidence of insurability.

See the policy provisions for details.

**READ YOUR POLICY CAREFULLY. IT IS A CONTRACT BETWEEN YOU AND US.**

U606

# TABLE OF CONTENTS

SCHEDULE PAGE

BRIEF SUMMARY OF MAIN PROVISIONS

PART1: DEFINITIONS.................................. 1

PART2: GENERAL PROVISIONS.................... 2
  Effective Date of Insurance.................... 2
  The Policy and Application.................... 2
  Not Eligible for Annual Dividends........... 2
  Revised Schedule Pages...................... 2
  Age................................................3
  Misstatement of Age or Sex................. 3
  Contestability................................... 3
  Insurability Requirements After Issue.... 3
  Suicide Exclusion.............................. 4
  Termination..................................... 4
  Minimum Policy Values...................... 4

PART 3: OWNER, COLLATERAL
ASSIGNMENT, BENEFICIARY.................... 4
  Owner............................................ 4
  Rights of Owner................................ 4
  Collateral Assignment........................ 5
  Beneficiary...................................... 5
  How to Change the Beneficiary............. 6

PART 4: PREMIUMS................................ 6
  Payments........................................ 6
  Total Premium Limit........................... 6
  Grace Period and Lapse...................... 7
  Reinstatement.................................. 7

PART 5: POLICY VALUES........................ 8
  Basics of Calculations........................ 8
  Policy Value.................................... 8
  Interest Rate................................... 9
  Benchmark Interest Bonus.................. 9
  Monthly Deduction.......................... 10
  Cost of Insurance............................ 10
  Cost of Insurance Rates.................... 10
  Surrender Value.............................. 11
  Partial Withdrawals......................... 11

PART 6: POLICY LOANS.......................... 12
  When Available................................ 12
  Amount Available............................. 12
  Loan Interest.................................. 12
  Debt............................................. 13
  Repayment..................................... 13

PART 7: INSURANCE COVERAGE
PROVISIONS....................................... 13
  Death Proceeds............................... 13
  Interest on Insurance Proceeds........... 14
  Death Benefit.................................. 14
  Minimum Death Benefit...................... 14
  Death Benefit Following Insured's
  Age 100........................................ 14
  Change in Death Benefit Option........... 15
  Request for a Decrease in Face
  Amount......................................... 15

PART 8: MISCELLANEOUS
PROVISIONS....................................... 15
  Annual Report................................. 16
  Projection of Benefits and Values........ 16
  Notices by Us................................. 16
  Deferment of Certain Payments........... 16
  Claims of Creditors.......................... 16
  Corrections.................................... 16

PART 9: PAYMENT OPTIONS..................... 16
  Who May Elect Payments Options........ 16
  How to Elect a Payment Option........... 17
  What Payment Options Are Available 17
  Other Payment Options...................... 19
  Additional Interest........................... 19

PART 10: TABLE OF PAYMENT OPTION
AMOUNTS.......................................... 19
  Adjusted Age.................................. 19
  Tables for Options 3, 4 and 5............. 21
  Table for Option 7........................... 22

U606

# PART 1: DEFINITIONS

**Assigns**  
Any persons to whom You assign an interest in this policy if We have notice of the assignment in accordance with the provisions stated in Part 3.

**Death Benefit Option**  
The type of Death Benefit in effect as described in Part 7.

**Due Proof of Death**  
A certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to Us.

**In Force**  
The policy has not terminated or otherwise lapsed in accordance with the Grace Period and Lapse Provision in Part 4.

**In Writing (Written Notice) (Written Request)**  
Is a written form signed by You, satisfactory to Us and received at Our Home Office or Our Main Administrative Office.

**Monthly Calculation Day**  
The first Monthly Calculation Day is the same day as the Policy Date. Subsequent Monthly Calculation Days are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day.

**Subsequent Planned Premium**  
The premium shown on the Schedule Page, which is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy.

**Policy Anniversary**  
The anniversary of the Policy Date.

**Policy Date**  
The Policy Date shown on the Schedule Pages from which Policy Years and Policy Anniversaries are measured.

**Policy Debt**  
Unpaid policy loans with accrued interest.

**Policy Month**  
The period from one Monthly Calculation Day up to but not including the next Monthly Calculation Day.

**Policy Value**  
The Policy Value as defined in Part 5.

**Policy Year**  
The first Policy Year is the one-year period from the Policy Date to, but not including, the first Policy Anniversary. Each succeeding Policy Year is the one-year period from the Policy Anniversary up to but not including the next Policy Anniversary.

**Surrender Value**  
The Surrender Value as defined in Part 5. The Surrender Value is the Policy Value on the date of surrender less any applicable surrender charge, unpaid issue charge, and less any Policy Debt.

**We (Our, Us)**  
PHL Variable Insurance Company.

**You (Your)**  
The owner of this policy at the time an owner's right is exercised.

# PART 2: GENERAL PROVISIONS

**Effective Date of Insurance**

This policy will be In Force from the Policy Date until terminated in accordance with its terms, provided the first Issue Premium shown on the Schedule Pages is paid on or before delivery of this policy while the Insured is alive.

**The Policy and Application**

This policy, including the Schedule Pages (and any supplements or changes thereto), any riders or endorsements to it, and the application for it (and any supplemental applications) constitute the entire contract between You and Us.

This policy is made in consideration of the application and the payment of premiums as provided in this policy. We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, in the absence of fraud, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:

1. it is contained in the application or in a supplemental application; and

2. a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, including modifying the policy, waiving any of its conditions, or making an agreement for the Company, to be in effect, must be In Writing and signed by one of Our executive officers and countersigned by Our registrar or one of Our executive officers. This policy is issued by Us at Our Main Administrative Office in Hartford, Connecticut. Any benefits payable under this policy are payable at Our Main Administrative Office.

**Not eligible for Annual Dividends**

This policy is non-participating and therefore is not eligible for annual dividends. This means that You are not entitled to participate in company profits.

**Revised Schedule Pages**

The Schedule Pages issued with the policy show the initial policy data in effect for this policy on the Policy Date. Some of this policy data may change by an action You request or take or by a change You make. Any of these changes will be reflected in Revised Schedule Pages which supplement or restate the Schedule Pages and show the effective date of the change. We will send You such Revised Schedule Pages along with a copy of any supplemental application, and they will become part of this policy as of their effective date.

| | |
|---|---|
| **Age** | Issue Age means the Insured's age on the Policy Date as of the Insured's nearest birthday. The attained age of the Insured on any Policy Anniversary and for the entire Policy Year then starting is the Issue Age plus the number of Policy Years since the Policy Date. |
| **Misstatement of Age or Sex** | If the age or sex of the Insured is misstated, the Policy Value and any Death Benefits payable shall be adjusted on the basis of the difference between the monthly deductions made and the monthly deductions which should have been made, accumulated at the interest rates that were credited to the Policy Value. |
| | In the event of death, the recalculation, in and of itself, will not result in termination of the policy prior to the date of death. We will not pay less on the date of death on the policy after recalculation than the Surrender Value determined based upon the misstated age. |
| **Contestability** | We cannot contest the validity of the original face amount of this policy after it has been in effect during the Insured's lifetime for two years from the Policy Date (or two years from any reinstatement). |
| | While insurance is contestable, We may rescind the insurance or deny a claim on the basis of: |

1. a misstatement in the application or supplemental application for this policy or any face amount increase; or

2. a misstatement in the reinstatement application if there has been a reinstatement of this policy.

If We contest the validity of all or a portion of the face amount provided under this policy, the amount We pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by Us for the contested face amount or the sum of any monthly deductions made under this policy for the contested face amount.

**Insurability Requirements After Issue**

To make some changes or elections under this policy after it is issued, the Insured must meet Our insurability requirements (medical and/or financial) as follows:

1. evidence of the Insured's insurability must be given that is satisfactory to Us; and

2. under Our underwriting standards, the Insured must be in a Risk Classification that is the same as, or better than, the Risk Classification for this policy at issue.

**Suicide Exclusion**

If the Insured, whether sane of insane, dies by suicide within two years from the Policy Date, (or within two years from any reinstatement of the policy) and while the policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy less any debt owed Us and less any partial withdrawals.

**Termination**

If not previously terminated, this policy will terminate automatically on the earliest of:

1.  the date the Insured dies; or

2.  the date the grace period expires without the payment of sufficient premium in accordance with the Grace Period and Lapse Provision in Part 4.

**Minimum Policy Value**

All of the values under this policy are equal to or more than the minimum required on the Policy Date by the state in which this policy was delivered. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered.

## PART 3: OWNER, COLLATERAL ASSIGNMENT, BENEFICIARY

**Owner**

The Insured is the owner of this policy, unless otherwise provided in the application or be later transfer of ownership.

**Rights of Owner**

While the Insured is living, You may, as the owner, exercise all rights provided by this policy or allowed by Us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. By Written Notice You may:

1.  Transfer ownership to a new owner.

2.  Name or change a contingent owner to succeed to the rights of the owner at the owner's death. If there is no contingent owner at the owner's death, ownership will pass to the Insured, except as You may have otherwise directed In Writing.

3.  Receive any amounts payable under this policy during the Insured's lifetime.

4.  Change the beneficiary of the death benefit. See Part 3.

5.  Change the Subsequent Planned Premium payment amount and frequency. See Part 4.

6.  Obtain a partial withdrawal. See Part 5.

7.  Surrender this policy for its cash Surrender Value. See Part 5.

8.  Obtain policy loans. See part 6.

9. Request changes in the insurance amount. See Part 7.

10. Change the Death Benefit Option. See Part 7.

11. Select a payment option for any cash Surrender Value that becomes payable. See Part 10.

12. Assign, release or surrender any of Your interest in the policy.

Exercise of any of these rights will, to the extent thereof, assign, release or surrender the interest of the Insured and all other beneficiaries and owners under this policy.

An ownership transfer designation or change of designation will be effective as of the date the notice was signed, subject to any action taken by Us before We record such notice. A transfer of ownership (or absolute assignment) is not the same as a "collateral assignment" as described in the next paragraph, and the new owner is not an "assignee" as these terms are used in this policy.

**Collateral Assignment**

By Written Notice You may assign an interest in this policy as collateral to a collateral assignee. The collateral assignment or a certified copy of it must be filed with Us at Our Main Administrative Office. When filed, it will bind Us as of the date of the assignment, subject to any action taken by Us before such filing. We shall not be responsible for the validity of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. A collateral assignee cannot change the beneficiary, owner or contingent owner.

**Beneficiary**

Unless another payment option is elected as described in Part 10, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:

a) Primary beneficiaries;

b) Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;

c) You or Your executor or administrator, provided no primary or contingent beneficiary is living at the death of the insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the insured.

**How to Change the Beneficiary**

You may change the beneficiary by Written Notice filed with Us at Our Main Administrative Office. When We receive it, the change will relate back and take effect as of the date it was signed by You. However, the change will be subject to any payments made or actions taken by Us before We received the notice at Our Main Administrative Office.

# PART 4: PREMIUMS

**Payments**

The Issue Premium as shown on the Schedule Pages is payable on or before delivery of this policy. The Insured must be alive when that premium is paid.

Subject to the limitations stated below, You may pay additional premiums at any time prior to age 100 while this policy is In Force. All premiums are payable at Our Main Administrative Office or to an authorized agent of ours. You may request a receipt signed by one of Our executive officers.

On Written Request We will send Subsequent Planned Premium notices to You. These notices can be sent annually, semi-annually or quarterly. Premiums may also be paid at other intervals, or under automatic collection methods, subject to Our consent. We may limit the number and amount of premium payments in any Policy Year.

The minimum premium payment amount that We will accept is $25. Any premium payment that would increase the Death Benefit by more than it would increase the Policy Value, shall be subject to evidence of insurability satisfactory to Us. To the extent of such evidence, the Contestability and Suicide Exclusion provisions will apply. The application for such evidence is attached to and will be made part of the policy.

**Total Premium Limit**

The total premium limit is shown on the Schedule Pages and is applied to the sum of all premiums received by Us to date, excluding premiums applied to debt repayment, reduced by the sum of all partial withdrawals paid by Us to date. If the total premium limit is exceeded, We will refund the excess with interest at an annual rate of not less than 4%, not later than 60 days after the end of the Policy Year in which the limit was exceeded. The Policy Value will be adjusted to reflect such refund.

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the Grace Period And Lapse provision, and such additional premium is permitted by federal tax laws or regulations such that this policy continues to meet the Definition of Life Insurance.

The total premium limit may change due to:

a) change in Death Benefit Option;

b) a decrease of face amount;

c) a partial withdrawal;

d) addition, change or termination of a rider; or

e) a change in federal tax law or regulations.

If the total premium limit changes, We will send You Revised Schedule Pages reflecting the change. However, We reserve the right to require that the policy be returned to Us to endorse the change.

**Grace Period and Lapse**

During the first seven Policy Years, if on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any Policy Debt, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

After the seventh Policy Year, if on any Monthly Calculation Day the required monthly deduction exceeds the Surrender Value, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

The policy will continue In Force during such grace period. We will mail to You and any Assigns at the post office addresses last known to Us a Written Notice as to the amount of premium required. If such premium amount is not postmarked as having been mailed to Us by the end of the grace period, the policy will lapse without value, but not before 30 days have elapsed since We mailed Our Written Notice to You and any Assigns. The date of lapse will be the Monthly Calculation Day on which the deduction was to be made, and any insurance and rider benefits provided under this policy will terminate as of that date.

**Reinstatement**

If this policy terminates, in accordance with the Grace Period and Lapse Provision, You may reinstate this policy back to an "In Force" status within five years after the expiration of the Grace Period. Reinstatement must become effective prior to age 100 and while the Insured is alive. We will not approve a request for a reinstatement until We receive at Our Main Administrative Office all of the following:

1. a Written Request for reinstatement;

2. evidence of insurability satisfactory to Us;

3. if applicable, payment or reinstatement of any Policy Debt as of the date of lapse; and

4. the payment of a reinstatement premium while the Insured is alive which equals an amount needed to provide for a positive Surrender Value as of the date of lapse, plus three monthly deductions. However, during the first seven Policy Years, the reinstatement premium will equal an amount needed to provide for a positive Policy Value (less any Policy Debt) as of the date of lapse, plus three monthly deductions.

Subject to the foregoing conditions, the effective date of a reinstatement will be the Monthly Calculation Day following the date We approve the request for reinstatement. If We approve it on a Monthly Calculation Day, the effective date will be that Monthly Calculation Day.

The Policy Value as of the effective date of a reinstatement shall equal the reinstatement premium received, plus any Policy Debt in effect as of the date of lapse, minus the monthly deduction for the month then starting.

# PART 5: POLICY VALUES

The premiums You pay, minus the premium expense charges shown on the Schedule Pages, are added to the policy's Policy Value. We make monthly deductions from the Policy Value to cover the cost of insurance, the cost of any additional benefit riders and the monthly charges shown on the Schedule Pages. We also deduct any partial withdrawals You make and charges for them, as well as any charges for face amount decreases. The Policy Value earns interest. Details are provided below. We will keep You informed of the current Policy Value by sending You an Annual Report as described in Part 8 of this policy.

**Basis of Calculations**

Minimum Surrender Values are determined from the Basis of Calculations shown on the Schedule Pages. The Guaranteed Maximum Insurance Rates shown on the Schedule Pages are also based on this Table.

**Policy Value**

Policy Value is to be calculated as follows:

1. In each Monthly Calculation Day following the Policy Date, the Policy Value will equal $(A + B + C - D - E)$;

2. on a day of the month other than a Monthly Calculation Day, it will equal $(A + C)$;

3. on the Policy Date, it will equal all premiums received, net of any premium expense charges, minus E; where:

A= the Policy Value on the prior Monthly Calculation Day, after assessment of the monthly deduction on that day;

B= one month's interest on A, including any Benchmark Interest Bonus;

C= all premiums received, net of any premium expense charges, since the prior Monthly Calculation Day, plus interest thereon to the end of the Policy Month, or any earlier date on which the Policy Value is being determined;

D= any partial withdrawal, and charge for it, being made as of that Monthly Calculation Day; and

E= the monthly deduction for the month then starting (no monthly deduction is made if the policy is surrendered for its full Surrender Value as of that Monthly Calculation Day).

**Interest Rate**

We will, from time to time, determine the interest rate used in the calculation of the Policy Value, based on Our anticipation of future investment earnings, mortality, persistency and expense/administrative costs. We will determine the interest rate at least once each year. We may, in Our sole discretion, change the interest rate. Changes made will be in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered. Changes in the rate will apply to all policies in the same investment class. Any interest credited in excess of the Guaranteed Minimum Interest Rate is referred to as "excess interest." The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate in effect on a given date for unloaned amounts is referred to as the "current interest rate." The rate in effect on a given date for loaned amounts will be no less than the Loan Interest Rate in effect on that date less 2%. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

**Benchmark Interest Bonus**

Beginning in the third Policy Year of this policy, in addition to interest being credited under the policy on each Monthly Calculation Day, We will also credit an interest bonus on each Monthly Calculation Day on amounts in excess of the Policy Value Benchmark Amount, shown on the Schedule Page. The Bonus Interest Rate will be equal to:

1. An annual effective rate of 1% if the Current Interest Rate is 5% or greater; or

2. An annual effective rate of .5% if the Current Interest Rate is at least 4.5% but less than 5%; or

3. An annual effective rate of 0% if the Current Interest Rate is less than 4.5%.

This bonus will be equal to (A x B), where:

A= the Bonus Interest Rate; and

B= the excess of the unloaned portion of the Policy Value over the Policy Value Benchmark Amount, shown on the Schedule Page.

**Monthly Deduction**

The monthly deduction is the amount deducted from the Policy Value on the Policy Date and on each Monthly Calculation Day to pay the cost of insurance, the cost for any additional benefit riders and monthly charges for the Policy Month starting on that day. The monthly deduction will be equal to:

$$(A + B + C); \text{ where:}$$

A= the cost of insurance (as defined in the Cost of Insurance provision below);

B= the monthly cost for any additional benefit riders as shown on the Schedule Pages;

C= the Monthly Service Charge shown on the Schedule Pages, and if applicable, one–twelfth of the Issue Charge.

**Cost of Insurance**

The cost of insurance is the amount We charge each month for providing the insurance coverage. The cost of insurance is equal to:

$$(A \times (B - C)) + D; \text{ where}$$

A= the applicable cost of insurance rate for the Insured's risk class, based upon the Net Amount at Risk and Insured's risk class, including any applicable substandard mortality percentage extra. The Net Amount at Risk is equal to (B–C) below;

B= the Death Benefit at the beginning of the Policy Month, divided by the Monthly Factor shown on the Schedule Pages;

C= the Policy Value at the beginning of the Policy Month, after the Monthly Service Charge and, when applicable, one–twelfth of the Issue Charge, and prior to subtracting the Cost of Insurance for that month;

D= the Substandard (Temporary or Permanent) Extra Charge, if any, shown on the Schedule Pages.

In item B "Death Benefit" means the Death Benefit as defined in Part 7 but prior to subtracting the cost of insurance for that month from any Policy Value element.

**Cost of Insurance Rates**

The cost of insurance rate for each Policy Month is based on the Insured's age at issue, risk class and sex, and on policy duration. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages for the insured risk classification(s), or such lower rate as We may declare. At least 31 days before the start of the Policy Year, We will send You a notice of any change in rates.

No more frequent than once per year and no less frequent than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:

1. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2 Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

3. Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4. Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

The Monthly Service Charge, shown on the Schedule Pages, is subject to change based on Our expectations of future investment earnings, mortality, persistency and expense/administrative costs, subject to the maximum Monthly Service Charge stated on the Schedule Pages.

**Surrender Value**

You may surrender this policy for its Surrender Value at any time, by sending Us a Written Request along with this policy on or before such Monthly Calculation Day.

The Surrender Value on any date is the Policy Value on that date minus any applicable surrender charge as shown in the Table of Surrender Charges on the Schedule Pages, minus any Policy Debt, minus any unpaid issue charge. If the surrender is requested within 30 days after a Policy Anniversary, the Surrender Value shall not be less than the Surrender Value on the Policy Anniversary less any debt, partial withdrawals and charges made or incurred since the Policy Anniversary. The Surrender Value is never less than zero.

If this policy is terminated, the remaining schedule of Surrender Charges will be suspended. When this policy is reinstated, the remaining schedule of Surrender Charges also will be reinstated. The Surrender Charges are based on the period of time the policy is in effect. When reinstated, the schedule of Surrender Charges will start from the point where the schedule was suspended.

**Partial Withdrawals**

You may withdraw part of the Surrender Value as of any Monthly Calculation Day while the Insured is living, subject to the charges and limitations shown on the Schedule Pages. We must receive your Written Request for partial withdrawal on or before the Monthly Calculation Day on which the partial withdrawal is to be effective. The Policy Value will be reduced by the amount withdrawn, a partial surrender charge and a partial withdrawal fee.

The partial surrender charge is equal to a pro-rata portion of the surrender charge that would apply to a full surrender. The partial surrender charge is determined by multiplying the full surrender charge by a fraction equal to the partial surrender amount payable divided by the result of subtracting the applicable surrender charge from the Policy Value.

The partial withdrawal fee is shown on the Schedule Pages.

Under Death Benefit Option A (the Face Amount), the Face Amount is decreased by the same amount of reduction as the Policy Value.

Under Death Benefit Option B (the Face Amount plus the Policy Value), the Face Amount does not change.

A partial withdrawal will not be permitted which would reduce the Face Amount below Our then current Minimum Face Amount, or the Surrender Value to zero.

# PART 6: POLICY LOANS

**When Available**

You may obtain a loan from Us at any time, on assignment of the policy to Us as security, if it has a Surrender Value greater than zero.

**Amount Available**

The amount of any loan may not exceed the lesser of:

- the Surrender Value of this policy projected from the date of the loan to the next Policy Anniversary based upon guaranteed assumptions, minus loan interest charges through the next Policy Anniversary; and

- the current Surrender Value of this policy.

If on any Monthly Calculation Day the Policy Debt exceeds the Policy Value minus any applicable surrender charge then in effect, this policy will lapse according to the terms of the Grace Period and Lapse provision.

A loan will not be permitted in an amount less than the Minimum Loan Amount shown on the Schedule Pages, except if the amount to be loaned equals the full loaned amount then remaining.

We reserve the right to defer the granting of a loan, other than for the payment of any premium to Us, for six months after submission of a loan application.

Loan interest will accrue on a daily basis from the date of the loan, and is payable in arrears.

**Loan Interest**

Loans will bear interest at such rate or rates as established by Us for any period during which loans are outstanding. Each year We will set the rate that will apply during the next Policy Year. Such rate will be effective at the beginning of that year and will apply to both new and any outstanding loans under this policy.

U606                              -12-

We will notify You of the initial loan interest rate at the time a policy loan is made, or as soon as practical thereafter. If there are any outstanding loans, except for purposes of reinstatement, We will give You advance notice of any increase in the rate.

There is a maximum limit on the interest rate We can set. The maximum limit is the Published Monthly Average for the calendar month ending two months before the Policy Year begins or the Guaranteed Minimum Interest Rate used in computing the Policy Value plus 1%, whichever is higher.

The Published Monthly Average will be:

A. The Corporate Bond Yield Average − Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

B. If that Monthly Average is no longer published, a substantially similar average, established by regulation issued by the insurance supervisory official of the state where this policy was delivered.

If the maximum limit for a Policy Year is at least 1/2% higher than the rate in effect for the previous year, We may increase the rate to not more than that limit.

If the maximum limit for a Policy Year is at least 1/2% lower than the rate in effect for the previous Policy Year, We must decrease the rate to not more than that limit.

**Debt**

As used in this policy, "debt" or "Policy Debt" means all loans existing on this policy plus accrued interest. When this policy terminates, We will add to any existing debt interest accrued from the prior Policy Anniversary to the termination date.

**Repayment**

The whole or any part of a loan may be repaid at any time while this policy is in effect. Any moneys received will be applied directly to reduce the debt unless specified as a premium payment. We will not accept partial payments in amounts less than $25.

# PART 7: INSURANCE COVERAGE PROVISIONS

**Death Proceeds**

Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy. The death proceeds at the death of the Insured are equal to:

a) the Death Benefit, as described below, in effect on the Insured's date of death; PLUS

b) any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; PLUS

c) any premiums received by Us after the Monthly Calculation Day just prior to the Date of Death and on or before the Date of Death; MINUS

d) Any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

e) Any debt then existing on this policy; MINUS

f) Any monthly deductions not already made up to and including the Policy Month of death.

**Interest on Insurance Proceeds**

We will pay interest on any death proceeds from the date of death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. However, in no case will the amount of interest be less than the minimum required in Your state.

**Death Benefit**

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is chosen and is then in effect, but in no event while the policy is In Force will it be less than the Minimum Death Benefit described below.

Option A: The Face Amount on that date.

Option B: The Face Amount plus the Policy Value on that date.

**Minimum Death Benefit**

The Minimum Death Benefit will be equal to a percentage of the Policy Value as of the insured's attained age at the beginning of the Policy Year in which the insureds death occurs, as follows:

| ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE |
|---|---|---|---|---|---|
| 0–40 | 250% | 54 | 157% | 68 | 117% |
| 41 | 243% | 55 | 150% | 69 | 116% |
| 42 | 236% | 56 | 146% | 70 | 115% |
| 43 | 229% | 57 | 142% | 71 | 113% |
| 44 | 222% | 58 | 138% | 72 | 111% |
| 45 | 215% | 59 | 134% | 73 | 109% |
| 46 | 209% | 60 | 130% | 74 | 107% |
| 47 | 203% | 61 | 128% | 75 | 105% |
| 48 | 197% | 62 | 126% | 76–90 | 105% |
| 49 | 191% | 63 | 124% | 91 | 104% |
| 50 | 185% | 64 | 122% | 92 | 103% |
| 51 | 178% | 65 | 120% | 93 | 102% |
| 52 | 171% | 66 | 119% | 94 | 101% |
| 53 | 164% | 67 | 118% | 95 and over | 100% |

**Death Benefit Following Insured's Age 100**

After the Policy Anniversary which follows the Insured's birthday, the Death Benefit will equal the Policy Value. Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Change in Death Benefit Option**

The Face Amount and Death Benefit Option You have chosen initially are shown on the initial Schedule Pages. While this policy is In Force, You may request In Writing to change the Death Benefit Option. Any change will be subject to the following:

1. A change in Death Benefit Option will require that there be no immediate change in Our insurance risk. To assure this, when We approve a change from Option A to Option B, We will decrease the Face Amount by the Policy Value. Such a change from Option A to Option B may not be made if it would reduce the Face Amount below the Minimum Face Amount shown on the Schedule Pages. Similarly, when We approve a change from Option B to Option A, We will increase the Face Amount by the Policy Value. We will not require evidence of insurability for a change in Death Benefit Option. You are limited to one change in Death Benefit Option for each Policy Year.

2. The effective date of any change will be the Monthly Calculation Day next following Our approval of Your Written Request for change. This date will be shown on the Revised Schedule Pages that We will send You.

**Request for a Decrease in Face Amount**

You may request a decrease in face amount at any time after the first Policy Year. The decrease requested must at least equal $25,000 and the face amount remaining after the decrease must at least equal $250,000. All requests to decrease the face amount must be In Writing and will be effective on the first Monthly Calculation Day following the date We approve the request. We reserve the right to require that this policy first be returned to Us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the Policy Value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send You a Revised Schedule Page reflecting the change.

## PART 8: MISCELLANEOUS PROVISIONS

**Annual Report**

We will send You, without charge, a report for each Policy Year which includes:

1. the current Policy Value, Death Benefit, Face Amount and Surrender Value;

2. any partial withdrawals, premiums paid, interest credited and charges made during the year;

3. any outstanding policy loans and new loans and loan repayments made during the year; and

4. any other information required by the insurance supervisory official of the state in which this policy was delivered.

You have the right to request an illustrative report at any other time. We reserve the right to charge up to $25.00 for the report.

**Projection of Benefits and Values**

We will provide You, on Written Request and payment of Our service fee of up to $25.00, a projection of illustrative future benefits and values under Your policy. We may limit the number of such projections in any Policy Year.

**Notices By Us**

Whenever We are required to give notice to You, it shall be deemed given if We mail it to You and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record at Our Main Administrative Office.

**Deferment of Certain Payments**

We may defer, for not more than six months after We receive Written Request, the payment of the Surrender Value due to surrender or partial withdrawal or the making of any loan. If payment is deferred 31 days or more on any surrender, interest will be paid at an effective annual rate of 4.00% on the amount deferred, from the date the request is received to the date of payment.

**Claims of Creditors**

The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law.

**Corrections**

We reserve the right to correct any clerical errors in this policy, or in Our administration of the policy.

# PART 9: PAYMENT OPTIONS

**Who May Elect Payment Options**

The surrender or death proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, the proceeds may be applied under one or more of the alternative income payment options described in this Part.

However, Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any Assigns or an owner other than the Insured if the owner has been changed.

Except for Option 7 which is not available for death proceeds, You may elect any payment option for payment of the death proceeds. You may also designate or change one or more beneficiaries who will be the payee or payees under that Option. You may only do this during the lifetime of the Insured. If no election is in effect when the death benefit becomes payable, the beneficiary may elect any payment option other than Option 7. The payment options are also available to the payee of any Surrender Value that becomes payable under this policy.

Unless We agree otherwise, all payments under any Option chosen will be made to the designated payee or to his or her executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How To Elect a Payment Option**

The election of an income payment option must be In Writing. You can elect that the payments be made on an annual, semi-annual, quarterly, or monthly basis provided that each installment will at least equal $25. We also require that at least $1,000 be applied under any option chosen.

**What Payment Options Are Available**

This section provides a brief description of the various payment options that are available. In Part 10 You will find tables illustrating the guaranteed installment amount provided by several of the Options described in this section. The amounts shown for Option 4, Option 5 and Option 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates We are using when the first payment is due. They will not be less than shown in the tables.

Option 1 – Payment in one sum

Option 2 – Left to earn interest

We pay interest on the amount left with Us under this Option as a principal sum.

We guarantee that at least one of the versions of this Option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specified period

Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement.

The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

Equal installments are paid until the later of:

a) the death of the payee;

b) the end of the period certain.

The first payment will be on the date of settlement. The period certain must be chosen at the time this Option is elected. The periods certain that may be chosen are as follows:

a) ten years;

b) twenty years;

c)    until the installments paid refund the amount applied under this Option. If the payee is not living when the final payment falls due, that payment will be limited to the amount which needs to be added to the payments already made to equal the amount applied under this Option.

If, for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, We will deem the longer period certain as having been elected.

Any life annuity as may be provided under this Option is calculated using an interest assumption of 3 3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3 1/4%.

Option 5—  Life annuity

Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement.

Any life annuity as may be provided under this Option is calculated using an interest rate of 3 1/2%.

Option 6—  Payments of a specified amount

Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

Option 7 — Joint survivorship annuity with a 10−year period certain

This payment option is not available for death proceeds. This Option is only available if the policy is surrendered within 6 months of the Policy Anniversary nearest the Insured's 55th, 60th, or 65th birthday. The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

a) the end of the 10−year period certain;
b) the death of the Insured;

c) the death of the other named annuitant.

The other annuitant must be named at the time this Option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 10 of at least 40.

Any joint survivorship annuity as may be provided under this Option is calculated using an interest rate of 3 3/8%.

**Other Payment Options**

We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**

In addition to:

a) the interest of 3% per year guaranteed on the principal sum remaining with Us under Option 2 or 6; and

b) the interest of 3% per year included in the installments payable under Option 3;

We will pay or credit at the end of each year such additional interest as We may declare.

# PART 10: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown, it will be the same amount as for the last age shown.

**Adjusted Age**

'The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as follows:

a) for Surrender Values, the age of the payee on the payee's nearest birthday to the Policy Anniversary nearest the date of surrender;

a) for death benefits, the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the nearest birthday to the Policy Anniversary nearest the date of surrender. The table for Option 7 only shows the amounts for annuitants of the opposite sex. Rates for annuitants of the same sex will be furnished upon request.

## Option 3 - Payments for a specified period

| Number of Years | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment $ | 211.99 | 179.22 | 155.83 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 |
| Monthly Installment $ | 17.91 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 |

| Number of Years | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment $ | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 55.76 | 49.53 |
| Monthly Installment $ | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | 4.18 |

## *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | | Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Fe-Male | Male | Fe-Male | Male | Fe-Male | | Male | Fe-Male | Male | Fe-Male | Male | Fe-Male |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.63 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.64 | 3.43 | 3.55 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.54 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

## *Option 5 - Life annuity

| Age of Payee | Male | Female | Age of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | $3.17 | $3.12 | 50 | $4.62 | $4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.15 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.98 | 85 | 18.72 | 16.54 |

**\* Option 7 - Joint survivorship annuity with 10-year period certain**

| Age of Other Annuit- ant F | Age of Insured Male | | Age of Other Annuit- ant F | Age of Insured Male | | Age of Other Annuit- ant M | Age of Insured Female | | Age of Other Annuit- ant M | Age of Insured Female | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | | 55 | 60 | | 55 | 60 | | 55 | 60 |
| 40 | $3.62 | $3.64 | 60 | $4.43 | $4.64 | 40 | $3.72 | $3.77 | 60 | $4.34 | $4.64 |
| 45 | 3.80 | 3.83 | 65 | 4.61 | 4.93 | 45 | 3.89 | 3.97 | 65 | 4.44 | 4.82 |
| 50 | 4.00 | 4.07 | 70 | 4.75 | 5.18 | 50 | 4.06 | 4.19 | 70 | 4.50 | 4.95 |
| 55 | 4.22 | 4.34 | 75 | 4.86 | 5.36 | 55 | 4.22 | 4.43 | 75 | 4.54 | 5.03 |

\* Minimum monthly income for each $1,000 applied

# AGE 100+ RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**Rider Date:**              JANUARY 25, 2006

**Rider Charge Date:**       N/A

## DEFINITIONS

**Age 100 Anniversary**
The Policy Anniversary nearest the Insured's 100th birthday.

## GENERAL

**Death Proceeds**
While this rider is in effect, the "Death Proceeds" provision of the basic policy is amended by adding the following to the end of that provision:

On and after the Age 100 Anniversary, the death proceeds at the death of the Insured are equal to:

a)   the Death Benefit, as described below; MINUS

b)   any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

c)   any debt then existing on this policy

**Death Benefit Following Insured's Age 100**
While this rider is in effect, the "Death Benefit Following Insured's Age 100" provision of the basic policy is replaced with the following:

On and after the Age 100 Anniversary, the death benefit will equal 1 or 2, whichever is greater:

1.   the face amount of the basic policy on the date of the insured's death, plus the Total Rider Insurance Amount under the Individual Term Rider as of the day before the Age 100 Anniversary provided the Individual Term Rider was in effect on that date; or

2.   the Policy Value on the date of the insured's death.

Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Under federal tax law, this policy may not qualify as life insurance after the Age 100 Anniversary. It may be subject to adverse tax consequences and a tax advisor should be consulted before You choose to continue the policy after the Age 100 Anniversary.**

UR69 CA

**Monthly Rider Charges**
There is no charge for this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1.  the date of full surrender or lapse of the basic policy;

2.  Our receipt of Your Written Request to cancel this rider, which shall be effective as of the next Monthly Calculation Day; or

3.  the date of the insured's death.

Upon termination of this rider the "Death Benefit Following Insured's Age 100" provision in the policy will become operative including any consequent reduction in death benefit to equal the Policy Value. No retroactive assessment will be made for monthly deductions waived under this rider.

PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

# ACCELERATED BENEFIT RIDER

This Rider is part of the Policy to which it is attached, effective as of the Rider Date, if it is listed on the Policy's Schedule Page or in an Endorsement after that page. You should therefore review the Policy's Schedule Page for applicability. Except as stated in this Rider, it is subject to all of the provisions contained in the Policy.

**THE BENEFIT PAID UNDER THIS RIDER MAY BE TAXABLE. YOU SHOULD CONSULT YOUR PERSONAL TAX ADVISOR REGARDING POSSIBLE TAX CONSEQUENCES.**

| | |
|---|---|
| **Rider Date** | SAME AS POLICY DATE |
| **Maximum Administrative Charge** | $300.00 |
| **Maximum Proportion Allowable** | 75% |
| **Maximum Accelerated Benefit** | $250,000 |
| **Minimum Remaining Face Amount** | $10,000 |

**Definitions**

**Insured** is the person covered under the basic Policy.

**You (Your)** is the owner of the Policy to which this Rider is attached.

**We (Our, Us)** refers to PHL Variable Insurance Company.

**Eligible Amount** is the amount of insurance under the Policy that is eligible for accelerated payment. It is equal to the death benefit of the basic Policy at the time of claim plus any term insurance amounts In Force provided by Rider on the life of the Insured, which provides coverage renewable to the Insured's attained age 95 or beyond, but exclusive of any other supplemental Rider death benefits.

**Proportion** is the percentage of the Eligible Amount that will be accelerated under this Rider. The Proportion is chosen by You at the time of election of an accelerated benefit, subject to the following limitations. The Proportion elected:

1. can be no more than the Maximum Proportion Allowable as specified in this Rider;

2. cannot result in a remaining death benefit below the minimum as specified in this Rider; and

3. cannot result in a Requested Benefit that exceeds the Maximum Accelerated Benefit as specified in this Rider.

This Rider terminates upon payment of the accelerated benefit.

Maximum Accelerated Benefit is the amount shown on the first page of this Rider. This Maximum Accelerated Benefit applies, in aggregate, to all policies issued on the Insured by Us.

Requested Benefit is the Proportion multiplied by the Eligible Amount.

Terminal Illness is an illness or condition that is expected to result in the Insured's death within six months based on evidence satisfactory to Us as defined under the Proof of Terminal Illness section below.

**Rider Description**     This Rider allows You to elect an accelerated benefit upon terminal illness of the Insured. The election must be made by a Written Request signed by You. We must also receive proof satisfactory to Us of the Insured's terminal illness as described in the Proof of Terminal Illness section below. The amount of the accelerated benefit will be adjusted as described under the Payment Made to You section below. The resulting payment will be made in a lump sum. Policy Values, cash Surrender Values, loan values and the death benefit as specified in the Policy to which this Rider is attached will be reduced if You receive an accelerated benefit. There is no premium charge for this Rider.

**Payment Made**     The amount of the payment made to You will be determined by
**To You**     discounting the Requested Benefit at Our then current discounting rate for a period of twelve (12) months, to reflect the early payment of insurance proceeds under the Policy.

Our discounting rate will be subject to the higher of:

1. 5%; or
2. the Published Monthly Average for the calendar month ending two months before the Policy Anniversary on or immediately preceding the date that We receive Your Written Request for payment under this Rider.

The Published Monthly Average will be:

a. The Corporate Bond Yield Average -- Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or
b. If that Monthly Average is no longer published, a substantially similar average, established by regulation for policy loan rates issued by the Insurance Department of the state where the Rider was delivered will be applicable.

If the discounting rate computed for a Policy Year is no more than 1/2% higher than the rate in effect for the previous Policy Year, then We will maintain such prior year's rate.

If the discounting rate computed for a Policy Year is no more than 1/2% lower than the rate in effect for the previous Policy Year, then We may, at Our discretion, maintain such prior year's rate.

If the cash Surrender Value multiplied by the Proportion exceeds the discounted value, then the discounted Requested Benefit will be increased to equal such greater amount.

The discounted Requested Benefit is reduced by the Proportion of any Policy debt, including any unpaid loan interest, and the Proportion of any other amounts due Us from You. This result is then reduced by Our then current Administrative Charge for benefits under this type of Rider, not to exceed the maximum as specified in this Rider. The amount that remains is the payment that will be made to You.

In the event that the Insured dies after the Written Request but before We make the payment, and We receive Written Notice at Our Main Administrative Office during this period of this event, the request will be considered void, and no payment will be made under this Rider.

**Effect On Contract**

The following values will be reduced by the Proportion at the time the payment is made to You:

1. the future planned premium payable on the basic Policy;

2. the face amount of the Policy at the time of claim;

3. the cash value (Policy Value);

4. any remaining Surrender Charge;

5. the cash Surrender Value; and

6. any Policy debt including any unpaid loan interest.

If this Rider is attached to a variable life insurance policy that permits fund investment in various subaccounts of Our Variable Universal Life Separate Account, the reduction in Policy Value will be achieved through a proportionate reduction in this Policy's share in the value of each subaccount based on the allocation You request at the time of Your accelerated benefit request. If no allocation request is made, the assignment to each subaccount will be made in the same manner as provided for monthly deductions.

Future values under the Policy will be determined in a manner consistent with that under the original Policy, as adjusted to reflect the above reductions. We will mail to You a new policy Schedule Page reflecting any payment made under this Rider.

**Proof of Terminal Illness**

A licensed physician, who is not Yourself or a member of Your family, must provide Us with evidence satisfactory to Us of the Insured's terminal illness. We reserve the right to obtain a second medical opinion from a physician of Our choosing at Our expense.

**Conditions**

Payment under this Rider is subject to the following conditions:

1. The Policy must not have lapsed.

2. We will require the consent of any assignees and irrevocable beneficiaries to any request for payment under this Rider.

3. No payments will be made under this Rider to satisfy the claims, demands, or obligations of any creditor, trustee in bankruptcy or governmental agency, or arising under any court order directed against You, to the extent that We have written notice thereof.

**Rider Termination**

This Rider will terminate on the earliest of:

1. Lapse or surrender of this Policy to which it is attached.
2. Our receipt of Your written request to terminate this Rider; or
3. Payment of any benefit under this Rider.

PHL Variable Insurance Company

*John N. Beers*

Secretary

# Life Plan Options Rider

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

## DEFINITIONS

Option Review Period
The 90-day period immediately preceding the 5th, 10th and 15th Policy Anniversaries.

Individual Term Life Rider
As used in this rider form "Individual Term Life Rider" refers to any of the following riders: Individual Term Rider, Individual Term Insurance Rider, Policy Term Rider, Policy Term Insurance Rider, Phoenix Individual Edge Term Rider, or the Variable Policy Term Rider.

## OPTION BENEFITS

Increased Coverage Determination without Medical Exam
Policies that include both this rider and the Individual Term Life Rider are eligible during each Option Review Period, while both such riders are in effect, for an increase in their term insurance rider amount up to a maximum lifetime increase of $1,000,000, with underwriting and our agreement to such increase determined without the inconvenience of an additional medical exam. Our other ordinary underwriting rules will continue to apply and thus the increase in coverage is still subject to our normal underwriting approval.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- The insured must be attained age 65 or younger on the last day of the Option Review Period.
- The risk classification of the insured must be standard through Table D (200%) at original issue of the basic policy.
- The insured must be alive and meet our underwriting requirements at the time of your request for the increase in term rider face amount.
- The Individual Term Life Rider must either already be attached to the policy or then currently approved and available for sale in the state of applicable jurisdiction.
- There is a maximum lifetime increase of $1,000,000 per insured life.

Reduced Coverage without Surrender Charge
During each Option Review Period you may request a decrease in the face amount of the policy without our assessment of the partial surrender charge that, under the terms of your basic policy, would otherwise apply. In such case the surrender charge remaining under the policy will continue to be calculated as if such decrease in face amount had not been made.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- Total option reductions of the basic policy face amount may not exceed the lesser of 50% of the initial basic policy face amount or $5,000,000 in combined aggregate of all option reductions for all Our policies on the same insured.

UR73

<u>Exchange for Annuity without Surrender Charge</u>
During each Option Review Period beginning with the 90-day period preceding the 10th policy anniversary, you may request that the policy be surrendered as part of an exchange request to an eligible annuity offered by us. In such an exchange, we would not assess the surrender charge that would otherwise apply. In such case, the new annuity will reflect the usual surrender charges that would ordinarily apply for new business.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.


**TERMINATION OF THIS RIDER**

This rider will terminate on the first of any of the following events to occur:

1. exercise of the Exchange for Annuity without Surrender Charge Option;

2. the 15th policy anniversary;

3. termination of the basic policy.



PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

UR73

# EXCHANGE OF INSURED OPTION RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**The Exchange Option**
While this rider is in effect and subject to its terms, you have the option to exchange your policy ("the exchange policy") for a new policy on the life of a substitute insured.

**How to Exercise This Option**
To exercise this option, You must file an application with Us at Our Main Administrative Office. It must be signed by You. We must also receive:

1. Evidence that You have a satisfactory insurable interest in the life of the substitute insured.

2. Evidence that the substitute insured is insurable under our established practice in the selection of risks for the amount and plan applied for. Selection of risks includes health and non-health factors.

3. The release of any lien against or assignment of your policy. You may instead submit written approval by the lienholder or assigns of the exchange policy in a form satisfactory to Us with such other documents as We may reasonably require.

4. The surrender and release of the exchange policy.

5. Payment of any amounts due to Us for the exchange as described in the Exchange Adjustments.

Unless otherwise provided in the application, the owner and the beneficiary of the new policy will be the same as under the exchange policy. Any subsequent changes will be governed by provisions of the new policy.

The Date of Exchange will be the policy anniversary following the later of:

1. Our receipt of the application;

2. Payment of the Exchange Adjustments, if any; and

3. Our approval of the insurable interest.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the exchange policy will terminate.

**The New Policy**
The Policy Date of the new policy will be the Date of Exchange.

The issue age of the Insured under the new policy will be determined based upon the substitute insured's age on his or her birthday nearest the date of issue of the new policy.

The new policy on the life of the substitute insured will be written on any plan of universal life insurance issued with a level face amount issued by Us at the time of the exchange. The new policy will be subject to Our published issue rules (e.g., age and amount limits) for the plan chosen which are in effect at that time. The risk classification and any exclusions applicable to the new policy will be determined in accordance with Our rules and practices in effect on the date of exchange. The rates for the new policy will be based on Our published rates in effect on the Date of Exchange.

The face amount of the new policy will equal the basic face amount of the exchange policy without regard to any riders under the exchange policy, except as provided below. The Policy Value of the exchange policy on the Date of Exchange will be applied as premium to the new policy, but without any issue or sales charge applied under the new policy.

**Exchange Adjustments**
The owner must pay an amount equal to the excess, if any, of the surrender charge in effect on the exchange policy over the surrender charge for the new policy. All such surrender charges will be determined as of the Date of Exchange.

In some cases, the amount of Policy Value that may be applied to the new policy may exceed the premium limit for the new policy. In that event, We will return such excess Policy Value to You in cash.

**Monthly Rider Charges**
There are no Monthly Charges for coverage under this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1.  Termination of the exchange policy;

2.  Lapse or Exchange of the exchange policy;

3.  Our receipt at Our Home Office of a Written Request to cancel this rider; and

4.  Death of the insured.

PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

Exhibit 3

 **PHL VARIABLE INSURANCE COMPANY**
A Stock Company

| | |
|---|---|
| **Insured** | ███████████ |
| **Policy Number** 97518606 | |
| **Death Benefit** Option A | |
| **Plan** Phoenix Accumulator UL | |

**Total Face Amount at Issue**   $5,000,000
**Policy Date**   July 12, 2006
**Issue Date**   July 12, 2006

The PHL Variable Insurance Company ("the Company") agrees, subject to the conditions and provisions of this policy, to pay the Death Benefit to the Beneficiary in a lump sum upon the death of the Insured if such death occurs while the policy is in force, and to provide the other benefits, rights, and privileges of the policy. If the Company makes other plans of payment available other than a lump sum, then a Beneficiary may request written election of any such other plans in lieu of a lump sum. The Death Benefit will be payable on receipt at the Main Administrative Office of the Company of due proof of the Insured's death.

We are issuing the policy in consideration of the application and our receipt of the Minimum Initial Premium at our Main Administrative Office. The provisions of this and the following pages and any attachments make up your contract.

**RIGHT TO RETURN THIS POLICY.** This policy may be returned within 10 days (20 days for replacements) after you receive it for a refund of any premium received, less any withdrawals and loans made under this policy. This policy will be void from its beginning. You may return the policy by delivering or mailing it to us at the address below or by returning it to the agent or agency office through which it was delivered.

**Main Administrative Office**

PHL Variable Insurance Company
Variable and Universal Life Administration
P.O. Box 8027
Boston, MA 02266-8027
Telephone (800) 541-0171

Signed for PHL Variable Insurance Company at One American Row, Hartford, Connecticut 06103-2899.

*Philip K Polkinghorn*

President

*John M. Beers*

Secretary

**READ YOUR POLICY CAREFULLY**
It is a legal contract between the Owner and PHL Variable Insurance Company

Universal Life Insurance Policy
Flexible Premiums
Death Benefit payable at death of Insured
Nonparticipating – not eligible for dividends
Benefits, premiums, and the Risk Classification are shown in Section 1

05PAUL

U001ZZF1

# TABLE OF CONTENTS

**Section      Provision**

1. Schedule Pages
2. Table of Rates
3. Definitions
4. Qualification as Life Insurance
5. Total Face Amount
6. Death Proceeds
7. Guaranteed Death Benefit
8. Death Benefit On or After Age 100 Anniversary
9. Policy Value
10. Premiums
11. Grace Period
12. Policy Termination
13. Reinstatement
14. Loans and Overloan Protection
15. Surrenders and Withdrawals
16. Basis of Computations
17. Owner(s) and Beneficiary(ies)
18. Assignment
19. Misstatements
20. Suicide Exclusion
21. Incontestability
22. The Entire Contract
23. Annual Statement
24. Claims of Creditors
25. Right to Defer Payment of Benefits

U001ZZT1

POLICY NUMBER:   97518606

| | |
|---|---|
| **Insured** | ████████████ |
| **Age at Policy Date** | █ |
| **Sex** | █ |
| **Risk Classification** | Non-Smoker |
| **Additional Ratings** | Not Applicable |
| | |
| **Owner, Beneficiary** | As designated in the application or subsequently changed |
| **Policy Date** | July 12, 2006 |
| **Issue Date** | July 12, 2006 |
| **Death Benefit Option at Issue** | Option A |
| **Life Insurance Qualification Test** | Guideline Premium Test |

| | | |
|---|---|---|
| **Total Face Amount** | Basic Face Amount at Issue | $5,000,000 |
| | Supplemental Face Amount at Issue | $0 |
| | Total Face Amount at Issue | $5,000,000 |

### Premiums at Issue

| | |
|---|---|
| **Premium Mode** | Quarterly |
| **Minimum Initial Premium** | $30,375.00 |
| **Planned Premium** | $83,723.00 |
| **Monthly Guarantee Premium** | $15,187.50 |

### Other Benefits and Specifications
#### (See Rider Information for further details regarding riders)

| | |
|---|---|
| **Preferred Loan Amount at Issue** | $0 |
| **Interest Bonus Start Date** | July 12, 2013 |
| **Guaranteed Death Benefit Period** | 5 Policy Years |
| **Withdrawal Charge Period** | Policy Years 1-10 |
| | |
| **Rider 1** | Life Plan Options Rider |
| **Rider 2** | Living Benefit Rider |

Notice: The actual premiums paid will affect the Policy Value, the duration of insurance coverage, and the amount of Death Benefit as described in Section 6. Even if the Planned Premiums shown above are paid as scheduled, they may not be sufficient to continue the policy in force until the death of the Insured. Unless the Total Cumulative Premium Test is satisfied during the Guaranteed Death Benefit Period, the policy will continue in force until the death of the Insured only if on each Monthly Calculation Date the Net Policy Value, less Policy Debt, during the first 9 Policy Years is at least equal to all due and unpaid Monthly Deductions. After the first 9 Policy Years, the Net Surrender Value on each Monthly Calculation Date must be at least equal to all due and unpaid Monthly Deductions.

U001ZZS1

POLICY NUMBER:   97518606

## Policy Charges

### Deductions from Premium Payments

Sales Charge*    10% of first $315,900.00 of premium paid in the first Policy Year
7% of any premium paid in excess of $315,900.00 in the first Policy Year
5% of all premiums paid in Policy Years 2 and thereafter.

*No sales charge will apply to any loan carried over as part of the initial premium paid for this policy.

### Monthly Deduction  (the following charges are deducted monthly from the Policy Value on each Monthly Calculation Date)

Issue Charge    $50.00   deducted during the first Policy Year only

Service Charge    $3.50   guaranteed not to exceed $7.00.

Cost of Insurance Charge    Determined in accordance with Section 9.  Maximum monthly rates per $1,000 of Net Amount at Risk are shown in Section 2.

Rider Charges    As hereinafter described in this Section 1 under Rider Information

### Other Deductions

Overloan Transaction Charge    3.5% of the Policy Value, deducted when the overloan protection feature is exercised, as described in Section 14.

Surrender Charge    The charges shown in this table are as of the beginning of each Policy Year. These Surrender Charges will reduce on a monthly basis to equal zero over time, as shown in this table.  The policy's Surrender Charge is equal to the sum of that shown for the Basic Face Amount and that shown for the Supplemental Face Amount.

### Table Of Surrender Charges

| Policy Year | Basic Face Amount | Supplemental Face Amount |
|---|---|---|
| 1 | $277,770 | $0 |
| 2 | $265,306 | $0 |
| 3 | $253,122 | $0 |
| 4 | $241,238 | $0 |
| 5 | $229,700 | $0 |
| 6 | $218,594 | $0 |
| 7 | $208,016 | $0 |
| 8 | $198,007 | $0 |
| 9 | $188,553 | $0 |
| 10 | $179,585 | $0 |
| 11 | $171,006 | $0 |
| 12 | $162,658 | $0 |
| 13 | $154,378 | $0 |
| 14 | $134,550 | $0 |
| 15 | $64,350 | $0 |
| 16 | $0 | $0 |
| 17 | $0 | $0 |
| 18 | $0 | $0 |
| 19 | $0 | $0 |
| 20 | $0 | $0 |
| 21+ | $0 | $0 |

U001ZZS2

POLICY NUMBER:   97518606

### Rider Information

| Rider Description | Rider Issue Date | Benefit Amount | Rider Expiry Date | Rider Charge |
|---|---|---|---|---|
| UR11 | Living Benefit Rider | 07/12/2006 | | | None |
| UR73 | Life Plan Option Rider | 07/12/2006 | | | None |

Rider Charges for subsequent Policy Months are in accordance with those guarantees specified in the rider.

POLICY NUMBER:    97518606

### Table of Values

Refer to your policy provisions for details on the terms and values shown in this table.

| | |
|---|---|
| Minimum Total Face Amount | $100,000 |
| Minimum Basic Face Amount | $100,000 |
| Policy Loan Interest Rate | 6% |
| Minimum Loan Amount | $500 |
| Minimum Withdrawal Amount | $500 |
| Guaranteed Minimum Interest Rate | 4% |
| Policy Value Benchmark Percentage | 40% |
| Guideline Single Premium | $3,635,524.45 |
| Guideline Level Premium | $607,674.13 |
| Maximum Annual Premium | $1,000,000 |
| Minimum Total Face Amount Decrease | $10,000 |

U001ZZS4

POLICY NUMBER:   97518608

## MINIMUM DEATH BENEFIT PERCENTAGES & MAXIMUM MONTHLY COST OF INSURANCE RATE TABLE

| Attained Age | Minimum Death Benefit Percentage | Maximum Monthly Rates per 1,000 of Net Amount at Risk | Attained Age | Minimum Death Benefit Percentage | Maximum Monthly Rates per 1,000 of Net Amount at Risk |
|---|---|---|---|---|---|
| 78 | 105% | 6.5392 | 90 | 105% | 18.3492 |
| 79 | 105% | 7.1433 | 91 | 104% | 19.6533 |
| 80 | 105% | 7.8058 | 92 | 103% | 21.0625 |
| 81 | 105% | 8.5433 | 93 | 102% | 22.8358 |
| 82 | 105% | 9.3767 | 94 | 101% | 24.6375 |
| 83 | 105% | 10.3158 | 95 | 100% | 27.4967 |
| 84 | 105% | 11.3425 | 96 | 100% | 32.0458 |
| 85 | 105% | 12.4333 | 97 | 100% | 40.0167 |
| 86 | 105% | 13.5667 | 98 | 100% | 54.8317 |
| 87 | 105% | 14.7325 | 99 | 100% | 83.3333 |
| 88 | 105% | 15.9075 | 100+ | 100% | 0.0000 |
| 89 | 105% | 17.1075 | | | |

**Basis of Calculations:**  1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table (Age Nearest Birthday) for the Insured's sex and Risk Classification, Age, and 4% effective annual interest rate. The Monthly Factor used in determining Cost of Insurance is 1.0032737.

If this policy is issued on a unisex basis, we will use the 1980 Commissioners' Standard Ordinary Mortality Smoker/Nonsmoker Distinct 80% Male Table (Age Nearest Birthday) for the Insured's Risk Classification, Age, and 4% effective annual interest rate.  The Monthly Factor used in determining the Cost of Insurance is 1.0032737.

7

The term **"Age"** means, on any given date, the age of the person in question at his or her birthday nearest that date.

The term **"Age 100 Anniversary"** means the Policy Anniversary nearest the Insured's 100th birthday.

The term **"Attained Age"** on any date means the Age plus the number of whole years that have elapsed since the Policy Date.

The term **"business day"** means any day that we are open for business.

The term **"due proof of death"** means, a certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to us.

The term **"in force"** means the policy has not terminated or otherwise lapsed in accordance with the Grace Period provision.

The terms **"in writing," "written notice," and "written request"** mean a written form signed by you, satisfactory to us and received at our Home Office or Main Administrative Office or such other medium electronic or otherwise that we may from time to time make available.

The term **"Issue Date"** means the date from which the Suicide Exclusion and Incontestability provisions are applied.

The term **"Minimum Initial Premium"** means the minimum premium needed to put the policy in force and is shown in Section 1.

The terms **"Monthly Calculation Date"** or **"Monthly Calculation Day"** mean the date on which monthly deductions are assessed from the Policy Value. The first Monthly Calculation Date is the Policy Date. Subsequent Monthly Calculation Dates are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be used.

The term **"Net Policy Value"** equals the Policy Value less the Policy Debt.

The term **"Net Surrender Value"** equals the Surrender Value less the Policy Debt.

The term **"notice"** means that whenever we are required to give notice to you, it shall be deemed given if we mail it to you and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record from our Main Administrative Office. If we mutually agree notice may also be provided by an electronic medium.

The term **"Planned Premium"** means the premium that is selected in the application or as later changed by you for this policy that you intend to be pay on a regular modal basis

The term **"Policy Anniversary"** means the same day and month of each year as the Policy Date. If the day does not exist in a month, the last day of the month will be used.

The term **"Policy Date"** means the date shown in Section 1. Policy Charges are calculated from the Policy Date. Policy Years, Policy Months, and Policy Anniversaries are determined from the Policy Date.

The term **"Policy Debt"** means unpaid loans with accrued interest.

The term **"Policy Month"** means the period from one Monthly Calculation Date up to, but not including, the next Monthly Calculation Date.

The term **"Policy Value"** means the amount equal to the Net Premium credited less an amount not to exceed one month of Monthly Deductions from the Policy Value on the later of the Issue Date or the receipt of the first payment at our Main Administrative Office as shown in Section 1. Thereafter the Policy Value is determined by accumulating with interest the Policy Value for the prior day increased by Net Premiums credited and decreased by withdrawals and, on the Monthly Calculation Date, the Monthly Deductions from Policy Value shown in Section 1.

The term **"Policy Year"** means, with respect to the first Policy Year, the one-year period beginning on the Policy Date up to, but not including, the first Policy Anniversary. Each subsequent Policy Year is the one-year period beginning on a Policy Anniversary up to, but not including, the next Policy Anniversary.

The term **"Preferred Loan"** means any loan that is carried over as part of the initial premium paid for this policy from a previously issued policy plus any loan taken to pay loan interest on the Preferred Loan.

U001ZZR1

The term "Surrender Value" means the Policy Value less any applicable Surrender Charges, and less any unpaid issue charges.

The terms **"we", "us",** and **"our"** refer only to the Company.

The terms **"you"** and **"your"** refer only to the owner of this policy as defined in Section 17.

---

## SECTION 4: Qualification as Life Insurance

The provisions of this policy are to be interpreted to ensure or maintain qualification as a life insurance contract for federal income tax purposes, notwithstanding any other provisions of the policy to the contrary. We reserve the right to make any reasonable adjustments to the terms or conditions of this policy, including distributions from the policy to the extent we deem it necessary, if it becomes necessary to maintain qualification as life insurance. This provision should not be construed to guarantee that this policy will receive tax treatment as life insurance or that the tax treatment of life insurance will never be changed by the future actions of any tax authority. To ensure that the policy qualifies as life insurance, one of the following tests will apply to the policy. The test you elected is shown in Section 1, Schedule Pages. Your election cannot be changed after issue. We reserve the right to refuse any premium payments that would cause the policy to fail the test you elected.

### Guideline Premium Limit
Under the Guideline Premium Limit test, the sum of the premiums paid less a portion of any withdrawals, as defined in the Code, may not exceed the greater of:
- The Guideline Single Premium (as determined for your policy); or
- The sum of the annual Guideline Level Premium to the date of the payment.

If you elected this test, the Guideline Single Premium and the Guideline Level Premium are shown in Section 1. If at any time the premiums received under the policy exceed the amount allowable for such tax qualification, such excess amount shall be removed from the policy as of the date of its payment, together with interest thereon from such date, and any appropriate adjustment in the Death Benefit shall be made as of such date. This excess amount (plus or minus any interest) shall be refunded to you no later than 60 days after the end of the applicable Policy Year. If this excess amount (plus or minus any interest) is not refunded by then, the Total Face Amount under the policy shall be increased retroactively so that at no time is the Death Benefit ever less than the amount necessary to ensure or maintain such tax qualification. In no event, however, will we refuse to accept any premium necessary to prevent the policy from terminating.

### Cash Value Accumulation Test
Under this test, the net single premium for the future benefits of the contract must always be greater than the Policy Value. The net single premium is the single amount that would provide for the cost of the Death Benefit and any applicable riders under this policy. We reserve the right to modify the Death Benefit Percentages shown in Section 2, retroactively if necessary, to ensure or maintain qualification of this policy as a life insurance contract for federal income tax purposes, notwithstanding any other provisions of this policy to the contrary.

---

## SECTION 5: Total Face Amount

The Total Face Amount is made up of two components: (i) the Basic Face Amount, and (ii) the Supplemental Face Amount, if any. The Total Face Amount remains equal to the Total Face Amount at Issue, shown in Section 1, or as modified according to the terms of this Policy.

### Reduction of Total Face Amount
You may request a reduction in Total Face Amount at any time after the first Policy Year provided this policy is in force and subject to the Minimum Total Face Amount. Any reduction in the Total Face Amount will be implemented by first reducing any Supplemental Face Amount. Any reduction in the Total Face Amount will be effective on the next Monthly Calculation Date after our approval. Upon a reduction in Total Face Amount, a pro-rata Surrender Charge will be deducted from the Policy Value based on the Policy Year and amount of the reduction in accordance with the Table of Surrender Charges shown in Section 1.

If the Insured dies while the policy is in force, we will pay the Death Proceeds, as described below, upon receipt of due proof of death of the Insured, subject to any applicable provisions of the policy.

If the Insured dies on or after the date we receive a request from you to surrender the policy, no Death Proceeds will be paid. We will pay the amount payable under the Surrenders and Withdrawals provision instead. The Death Proceeds at the death of the Insured are equal to:

    (a) the Death Benefit, as described below, in effect on the Insured's date of death; plus

    (b) any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; less

    (c) any Policy Debt then existing on this policy.

If the Insured dies during the Grace Period, the Death Proceeds payable described above will be modified as follows:

    (a) the Death Proceeds will be reduced by any outstanding Policy Charges due; and

    (b) the Policy Value used in the calculation of the Death Benefit will be the Policy Value as of the date of death of the Insured.

We will pay interest on any Death Proceeds paid in one sum in the event of the Insured's death from the date of death to the date of payment as required by applicable state law. If the state does not specify the interest rate, we will use the rate for Death Proceeds left on deposit with us.

**Death Benefit**
The Death Benefit under this policy will be determined under either Option A or Option B, whichever is then in effect.

Option A: The Total Face Amount on the date of death of the Insured or, if greater, the Minimum Death Benefit as described below.

Option B: The Total Face Amount plus the Policy Value on the date of death of the Insured or, if greater, the Minimum Death Benefit as described below.

If withdrawals are made, the Death Benefit will be reduced by reducing the Total Face Amount if Option A is in effect, or the Policy Value if Option B is in effect.

**Minimum Death Benefit**
The Minimum Death Benefit is equal to the Policy Value on the date of death multiplied by the applicable Minimum Death Benefit Percentage for the Attained Age of the Insured. The Minimum Death Benefit Percentages are shown in Section 2. To the extent that the Net Amount at Risk associated with the Minimum Death Benefit that results from this calculation exceeds our guidelines and limitations that may be in effect, we reserve the right to:

    (a) distribute to you a portion of the Policy Value such that the Net Amount at Risk associated with the resulting Minimum Death Benefit does not exceed our guidelines and limitations in effect; or

    (b) if we should decide to accept the additional death benefit, require evidence of insurability satisfactory to us.

**Change in Death Benefit Option**
While this policy is in force and prior to the Age 100 Anniversary, you may request in writing to change the Death Benefit Option, subject to the Minimum Basic Face Amount shown in Section 1. If, however, you have exercised the Overloan Protection feature as described in Section 14, the death benefit will be changed to Death Benefit Option A if it is not already in effect. No further changes to death benefit options will be allowed. Any change in Death Benefit Options will be effective on the next Monthly Calculation Date. Any change will be subject to the following:

    • Change from Option A to Option B: the Total Face Amount will be reduced by the Policy Value.

    • Change from Option B to Option A: the Total Face Amount will be increased by the Policy Value.

Any reduction in the Total Face Amount will be implemented by first reducing any Supplemental Face Amount, with no change to the surrender charge schedule of the policy.

If the Supplemental Face Amount is greater than 0, any increase in the Total Face Amount will be implemented by increasing the Supplemental Face Amount. If the Supplemental Face Amount is equal to 0, any increase in Total Face Amount will be implemented by increasing the Basic Face Amount.

U001ZZP3

We will not require evidence of insurability for a change in Death Benefit Options. You are limited to one change in Death Benefit Option per Policy Year.

Any change in Total Face Amount as a result of a death benefit option change will not change the surrender charges for this policy.

## SECTION 7: Guaranteed Death Benefit

The Guaranteed Death Benefit feature provides a guarantee during the Guaranteed Death Benefit Period that the Basic Face Amount, any Supplemental Face Amount, and any rider benefits of your policy will not terminate, regardless of Policy Value, if the Total Cumulative Premium Test is met.

**Total Cumulative Premium Test** — In order to pass this test, the total premiums paid by you less partial withdrawals, since policy issue, less policy debt must be at least equal to the sum of all Monthly Guarantee Premiums applicable for each Policy Month since the Policy Date.

The Monthly Guarantee Premium applicable on the Policy Date is shown on the Schedule Page of the Policy, and shall be the same for each Policy Month thereafter. However, if there is a change in the (a) Total Face Amount, (b) the addition, change or termination of a rider, or (c) a change in risk classification, we will modify the Monthly Guarantee Premium. The revised Monthly Guarantee Premium shall then be applicable for the Policy Month in which the change occurs and for each Policy Month thereafter until another change, if any, shall occur.

While the Guaranteed Death Benefit feature is in effect, monthly deductions will continue to be deducted from the Policy Value as provided for under the terms of this Policy. If the Policy Value is insufficient to cover such monthly deduction, such insufficiency shall be carried over as a charge to be deducted from such future Policy Value(s) as may later exist. No interest will accrue on these charges.

## SECTION 8: Death Benefit On or After Age 100 Anniversary

Coverage under this policy on or after the Age 100 Anniversary is subject to the conditions specified below.

**Death Benefit**

The Death Benefit will be determined in the same respect as specified in Section 6, except as follows.

- If Death Benefit Option B is in effect, we will change to Death Benefit Option A effective on the Age 100 Anniversary, which means the Total Face Amount will not be increased by the Policy Value.
- The Death Benefit will be equal to the greater of (a) the Total Face Amount on the Date of the Insured's death, or (b) the Policy Value after the Age 100 Anniversary.

**Premiums and Monthly Deductions**

We will cease to take Monthly Deductions specified in Section 1, and we will not accept any further premium payments.

**Credited Interest**

We will continue to credit interest monthly to the Policy Value.

**Policy Debt and Default**

Loan interest will continue to be charged if there is an outstanding loan on the Age 100 Anniversary. The policy will go into default at any time the Policy Debt exceeds the Policy Value, and the Loans provision and the Surrenders and Withdrawals provision will still be in effect.

U001ZZP4

**Net Premiums Added**

When we receive your premium payments at our Main Administrative Office, we deduct a Sales Charge which will not exceed the amount shown in Section 1 and add the balance remaining (the Net Premium) to your Policy Value. We will do this before we take any other deductions due on that business day. However, we will add any Net Premiums received before the Policy Date to your Policy Value as of the Policy Date. While a loan exists, we will treat the amounts you pay as premiums unless you request in writing that they be treated as loan repayments. If you instruct us to do so, we will first deduct from such payments the amount of accrued interest on loans and then deduct the amount specified as a loan repayment before applying any balance remaining as a premium payment.

**Monthly Deductions**

A deduction is due and will be taken from the Policy Value as of the Policy Date and as of each applicable Monthly Calculation Date. Monthly Deductions are calculated from the Policy Date. If, at your request, we set the Policy Date to a date which precedes the date on which we receive the initial premium, Monthly Deductions due for the period prior to receipt of the initial premium will be taken on the later of the date we receive the initial premium and the date our underwriters approve issuance of this policy.

Monthly Deductions are due until the Age 100 Anniversary, at which time we will cease to take any further Monthly Deductions as described in Section 8.

The Monthly Deduction for any Policy Month that will be deducted from your Policy Value consists of charges (a) through (e) listed below, each of which will be deducted in the order as listed, where:

  (a)   is the Issue Charge;

  (b)   is the Service Charge;

  (c)   is the sum of the charges for riders which are part of the policy, if any,;

  (d)   is the sum of all charges for any applicable Additional Ratings shown in Section 1; and

  (e)   is the Cost of Insurance Charge, as described below.

**Cost of Insurance Charge**

The rates for the Cost of Insurance Charge as of the Policy Date are based on the sex, if applicable, Age, Risk Classification, Basic Face Amount, Supplemental Face Amount, Net Amount at Risk, and duration that the coverage has been in force for the Insured.

The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount at Risk. The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and such rates will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions. The Maximum Monthly Rates at any Age are shown in Section 2 as a rate per $1,000 of Net Amount at Risk. To get the maximum rate per dollar, the rate shown must be divided by 1,000. Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk.

The Cost of Insurance calculation will reflect any adjustment for the Minimum Death Benefit.

We review our Cost of Insurance rates periodically, and may re-determine Cost of Insurance rates at such time on a basis that does not discriminate unfairly within any class of insureds. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

**Net Amount at Risk**

The Net Amount at Risk is the amount determined by subtracting (a) from the greater of (b) or (c) where:

  (a)   is the Policy Value at the end of the immediately preceding business day less all charges due on the Monthly Calculation Date;

  (b)   (i) is the Total Face Amount divided by the applicable Monthly Factor shown in the footnote in Section 2 for Death Benefit Option A; or (ii) is the Total Face Amount divided by the applicable Monthly Factor shown in the footnote in Section 2 plus the Policy Value for Death Benefit Option B; and

  (c)   is the amount defined in (a) multiplied by the applicable Minimum Death Benefit Percentage shown in Section 2.

U001ZZPS

## Interest Rate

We will determine the credited interest rate(s) used in the calculation of the Policy Value, based on our anticipation of future investment earnings, mortality, persistency, expense and administrative costs, and taxes. We may, in our sole discretion, change the interest rate(s). Changes in the rate(s) will apply to all policies in the same Risk Classifications. The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown in Section 1. Any interest credited in excess of that computed based upon the Guaranteed Minimum Interest Rate is referred to as "excess interest."

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate(s) in effect on a given date for unloaned amounts is referred to as the "current interest rate(s)." The rate in effect on a given date for loaned amounts will be no less than the Policy Loan Interest Rate less 2% nor greater than the Policy Loan Interest Rate. We may credit interest on loaned Policy Value for Preferred Loans at a different rate than the rate credited on loaned Policy Value for non-Preferred Loans. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

## Interest Bonus

On each Monthly Calculation Date beginning on the Interest Bonus Start Date, (shown in Section 1), in addition to interest being credited under the policy, we will also credit an Interest Bonus on amounts in excess of the Policy Value Benchmark Amount, defined as follows.

The Policy Value Benchmark Amount is equal to the Policy Value Benchmark Percentage (shown in Section 1) multiplied by the sum of the Total Face Amount at issue and the insurance amount then in effect on any applicable riders attached to this policy.

The bonus equals the monthly equivalent of the Bonus Interest Rate, as specified in the table below, multiplied by the amount that (a) exceeds (b), where:

    (a) = the lesser of the unloaned portion of the Policy Value and the Total Face Amount, and

    (b) = Policy Value Benchmark Amount.

| Effective Annual Rate on unloaned Policy Value | Bonus Interest Rate |
|---|---|
| At least 4.5% | 1.00% |
| At least 4.25% but less than 4.50% | .50% |
| Less than 4.25% | 0% |

---

## SECTION 10: Premiums

No insurance under this policy will take effect until our underwriters approve issuance of this policy and the conditions specified in the application form have been satisfied, including our receipt of at least the Minimum Initial Premium.

We will process any premium payment subject to the limitations of the life insurance qualification test elected by you, unless one of the following exceptions applies:

    (i)   we will process a payment received prior to the Policy Date as if received on the Policy Date.

    (ii)  we will process the portion of any premium payment for which we require evidence of the Insured's continued insurability on the first business day after we have received such evidence and found it satisfactory to us.

If however, our receipt of any premium payment (or portion thereof) would cause the policy to not qualify as a "life insurance contract" under the federal income tax laws, we will not process such payment (or portion thereof). In addition in the case of certain other situations that could have tax implications, we will process the payment (or portion thereof) on the first business day after we have received satisfactory written instructions from you.

U001ZZP6

Subject to these limitations, you may pay additional premiums at any time prior to the Age 100 Anniversary and while this policy is in force. Unless we agree otherwise, maximum premium payments are subject to the Maximum Annual Premium shown in Section 1. If, however, you have exercised Overloan Protection, no further premiums may be paid once Overloan Protection goes into effect. All premiums are payable at our Main Administrative Office or to an authorized agent. You may request a receipt signed by one of our executive officers.

If any premium payment results in an increase in the Death Benefit by more than it would increase the Policy Value, then we will either refund the premium or require evidence of insurability satisfactory to us. To the extent of such evidence, the Incontestability and Suicide Exclusion provisions will apply. We may limit the number and amount of premium payments in any Policy Year. The minimum premium payment that we will accept is $25.

---

### SECTION 11: Grace Period

**During the first 5 Policy Years** - If the Total Cumulative Premium Test is satisfied, as described in Section 7, then the Basic Face Amount, any Supplemental Face Amount, and any rider benefits will remain in effect during the Guaranteed Death Benefit Period. If, however, the Total Cumulative Premium Test is not satisfied, then this policy and any riders will go into default if, on any Monthly Calculation Date, the required Monthly Deductions exceed the Net Policy Value. A grace period of 61 days from the date the policy goes into default will be allowed for the payment of additional premiums. Such additional premium payments must be sufficient to increase the Net Policy Value on that Monthly Calculation Date to cover three Monthly Deductions or, if less, the amount necessary to pass the Total Cumulative Premium Test for the next three Policy Months.

**During Policy Years 6 through 9** - This policy and any riders will go into default if, on any Monthly Calculation Date, the required Monthly Deductions exceed the Net Policy Value. A grace period of 61 days from the date the policy goes into default will be allowed for the payment of additional premiums. Such additional premium payments must be sufficient to increase the Net Policy Value on that Monthly Calculation Date to cover three Monthly Deductions.

**After the 9th Policy Year** - This policy and any riders will go into default if, on any Monthly Calculation Date, the required Monthly Deductions exceed the Net Surrender Value. A grace period of 61 days from the date the policy goes into default will be allowed for the payment of additional premiums. Such additional premium payments must be sufficient to increase the Net Surrender Value on that Monthly Calculation Date to cover three Monthly Deductions.

At least 30 days prior to termination of coverage, we will send notice to your last known address, specifying the amount you must pay to bring the policy out of default. If we have notice of a policy assignment on file at our Main Administrative Office, we will also mail a copy of the notice of the amount due to the assignee on record. When payment is received, any Policy Charges which are past due and unpaid will be immediately deducted from the Policy Value. If the necessary additional premium payments have not been received by the end of the grace period, the policy will terminate. Upon termination of the policy, the remaining Net Surrender Value, if any, will be paid to the Owner. If the Insured dies while the policy is in default, then we will deduct from the proceeds all Monthly Deductions due and unpaid as of the date of the Insured's death. Unless a rider provides otherwise, no riders will be in effect after the policy terminates.

---

### SECTION 12: Policy Termination

This policy will terminate automatically on the earliest of:
  (1)  the date the Insured dies;
  (2)  the date the grace period expires without the payment of sufficient premium as provided in Section 11; or
  (3)  the date the policy is surrendered for its Net Surrender Value.

U001ZZP7

## SECTION 13: Reinstatement

If this policy terminates in accordance with the Grace Period provision, you may reinstate this policy while the Insured is alive within five years from the date the policy goes into default, as specified in Section 11. The policy cannot be reinstated if it has been surrendered for its Net Surrender Value. It also cannot be reinstated if the date of reinstatement is on or after the Age 100 Anniversary. We will not approve a request for reinstatement until we receive at our Main Administrative Office all of the following:

    (1) a written request for reinstatement;

    (2) evidence of insurability satisfactory to us;

    (3) payment or reinstatement of any Policy Debt as of the date of termination, if applicable; and

    (4) payment of the Reinstatement Premium. The Reinstatement Premium equals the amount that was required to bring the policy out of default immediately prior to termination, plus three Monthly Deductions.

Requirements (2) through (4) must be satisfied within 60 days after the date we receive a written request for reinstatement.

If we approve your request,

    (1) the reinstatement date will be the date we receive the required payment at our Main Administrative Office;

    (2) any Surrender Charge will be reinstated to the amount it was at the date of default;

    (3) the remaining Surrender Charge Schedule, if any, will be the same as on the date of default;

    (4) the Policy Value on the date of reinstatement, prior to the crediting of any Net Premium paid on the reinstatement, will be equal to the Policy Value on the date the policy terminated.

## SECTION 14: Loans and Overloan Protection

While this policy is in force, and sufficient loan value is available, a loan may be obtained by written request. Each loan must be for at least the Minimum Loan Amount shown in Section 1. A loan may not be taken after you have exercised Overloan Protection. To obtain a loan, we may require a loan agreement from you, since the policy is the only security for the loan. We may defer loans as provided by law or as provided in Section 25. Loans may not be made if the policy is in the grace period as described in Section 11.

### Maximum Loan Value
The Maximum Loan Value on the Policy Date is equal to 75% of the premiums received. Thereafter, the Maximum Loan Value on any date is equal to the lesser of (a) or (b), where:

    (a) = the Policy Value, projected (with interest and monthly charges) to the next Policy Anniversary, less any applicable Surrender Charge, discounted for interest at the policy loan interest rate; and

    (b) = the current Surrender Value of this policy.

The Maximum Loan Value, however, will not be less than the Preferred Loan Amount plus accrued interest on such amount, but in no event greater than the current Policy Value.

### Available Loan Value
The available loan value on any date is an amount equal to the Maximum Loan Value less Policy Debt.

15

**Loan Interest Charged**
Loan interest will accrue on a daily basis from the date of the loan, and is payable in arrears.

Loans will bear interest at a rate not to exceed the Policy Loan Interest Rate shown in Section 1. Loan interest will be payable on each Policy Anniversary and on the date the loan is settled. In the event that you do not pay the loan interest charged in a Policy Year, such amount will be added to the Policy Debt on the Policy Anniversary. The portion of the loan interest attributable to the Preferred Loan Amount will be reflected as an increase to the Preferred Loan Amount on the Policy Anniversary.

**Loan Repayment**
You may repay the Policy Debt in whole or in part at any time prior to the death of the Insured and while the policy is in force. Subject to any rider, endorsement, or other provisions, while a loan exists, we will treat any amounts you pay as premiums, unless you request in writing that they be treated as loan repayments.

**Overloan Protection**
You have the option of exercising Overloan Protection, in writing, when the following conditions exist on the Monthly Calculation Date:
1. the Policy Debt exceeds the specified Total Face Amount;
2. the Policy Debt is equal to 96% of the Policy Value;
3. the Insured is at least 65 years of Age;
4. this policy has been in force for at least 15 Policy Years; and
5. the Guideline Premium Life Insurance Qualification Test is in effect.

If the loan balance is in excess of 96% of the Policy Value, the portion of the loan balance that exceeds 96% of the Policy Value must be repaid at the time that such Overloan Protection is exercised. Overloan Protection will be effective on the Monthly Calculation Date following your written request. Once in effect, Overloan Protection will keep your policy in force and the following changes will automatically take effect.

1. Any riders then in effect will terminate.
2. The Death Benefit Option will be permanently set to Death Benefit Option A.
3. The Total Face Amount then in effect will be reduced to 101% of the Policy Value.
4. The death benefit will equal the greater of (a) and (b), where:
   (a) = the new Total Face Amount, and
   (b) = the applicable Minimum Death Benefit Percentage shown in Section 2, multiplied by the greater of (i) and (ii), where:
      (i) = the Policy Value, and
      (ii) = the Policy Debt.
5. No further premium payments will be accepted.
6. No further withdrawals will be allowed.
7. No further monthly deductions will be assessed.
8. No additional loans or loan repayments will be allowed.

Any loan balance will reduce the death benefit payable. Loan interest will continue to accrue on this policy.

Once you have exercised Overloan Protection, a one-time Overloan Transaction Charge, as shown in Section 1, will be assessed. There is no additional charge for this benefit or for any of the automatic changes that occur pursuant to your election of this benefit.

U001ZZP9

## SECTION 15: Surrenders and Withdrawals

**Surrender of the Policy**

You may surrender this policy upon written request for its Net Surrender Value at any time prior to the death of the Insured. We will determine the Net Surrender Value as of the end of the business day on which we have received at our Main Administrative Office your written request for surrender of the policy. After we receive your written request to surrender the policy, no insurance will be in force.

**Withdrawals**

Once per Policy Month while the Insured is living, you may request a withdrawal of part of the Net Surrender Value, if available. A withdrawal will not be permitted after you have exercised Overloan Protection. An amount equal to the withdrawal and its related pro-rata Surrender Charge, shown in Section 1, will be deducted from the Policy Value, if such withdrawal occurs during the Withdrawal Charge Period shown in Section 1. Withdrawals are subject to the following conditions:

   (a)   each withdrawal must be for at least the Minimum Withdrawal Amount shown in Section 1;

   (b)   after the withdrawal, the remaining Net Surrender Value must be greater than zero;

   (c)   a withdrawal will not be permitted which would reduce the Basic Face Amount below the Minimum Face Amount shown in Section 1.

We will process the withdrawal, thereby reducing the Policy Value, as of the end of the business day on which we receive your written request.

If Death Benefit Option A is in effect on the date of the withdrawal, such withdrawal will reduce, dollar for dollar, the Supplemental Face Amount first, and then the Basic Face Amount. If, however, the Death Benefit in effect on the date of the withdrawal is equal to the Minimum Death Benefit, withdrawals on such day will first reduce the Death Benefit by the amount withdrawn multiplied by the applicable Minimum Death Benefit Percentage until the Death Benefit is equal to the Total Face Amount. Such excess withdrawal amount will then reduce, dollar for dollar, the Supplemental Face Amount first, and then the Basic Face Amount. Your Death Benefit will continue to be determined in accordance with Sections 6 and 8 based upon the revised Total Face Amount of coverage.

If Death Benefit Option B is in effect at the time of the withdrawal, the amount of the withdrawal will be deducted from the Policy Value. The Total Face Amount does not change.

Any benefits provided are not less than that required by law of the state where this policy was delivered. We may defer payment of surrender values as provided by law or as provided in Section 25.

## SECTION 16: Basis of Computations

All of the values under this policy are equal to or more than the minimums required on the Policy Date by the state in which this policy was delivered or issued for delivery. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered or issued for delivery.

## SECTION 17: Owner(s) and Beneficiary(ies)

The Insured is the owner of this policy, unless otherwise provided in the application or if ownership is changed by later transfer of ownership. If, however, you are offered consideration to transfer ownership of your policy or any interest in your policy including a collateral or absolute assignment to a third party, no such transfer of ownership shall take effect unless we or one of our affiliated companies first have the right to purchase your policy. We require evidence satisfactory to us of any consideration offered by such third party.

17

While the Insured is living, the owner may exercise all rights provided by this policy or allowed by us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. If there is no surviving Beneficiary upon the death of the Insured, you will be the Beneficiary, but if you were the Insured, your estate will be the Beneficiary.

Any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:

    (a) Primary beneficiaries;
    (b) Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;
    (c) you or your executor or administrator, provided no primary or contingent beneficiary is living at the death of your insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the Insured. You may change the beneficiary by written notice filed with us at our Main Administrative Office. When we receive it, the change will take effect as of the date it was signed by you. However, the change will be subject to any payments made or actions taken by us before we received the notice at our Main Administrative Office.

---

### SECTION 18: Assignment

Except as otherwise provided in this policy, you may, by written notice, assign any interest in this policy without the consent of any person other than an irrevocable Beneficiary. The assignment or a certified copy of it must be filed with us at our Main Administrative Office. When filed, it will bind us as of the date of the assignment, subject to any action taken by us before such filing. We shall not be responsible for the validity or sufficiency of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. An assignee cannot change the beneficiary, owner, or contingent owner.

---

### SECTION 19: Misstatements

If the age or sex of the Insured has been misstated, we will adjust the Basic Face Amount, any Supplemental Face Amount, and every other benefit to that which would have been purchased at the correct age or sex by the most recent Cost of Insurance charge deducted under Section 9.

---

### SECTION 20: Suicide Exclusion

If the Insured, whether sane or insane, dies by suicide within two years from the Issue Date, (or within two years from any reinstatement of the policy) and while the policy is in force, our liability shall be limited to an amount equal to the premiums paid on this policy less any Policy Debt owed us and less any withdrawals.

---

### SECTION 21: Incontestability

This policy shall be incontestable after it has been in force during the Insured's lifetime for two years from the Issue Date, except for fraud, or any provision for reinstatement or policy change requiring evidence of insurability. In the case of reinstatement or any policy change requiring evidence of insurability, the incontestable period shall be two years from the effective date of such reinstatement or policy change. Any premium payment which we accept subject to insurability, and any increase in the Death Benefit resulting from such payment, shall be considered a policy change for purposes of this Section.

While insurance is contestable, we may either rescind the insurance or deny a claim on the basis of:

1. a misstatement in the application or supplemental application for this policy or any face amount increase; or
2. a misstatement in the reinstatement application if there has been a reinstatement of this policy.

U001ZZPB

If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the con tested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount.

## SECTION 22: The Entire Contract

The written application for the policy is attached at issue. This policy, including the Schedule Pages (and any supplements or changes thereto), any riders, amendments, or endorsements to it, and the application for it (and any supplemental applications) constitute the entire contract between you and us. However, additional written requests or applications for policy changes or acceptance of excess payment may be submitted to us after issue and such additional requests may become part of the policy.

We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, in the absence of fraud, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:
1. it is contained in the application or in a supplemental application; and
2. a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, including modifying the policy, waiving any of its conditions, or making an agreement for the Company, to be in effect, must be in writing and signed by one of our executive officers and countersigned by our registrar or one of our executive officers. We have the right to correct any clerical errors in this policy, or in our administration of the policy.

## SECTION 23: Annual Statement

Within 30 days after each Policy Anniversary, we will send you, without charge, a report for each Policy Year which includes:
1. the current Policy Value, Death Benefit, Total Face Amount and Surrender Value;
2. any withdrawals, premiums paid, interest credited and charges made during the year;
3. any outstanding loans and new loans and loan repayments made during the year; and
4. any other information required by the insurance supervisory official of the state in which this policy was delivered.

You have the right to request an illustrative report at any other time. We may charge a reasonable fee, not to exceed $50, for the report.

We will provide you, on written request, a projection of illustrative future benefits and values under your policy. We will provide one report annually without charge. For additional reports you request, we have the right to charge a reasonable service fee, not to exceed $50. We may limit the number of such projections in any Policy Year.

## SECTION 24: Claims of Creditors

The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law. These proceeds and payments may not be assigned or withdrawn before becoming payable without our agreement.

## SECTION 25: Right to Defer Payment of Benefits

We reserve the right to defer payment of Net Surrender Values, withdrawals, and policy loans, for up to six months, except when used to make a premium payment.

U001ZZPC

# ACCELERATED BENEFIT RIDER

This Rider is part of the Policy to which it is attached, effective as of the Rider Date, if it is listed on the Policy's Schedule Page or in an Endorsement after that page. You should therefore review the Policy's Schedule Page for applicability. Except as stated in this Rider, it is subject to all of the provisions contained in the Policy.

THE BENEFIT PAID UNDER THIS RIDER MAY BE TAXABLE. YOU SHOULD CONSULT YOUR PERSONAL TAX ADVISOR REGARDING POSSIBLE TAX CONSEQUENCES.

| | |
|---|---|
| Rider Date | SAME AS POLICY DATE |
| Maximum Administrative Charge | $300.00 |
| Maximum Proportion Allowable | 75% |
| Maximum Accelerated Benefit | $250,000 |
| Minimum Remaining Face Amount | $10,000 |

**Definitions**

Insured is the person covered under the basic Policy.

You (Your) is the owner of the Policy to which this Rider is attached.

We (Our, Us) refers to PHL Variable Insurance Company.

Eligible Amount is the amount of insurance under the Policy that is eligible for accelerated payment. It is equal to the death benefit of the basic Policy at the time of claim plus any term insurance amounts in Force provided by Rider on the life of the Insured, which provides coverage renewable to the Insured's attained age 95 or beyond, but exclusive of any other supplemental Rider death benefits.

Proportion is the percentage of the Eligible Amount that will be accelerated under this Rider. The Proportion is chosen by You at the time of election of an accelerated benefit, subject to the following limitations. The Proportion elected:

1. can be no more than the Maximum Proportion Allowable as specified in this Rider;

2. cannot result in a remaining death benefit below the minimum as specified in this Rider; and

3. cannot result in a Requested Benefit that exceeds the Maximum Accelerated Benefit as specified in this Rider.

This Rider terminates upon payment of the accelerated benefit.

**Maximum Accelerated Benefit** is the amount shown on the first page of this Rider. This Maximum Accelerated Benefit applies, in aggregate, to all policies issued on the Insured by Us.

**Requested Benefit** is the Proportion multiplied by the Eligible Amount.

**Terminal Illness** is an illness or condition that is expected to result in the Insured's death within six months based on evidence satisfactory to Us as defined under the Proof of Terminal Illness section below.

**Rider Description**

This Rider allows You to elect an accelerated benefit upon terminal illness of the Insured. The election must be made by a Written Request signed by You. We must also receive proof satisfactory to Us of the Insured's terminal illness as described in the Proof of Terminal Illness section below. The amount of the accelerated benefit will be adjusted as described under the Payment Made to You section below. The resulting payment will be made in a lump sum. Policy Values, cash Surrender Values, loan values and the death benefit as specified in the Policy to which this Rider is attached will be reduced if You receive an accelerated benefit. There is no premium charge for this Rider.

**Payment Made To You**

The amount of the payment made to You will be determined by discounting the Requested Benefit at Our then current discounting rate for a period of twelve (12) months, to reflect the early payment of insurance proceeds under the Policy.

Our discounting rate will be subject to the higher of:

1. 5%; or

2. the Published Monthly Average for the calendar month ending two months before the Policy Anniversary on or immediately preceding the date that We receive Your Written Request for payment under this Rider.

The Published Monthly Average will be:

a. The Corporate Bond Yield Average -- Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

b. If that Monthly Average is no longer published, a substantially similar average, established by regulation for policy loan rates issued by the Insurance Department of the state where the Rider was delivered will be applicable.

If the discounting rate computed for a Policy Year is no more than 1/2% higher than the rate in effect for the previous Policy Year, then We will maintain such prior year's rate.

If the discounting rate computed for a Policy Year is no more than 1/2% lower than the rate in effect for the previous Policy Year, then We may, at Our discretion, maintain such prior year's rate.

If the cash Surrender Value multiplied by the Proportion exceeds the discounted value, then the discounted Requested Benefit will be increased to equal such greater amount.

The discounted Requested Benefit is reduced by the Proportion of any Policy debt, including any unpaid loan interest, and the Proportion of any other amounts due Us from You. This result is then reduced by Our then current Administrative Charge for benefits under this type of Rider, not to exceed the maximum as specified in this Rider. The amount that remains is the payment that will be made to You.

In the event that the Insured dies after the Written Request but before We make the payment, and We receive Written Notice at Our Main Administrative Office during this period of this event, the request will be considered void, and no payment will be made under this Rider.

**Effect On Contract**

The following values will be reduced by the Proportion at the time the payment is made to You:

1. the future planned premium payable on the basic Policy;

2. the face amount of the Policy at the time of claim;

3. the cash value (Policy Value);

4. any remaining Surrender Charge;

5. the cash Surrender Value; and

6. any Policy debt including any unpaid loan interest.

If this Rider is attached to a variable life insurance policy that permits fund investment in various subaccounts of Our Variable Universal Life Separate Account, the reduction in Policy Value will be achieved through a proportionate reduction in this Policy's share in the value of each subaccount based on the allocation You request at the time of Your accelerated benefit request. If no allocation request is made, the assignment to each subaccount will be made in the same manner as provided for monthly deductions.

Future values under the Policy will be determined in a manner consistent with that under the original Policy, as adjusted to reflect the above reductions. We will mail to You a new policy Schedule Page reflecting any payment made under this Rider.

**Proof of Terminal Illness**

A licensed physician, who is not Yourself or a member of Your family, must provide Us with evidence satisfactory to Us of the Insured's terminal illness. We reserve the right to obtain a second medical opinion from a physician of Our choosing at Our expense.

**Conditions**

Payment under this Rider is subject to the following conditions:

1. The Policy must not have lapsed.

2. We will require the consent of any assignees and irrevocable beneficiaries to any request for payment under this Rider.

3. No payments will be made under this Rider to satisfy the claims, demands, or obligations of any creditor, trustee in bankruptcy or governmental agency, or arising under any court order directed against You, to the extent that We have written notice thereof.

**Rider Termination**    This Rider will terminate on the earliest of:

1. Lapse or surrender of this Policy to which it is attached.

2. Our receipt of Your written request to terminate this Rider; or

3. Payment of any benefit under this Rider.

PHL Variable Insurance Company

*John M. Beers*

Secretary

# Life Plan Options Rider

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

## DEFINITIONS

### Option Review Period
The 90-day period immediately preceding the 5th, 10th and 15th Policy Anniversaries.

### Individual Term Life Rider
As used in this rider form "Individual Term Life Rider" refers to any of the following riders: Individual Term Rider, Individual Term Insurance Rider, Policy Term Rider, Policy Term Insurance Rider, Phoenix Individual Edge Term Rider, or the Variable Policy Term Rider.

## OPTION BENEFITS

### Increased Coverage Determination without Medical Exam
Policies that include both this rider and the Individual Term Life Rider are eligible during each Option Review Period, while both such riders are in effect, for an increase in their term insurance rider amount up to a maximum lifetime increase of $1,000,000, with underwriting and our agreement to such increase determined without the inconvenience of an additional medical exam. Our other ordinary underwriting rules will continue to apply and thus the increase in coverage is still subject to our normal underwriting approval.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- The insured must be attained age 65 or younger on the last day of the Option Review Period.
- The risk classification of the insured must be standard through Table D (200%) at original issue of the basic policy.
- The insured must be alive and meet our underwriting requirements at the time of your request for the increase in term rider face amount.
- The Individual Term Life Rider must either already be attached to the policy or then currently approved and available for sale in the state of applicable jurisdiction.
- There is a maximum lifetime increase of $1,000,000 per insured life.

### Reduced Coverage without Surrender Charge
During each Option Review Period you may request a decrease in the face amount of the policy without our assessment of the partial surrender charge that, under the terms of your basic policy, would otherwise apply. In such case the surrender charge remaining under the policy will continue to be calculated as if such decrease in face amount had not been made.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- Total option reductions of the basic policy face amount may not exceed the lesser of 50% of the initial basic policy face amount or $5,000,000 in combined aggregate of all option reductions for all Our policies on the same insured.

UR73

Exchange for Annuity without Surrender Charge

During each Option Review Period beginning with the 90-day period preceding the 10th policy anniversary, you may request that the policy be surrendered as part of an exchange request to an eligible annuity offered by us. In such an exchange, we would not assess the surrender charge that would otherwise apply. In such case, the new annuity will reflect the usual surrender charges that would ordinarily apply for new business.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.

## TERMINATION OF THIS RIDER

This rider will terminate on the first of any of the following events to occur:

1. exercise of the Exchange for Annuity without Surrender Charge Option;

2. the 15th policy anniversary;

3. termination of the basic policy.


PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

# Exhibit 4



# PHOENIX

March 8, 2010



Re: 97515667

Dear Policyholder:

We are sending you this letter to inform you that on April 1, 2010, we are increasing cost of insurance rates on certain Phoenix Accumulator Universal Life policies. Your policy referenced above will be subject to this rate increase on your next policy anniversary beginning 2/17/2011 unless your accumulated policy value is maintained at a sufficient level.

The amount of the increase will vary based on the accumulated amount of your policy value. In general, maintaining higher levels of policy value in relation to the face amount will reduce or even eliminate the increase.

As background, we review our cost of insurance rates periodically to determine whether they should be changed and take action only when the rates are too low relative to our current actuarial and financial expectations related to the policies. This increase is in accordance with the terms of your policy and the adjusted rates for the cost of insurance will remain below the maximum guaranteed cost of insurance rates we are permitted to charge your policy.

If you have any questions or would like information about how you may reduce or eliminate the rate increase, please contact us at (800) 541-0171. Select Option 4, Option 5, Option 1, ext. 8875 between 8:30 a.m. and 5 p.m., Eastern Time. As always, we appreciate the opportunity to serve your insurance needs.

Sincerely,

Customer Care Center

cc: William E Stansbury

One American Row
P.O. Box 5056
Hartford, CT 06102-5056

860 403 5000 *Phone*
www.phoenixwm.com

# Exhibit 5



Andrew M. Cuomo
Governor

James J. Wrynn
Superintendent

September 6, 2011

Kathleen A. McGah, Esq.
Vice President and Counsel
Phoenix Life Insurance Company
One American Row
P.O. Box 5056
Hartford, CT 06102-5056

> Re: <u>Phoenix Life Insurance Company</u>
> COI Increase – U607 NY and 05PAUL
> File No. 1005160

Dear Ms. McGah:

I write in regard to the Department's investigation into Phoenix Life Insurance Company's ("Phoenix's") cost of insurance ("COI") rate increase for Phoenix's flexible premium adjustable universal life ("UL") insurance policy forms 05PAUL ("Accumulator UL") and U607 NY ("Accumulator UL II") (collectively, the "Policies").

With regard to the COI rates, the Policies state that the COI rate will be based upon certain characteristics: insured's age at issue, risk class and sex, and policy duration, for the Accumulator UL II; and sex, age, risk classification, basic face amount, supplemental face amount, net amount at risk, and the duration that the coverage has been in force for the insured, for the Accumulator UL.

As to the Accumulator UL II, there is no language in the policy that states that Phoenix will take into consideration a funding ratio of the policy's accumulated value to the face amount when adjusting COI rates. In addition, the change made to the COI rates based on the new formula using the funding ratio is contrary to the language in the policy that any change in rates will be made on a uniform basis for all insureds in the same class. The change in the COI rate varies from policy to policy based on the funding ratio. Therefore, by increasing COI rates in a manner that is inconsistent with the terms of the Accumulator UL II, Phoenix violated Insurance Law § 3201.

Furthermore, Phoenix violated Insurance Law § 3204(a)(1), because it used the funding ratio as a factor for a change in the COI rates even though the Accumulator UL II does not include the funding ratio as a factor for any change in COI rates. Section 3204(a)(1) requires a policy to contain the entire contract between the parties and prohibits incorporation by reference, unless a copy of the referenced document is endorsed upon or attached to the policy when issued.

With regard to the Accumulator UL, page 12 of this policy form states that rates for the COI charge as of the policy date are based on the sex (if applicable), age, risk classification, basic face amount, supplemental face amount, net amount at risk, and duration that the coverage has been in force for the insured. While the Accumulator UL refers to the net of amount of risk as a basis for determining the initial COI rates, this reference alone is insufficient to alert policyholders that Phoenix may take into consideration the funding of their account values relative to their face amounts when deciding whether to increase their COI rates. While page 3 of the Accumulator UL states that the actual premiums paid will affect the policy value, the duration of insurance coverage, and the amount of the death benefit, it does not indicate that actual premiums paid will affect COI rate increases.

From the aforementioned policy language, it would be unreasonable to expect a policyholder to conclude that the funding ratio of his or her policy is a factor that Phoenix may use in a new formula developed after policy issuance to increase COI rates. Nor would the Department have anticipated that a COI rate increase would apply as a function of the funding ratio based on the policy's use of the phrase "net amount at risk."

As a result, the Accumulator UL violates Insurance Law §§ 3102(c)(1)(A) and (B), which require that insurers write insurance policies in a clear and coherent manner and that wherever practicable, insurers use words with common and everyday meanings to facilitate readability and to aid the insured or policyholder with understanding the coverage provided. The Accumulator UL policy, without further explanatory language on how the term net amount risk could be utilized by the insurer to take into consideration a policy's funding ratio for COI rate increases, does not meet this standard. The Accumulator UL is also inconsistent with Insurance Law § 3201(c) (1) because it is misleading to the policyholder.

In addition, the Accumulator UL violates Insurance Law § 4232(b)(2), because page 12 of the Accumulator UL states that COI rates will be based, in part, upon Phoenix's expectations of capital and reserve requirements and tax assumptions. Section 4232(b)(2) only permits insurers to guarantee or credit additional amounts based upon reasonable assumptions as to investment income, mortality, persistency, and expenses.

With regard to the advertising materials that you submitted to the Department, given the way in which Phoenix implemented the COI rate increase, the materials are misleading and misrepresent the benefits and advantages of the Policies in violation of Insurance Law §§ 2123(a)(1) and 4226(a)(1) and 11 NYCRR Part 219 (Regulation 34-A). The advertising materials make numerous statements emphasizing premium payment flexibility, but do not make any statements to the effect that a person's failure to fund the policy at a certain level may affect

expectations with regard to future mortality, persistency, investment earnings, and expenses, thereby resulting in a COI rate increase.

In light of the foregoing, Phoenix is hereby directed to take the following remedial actions:

(1) Phoenix must reduce the COI rate for the affected policies to the COI rate that was in effect prior to the increase.

(2) Phoenix must credit the positive difference, if any, between the COI rates paid and the revised COI rates accumulated, with credited interest, to the policy values of the affected policies.

(3) Going forward, Phoenix may not use a policy's funding ratio as a basis for determining the allocation of COI rates among policy classes for these policies, and must implement changes in COI rates consistent with the Insurance Law and regulations promulgated thereunder, the relevant provisions of the Policies, and Phoenix's advertising materials.

The Department at this time will not address the Insurance Law §§ 4224(a)(1) and 4232(b)(4) issues related to the COI rate increases, as addressed in your February 8, 2011 submission to Supervising Insurance Examiner Ruth Gumaer. However, the Department reserves the right to revisit these issues.

Phoenix is directed to file with the Department, within 30 days from the date of this letter, a written plan describing the steps Phoenix will take to implement the remedial actions described above and a timeline for those steps, which shall be undertaken as expeditiously as possible. The written plan, and any questions regarding the foregoing, should be directed to the undersigned.

Very truly yours,

Michael Maffei
Assistant Deputy Superintendent and Chief
Life Bureau

cc: James J. Wrynn, Esq., Superintendent
    Martin A. Schwartzman, First Deputy Superintendent
    Martha A. Lees, Deputy Superintendent and General Counsel