UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————x

U.S. BANK NATIONAL ASSOCIATION,

      Plaintiff,

    -against-                   No. 12 Civ. 6811 (CM)

PHL VARIABLE LIFE INSURANCE COMPANY,

      Defendant.
—————————————————————x

U.S. BANK NATIONAL ASSOCIATION,

      Plaintiff,

    -against-                   No. 13 Civ. 1580 (CM)

PHL VARIABLE LIFE INSURANCE COMPANY,

      Defendant.
—————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/22/15

## DECISION AND ORDER

McMahon, J.:

      The court, for its rulings *in limine* on the motions filed by U.S. Bank National Association ("U.S. Bank") and PHL Variable Life Insurance Company ("Phoenix") (*see* Docket ##179, 182 in No. 13 Civ. 1580 and Docket ##386, 389 in No. 12 Civ. 6811), and on an untimely motion for judgment by the pleadings filed by Phoenix, (*see* Docket #398 in No. 12 Civ. 6811):

### I.    Phoenix's Motion for Judgment on the Pleadings

      Phoenix has filed a motion for judgment on the pleadings in No. 12 Civ. 6811 seeking dismissal of U.S. Bank's claim for breach of the covenant of good faith and fair dealing. I had previously dismissed an analogous claim in No. 13 Civ. 1580; applying New York law, I held that

the claim was duplicative of U.S. Bank's breach of contract claim. (No. 13 Civ. 1580, Docket #149.) Phoenix argues that dismissal of the analogous claim in No. 12 Civ. 6811 is compelled under California law as well, because U.S. Bank's bases for alleging that Phoenix breached the covenant of good faith and fair dealing depend on Phoenix's having improperly exercised discretion afforded to it by the life insurance contracts at issue. U.S. Bank alleges that Phoenix failed to exercise its discretion to set COI rates in good faith by raising rates to penalize policyholders who exercised their rights to minimally fund their policies, by using COI rate increases to make policies prohibitively expensive and encourage lapses, and by using COI rate increases to manage Phoenix's profitability at the expense of policyholders. According to Phoenix, California law does not recognize a claim for breach of the covenant of good faith and fair dealing based on one party's exercise of discretion afforded it under a contract.

The motion is **DENIED**.

Phoenix misstates the applicable law. Under California law, "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 200 (Cal. 1958). "This principle is applicable to policies of insurance." *Id.* Further, "The covenant of good faith *finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.* Such power must be exercised in good faith." *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 826 P.2d 710, 726 (Cal. 1992) (emphasis added). Thus, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Perdue v. Crocker Nat'l Bank*, 702 P.2d 503, 510 (Cal. 1985) (internal quotation marks and citation omitted).

However, "The covenant of good faith is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing." *Carma Developers*, 826 P.2d at 728 (internal quotation marks and citation omitted); *see also Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 803 (1995). That exception, in turn, is subject to its own exception. Courts will imply a covenant of good faith and fair dealing to cabin a party's exercise of express contractual rights when failing to do so would render the contract itself illusory for want of consideration. *Perdue*, 702 P.2d at 510; *Third Story Music*, 41 Cal. App. 4th at 804-08.

Phoenix flips these principles on their head by treating the implied covenant of good faith and fair dealing as an exception, inapplicable to any exercise of discretion under a contract unless unbounded discretion would render the contract illusory. The actual rule is that a covenant of good faith and fair dealing governs all exercises of contractual discretion except when the parties expressly permit certain acts that would otherwise violate an implied covenant.

Here, the insurance policies at issue unquestionable grant Phoenix discretion to set COI rates, subject to specific constraints: "We review our Cost of Insurance rates periodically and may re-determine Cost of Insurance rates at such time on a basis that does not discriminate unfairly within any class of insureds." (Docket #203, Ex. 2 at 12.) "No more frequent than once per year and no less frequent than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed." (Docket #203, Ex. 3 at 11.) Phoenix admits that these rate increases are subject to certain express conditions, including that they be based on permissible factors and that COI rates not exceed maximum permissible rates.

These insurance policies do not expressly permit the acts alleged in the complaint. While the policies provide Phoenix bounded discretion in setting insurance rates, there is no language suggesting that Phoenix was free to set rates as it pleased subject only to the express limitations of the contract. Nothing, for example, permits Phoenix to set its rates in a manner designed to penalize and deter policyholders from exercising their contractual rights to fund their policies minimally, or to force policyholders to let their policies lapse, or to use COI rate increases to manage Phoenix's profitability. Nothing permits Phoenix to set rates in a manner that discriminates among policy holders who, actuarially speaking, belong in the same class (indeed, that is expressly prohibited). Nothing suggests that Phoenix need not set COI rates in good faith.

Phoenix points to *Baymiller v. Guarantee Mut. Life Co.*, No. SA CV 99-1566 DOC AN, 2000 WL 1026565 (C.D. Cal. May 3, 2000), as an opinion dismissing a claim that an insurer breached the implied covenant of good faith and fair dealing by increasing insurance rates. But the contract in *Baymiller* included language expressly permitting any rate increase "in the amount and by the method to be determined by the Company." *Id.* at *1-2. Here, the policies merely state that Phoenix will periodically review and change COI rates, but will not do so in a way that does not discriminate unfairly within a class of insured and subject to the other terms of the policy that were the subject of extensive discussion in the opinion denying the motion for summary judgment. More analogous cases are those where insurance policies permit an insurer to take action such as increasing premiums, and to do so based on certain factors, but with no language absolving the insurer of its responsibility to exercise its responsibility reasonably. In those cases – where discretion exists without broad, *Baymiller*-like language – California courts have consistently implied a covenant of good faith and fair dealing. *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal.

App. 4th 385, 394-95 (2001); *Saver v. Principal Mut. Life Ins. Co.*, No. B147324, 2002 WL 440406, at *9-11 (Cal. Ct. App. Mar. 21, 2002). So it is here.

U.S. Bank may, of course, move for a directed verdict during the trial on the covenant of good faith and fair dealing or on any other count or counts. But now – with trial imminent – is not the time for U.S. Bank to make such a motion.

## II.    U.S. Bank's Motions *in Limine*

### A.    U.S. Bank's Motion *in Limine* #1

U.S. Bank's first motion *in limine* seeks to preclude Phoenix from offering the analyses of Douglas French, Phoenix's actuarial expert in *Fleisher*, through the testimony of Timothy Pfeifer, Phoenix's actuarial expert in this case. U.S. Bank points to three aspects of Pfeifer's report that it claims impermissibly adopted French's analysis:

> The COI increase class ($1 million+, ages 68/65+) underfunded their contracts to a much greater degree than other policyholders, as demonstrated in the September 16, 2013 Expert Report of Doug French in the related *Fleisher* litigation (as discussed later). (Solomon Decl. Ex. A (Pfeifer Rebuttal Report) at 10.)

> Since year-by-year data is sometimes not credible enough or more difficult to compare, the analysis performed by Douglas French in his Expert Report dated September 16, 2013 (pages 7-9) illustrated clearly that on an overall present value basis, the premium flow/persistency on PAUL policies at older ages (68+) was substantially lower than the premium flow/persistency at younger ages. (Pfeifer Rebuttal Report at 28.)

> On a present value basis, reflecting all years of funding, the present value of actual premiums as a percentage of the present values of CTP is 64% at ages 68+, compared to 82%/96% at younger ages (*see* French Expert Report, Page 9). *Thus, it is clear that the 68+ cohort behaved substantially different than the younger cohorts.*
> As further evidence, the average account value per unit of face amount on younger lives versus ages 68+ dropped dramatically from the PAUL IIb and earlier versions of PAUL to the PAUL IIc through PAUL IIIc versions of PAUL. (*See* French Expert Report, Page 9). (Pfeifer Rebuttal Report at 35-36.)

This motion is **DENIED**.

The law governing this motion is straightforward. One expert is permitted to rely on facts, opinions, and data not of the expert's own making – including analyses performed or findings made by another expert in the case – even if those facts, opinions, and data are otherwise inadmissible. *See Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014); *Jung v. Neschis*, No. 01 CIV. 6993 RMBTHK, 2007 WL 5256966, at *16 (S.D.N.Y. Oct. 23, 2007), *original report and recommendation adopted* (Sept. 21, 2007); *see also Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009); Wright & Miller, Fed. Prac. & Proc. Evid. § 6274 n.50 (1st ed.) ("[T]he Advisory Committee clearly contemplated that experts can base opinions on the opinions of others."). One expert may not, however, merely adopt another expert's opinions as his or her own reflexively and without understanding the materials or methods underlying the other expert's opinions. *Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of New York*, No. 06-CV-1164, 2010 WL 3907489, at *27 (N.D.N.Y. Sept. 30, 2010).

The cases on which U.S. Bank relies are not to the contrary. These cases establish that one expert may not rely on another expert's opinion if the first expert is unfamiliar with the methods and reasons supporting the second, *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993), that an expert cannot merely recite another expert's opinion, *Member Servs., Inc.*, 2010 WL 3907489, at *27, and that an expert cannot directly testify as to the conclusions of another expert. *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 409 (6th Cir. 2006). None of these cases establishes that Pfeifer was precluded from considering French's report – including French's opinions – together with Pfeifer's own analysis and the facts of the case in forming an opinion. Phoenix has not demonstrated that Pfeifer failed to conduct his own analysis, merely vouched for French's opinions, or failed to understand how French reached his conclusions.

U.S. Bank points to a laundry-list of things Pfeifer failed to do: oversee French's work, consult with French, ensure French properly applied his methodology to his data, and obtain and verify French's data. These are proper subjects for cross-examination and sound like excellent bases on which U.S. Bank could impeach Pfeifer. None of these alleged defects, however, shows that Pfeifer failed to understand French's work or incorporate it properly in formulating his own conclusions. Pfeifer's purported analytical shortcomings go to weight, not admissibility.

### B.     U.S. Bank's Motion *in Limine* #2

U.S. Bank moves to preclude Phoenix's actuarial expert, Pfeifer, from testifying about Phoenix's contention in the JPTO that "U.S. Bank would have received a COI Adjustment regardless of the methodology employed by P[hoenix]." U.S. bank argues that Pfeifer may not testify to this fact because Pfeifer offered no such opinion, in either his expert report or his deposition.

This motion is **GRANTED**.

It is well-established that "expert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)." *Advanced Analytics, Inc. v. Citigroup Global Markets, Inc.*, 301 F.R.D. 31, 36 (S.D.N.Y.), *reconsideration denied* (May 7, 2014), *objections overruled*, 301 F.R.D. 47 (S.D.N.Y. 2014) (quoting *In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 275 (S.D.N.Y. 1998) (alteration omitted)). "This result is self-executing and is an automatic sanction that is designed to provide a strong inducement for disclosure of relevant material that the disclosing party expects to use as evidence. This duty to disclose information concerning expert testimony is intended to allow opposing parties to have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *LaMarca v. United States*, 31 F. Supp. 2d 110, 122 (E.D.N.Y. 1998) (internal alteration, quotation marks, and citations omitted).

Phoenix has failed to demonstrate that its assertion about the inevitability of a COI rate increase in paragraph 30 of the JPTO – about which it intends to offer Pfeifer's testimony – was disclosed in Pfeifer's expert report.

Phoenix points to two statements made by Pfeifer in response to the report of Plaintiff's expert, Larry Stern:

> As Mr. Stern appears to concede, [Phoenix's] consideration of its future expectations with respect to these factors on re-determination of rates is not constrained by its approach, methodology, or evaluation of its prior COI rate determinations. (Pflepsen Decl. Ex. A (Pfeifer Rebuttal Report) at 11.)

> After the need for a change in future expectations was determined, the Funding Ratio methodology was a mechanism developed by the company . . .." (Pfeifer Rebuttal Report at 20.)

The first statement has nothing to do with an inevitable COI rate increase. The fact that Phoenix could have set COI rates based on many factors, and could select which factors it would apply when re-determining rates, is different from saying that a rate increase was inevitable no matter what methodology was used.

The second statement says nothing more than this: once Phoenix decided that its existing expectations ought to be changed on a going forward basis, Phoenix developed a methodology for changing COI rates. Once again, that is a far cry from saying that a COI increase was inevitable, let alone that any other funding ratio methodology Phoenix might have adopted would have yielded an increase.

Phoenix claims that even if these statements don't encompass the assertion in its JPTO, Phoenix should still be permitted to elicit testimony from Pfeifer about an inevitable COI rate increase because that assertion is within the scope of Pfeifer's report and would merely provide evidentiary details.

Phoenix is incorrect. Asserting that a different hypothetical COI rate increase would have inevitably been imposed if Phoenix had adopted an entirely different set of assumptions pursuant to a different (and never employed) funding ratio methodology is an argument entirely distinct from Phoenix's actuarial justifications for the rate increase that was actually imposed. Phoenix is trying to argue that the COI rate increase it imposed cannot be said to have caused U.S. Bank any harm – even if it was impermissible under the policies – because U.S. Bank would inevitably have suffered a COI rate increase of some kind. Phoenix points to *nothing* in the Pfeifer report making any such assertion. It simply asserts that the "actual substance and topics addressed by [Pfeifer's] reports" include an inevitable COI rate increase. But nothing in Pfeifer's report indicates that either he or Phoenix ever employed different assumptions to conclude that a rate increase in an equal or greater amount to the one actually imposed was actuarially justifiable at the moment Phoenix actually increased rates using the methodology it adopted.[1] Pfeifer's conclusory statements about alternative scenarios are supported neither by Phoenix's actual behavior at the time nor by Pfeiffer's own calculation of what alternative courses Phoenix could or should have followed to reflect its changing expectations without either running afoul of the terms of the policy or discriminating within a class of insureds. Phoenix has therefore failed to establish that Pfeifer's testimony about the inevitability of a COI rate increase is admissible.

## C.     U.S. Bank's Motion *in Limine* #3

U.S. Bank moves to preclude Phoenix from eliciting testimony from any witness – including Phoenix's actuarial expert witness Pfeifer – based on the "asset-share pricing model," which model Phoenix did not disclose to U.S. Bank. This motion specifically identifies

---

[1] Only a rate increase in an equal or greater amount than the one actually imposed, coming at or about the same time as the COI rate increase actually imposed, could be relied on to make an argument that Phoenix's actual COI rate increase, even if unjustified under the policy, worked plaintiffs no harm.

several documents that U.S. Bank seeks to exclude, including Exhibit 8 to the Pfeifer Report, and Defendant's Exhibits 35, 38-39, 42-43, 49, 52, and 55-58.

This motion is **DENIED**, because Phoenix states, and U.S. Bank cannot deny, that Phoenix timely produced to U.S. Bank (1) Exhibit 8 to the Pfeifer Report; and (2) every other Defendant's Exhibit identified in U.S. Bank's motion.

Phoenix has properly characterized U.S. Bank's argument as something akin to a "fruit of the poisonous model" argument. According to U.S. Bank, it served Phoenix with Requests for Production including "All pricing models that YOU ran or generated, at any time, for each of the POLICIES," and "All DOCUMENTS [defined to include electronically stored information] that reflect, evidence, [or] memorialize . . . any asset share calculations[.]" U.S. Bank claims that Phoenix objected to these requests for production and never produced the asset share model or any other model. Phoenix also allegedly violated Rule 26(a)(1)(A)(ii) by failing to disclose the asset share model, which U.S. Bank characterizes as "electronically stored information . . . that the disclosing party has in its possession . . . and may use to support its . . . defenses." Because Phoenix never produced the underlying model, U.S. Bank asserts that Phoenix can offer no evidence that relies on the model (including the Exhibits identified above) or testimony ultimately relying on conclusions drawn from that model.

In the first place, it appears that U.S. Bank misunderstands the asset share pricing model. Phoenix notes that the asset share pricing model is a "computer program" which it used to pull data from a database, which were then analyzed by Phoenix or its experts. (Pflepsen Decl. Ex. C.) Although the program has the word "model" in its name, it does not fall within the scope of the discovery requests described above, because it is not a "model" in the sense of a set of equations

or assumptions on which Phoenix priced its insurance policies. Rather, it is a tool for extracting data from an electronic data base. That is not what U.S. Bank requested.

Putting that to one side, it is undisputed that Phoenix produced every document on which it intends to rely during discovery. U.S. Bank was not precluded from deposing witnesses about these documents and could have asked any questions about how the data presented in the documents were generated. Indeed, Phoenix's counsel even exchanged emails with U.S. Bank's counsel, in which Phoenix explained that the asset share pricing model was used to produce the data underlying Exhibit 8 to Pfeifer's expert report. Thus, U.S. Bank had ample opportunity to question Pfeifer about what the asset share pricing model might be. It could have asked Pfeifer or any other Phoenix witness during his or her deposition about the pricing model and (for whatever it was worth) how that program extracts data for analysis. U.S. Bank will not be unfairly surprised if these documents are introduced at trial.

U.S. Bank has pointed to no cases holding that a party may not introduce documents because it failed to produce a computer program used to compile data presented in those documents. Rather, U.S. Bank cites opinions holding that an expert's report may be excluded when the underlying data supporting the report (for example patient records relied on by a medical expert) are not disclosed. But Exhibit 8 itself contained all the underlying data supporting Pfeifer's report, and Phoenix's counsel explained the calculations applied to the data pulled from Phoenix's database. (Pflepsen Decl. Ex. C.) Phoenix was required to produce no more.

### D.    U.S. Bank's Motion *in Limine* #4

U.S. Bank moves to preclude Phoenix from eliciting testimony from its actuarial expert, Pfeifer, that the 2010 and 2011 COI rate increases are justified because Phoenix's original expectations for investment earnings changed. U.S. Bank argues that Pfeifer's testimony rests on a fundamentally infirm factual basis. U.S. Bank alleges that Phoenix, contrary to Actuarial

Standard of Practice 2, has no contemporaneous evidence about its original investment earnings assumptions, and that all the documentation supporting Pfeifer's report and his claims about changes in original assumptions consists of after-the-fact fabrications. Thus, according to Phoenix, Pfeifer's opinion is unreliable and should not reach the jury.

This motion is **DENIED**.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Boykin v. W. Exp., Inc.*, No. 12-CV-7428 NSR JCM, 2015 WL 539423, at *6 (S.D.N.Y. Feb. 6, 2015) (quoting *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (E.D.N.Y. 2013) (internal citations omitted)). "Mere weakness in the factual basis of an opinion bears on the weight of the evidence, not its admissibility." *Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 335 (M.D. Pa. 2009); *see also Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Boykin*, 2015 WL 539423, at *6.

Here, U.S. Bank has no objection to Pfeifer's methodology (the basis of a valid *Daubert* motion), but only to the factual basis for Pfeifer's conclusions – i.e., the "original assumptions", which are input for the methodology – on which Pfeifer relied. Challenges to the factual basis for an expert's application of an otherwise reliable methodology are quintessential jury issues. U.S. Bank is free to impeach Pfeifer or any other U.S. Bank witness by asking when and how these original assumptions were developed. It can ask whether Phoenix gave Pfeifer contemporaneous documentary evidence about the original assumptions and it can ask Phoenix witnesses whether any such evidence exists (classic fodder for a Request to Admit, which would then be admissible

at trial). It can ask about inconsistencies between the documents supporting the "original assumptions" employed by Pfeifer and analyses performed by third parties and Phoenix itself. By doing so, it can call Pfeifer's conclusions into question, arguing "garbage in, garbage out."

Nor has U.S. Bank met the high burden described in *Boykin* of showing that Pfeifer's claims are so fundamentally unsupported that they offer no assistance to a jury. U.S. Bank instead offers something of an *ipse dixit* – because Phoenix has no documents about its original investment assumptions that were created at the time those assumptions were made, its reconstruction of those assumptions is necessarily unreliable. But that conclusion does not follow. Memory be faulty and Phoenix may have a motive to concoct biased reconstructions, but it is perfectly possible for someone to reconstruct work previously done. There is no reason at all to believe that Phoenix *could not* produce reliable documentation recreating those assumptions. Whether it *did so* is for a jury to decide.

### E.    U.S. Bank's Motion *in Limine* #5

U.S. Bank next moves to preclude Constance Foster, Phoenix's expert on insurance industry custom, practice, and standards, from offering non-rebuttal testimony. Foster was retained by Phoenix as a rebuttal expert and offered only a rebuttal report in response to the report of U.S. Bank's expert, Bruce Foundree.

Foundree's expert report concerns principles of fairness in the business of insurance and the application of those principles to the universal life policies at issue in this case. He opines that fair insurance practices are governed by the Insurance Marketplace Standards Association ("IMSA"), which places particular emphasis on accurate product descriptions and equal treatment within classes of insured by pricing according to mortality risk. Foundree concludes that the 2010 and 2011 COI rate increases violated these industry standards. Specifically he concludes that both increases violated industry fairness principles by impairing the insureds rights to minimally fund

13

their policies – an essential feature of universal life policies. Foundree also concludes that the 2010 and 2011 increases violated industry fairness principles treating a class of insureds in a non-uniform manner and improperly increasing rates by funding value, respectively.

U.S. Bank argues that several paragraphs of Foster's report, specifically paragraphs III(1), V, VI(1-3), (6), VII(6-8), and (16), are irrelevant and not responsive to anything in Foundree's report, and should there be excluded under Rules 26(a)(2)(D)(ii) and 37(c)(1).

This motion is **GRANTED IN PART** with respect to paragraphs III(1), V, VI(1-3), (6), and VII(16). It is otherwise **DENIED**.

Paragraphs III(1) and V of the Foster report discuss state regulatory review and approval processes for life insurance policies. Paragraph III(1) specifically refers to state review of policies as a means of ensuring policies are "fair[]." Paragraph V elaborates the state regulatory approval process in greater detail.

Both paragraphs are excluded. Although U.S. Bank has raised a claim for breach of the covenant of good faith and fair dealing, that claim does not put at issue fairness of the PAUL policies as such. Rather, the question is whether certain actions taken with respect to those policies frustrated the reasonable expectations of policyholders. Industry practices and standards are relevant to that claim insofar as they may inform what a reasonable policyholder would expect under a contract. But state policy approval processes are completely irrelevant.

Paragraphs VI(1-3), (6) and VII(16) address the life settlement market, the traditional role of insurance, and insurable interests. Paragraphs VI(1-3) assert that life insurance traditionally protects policyholders against losses resulting from the death of the insured – i.e., the concept of an insurable interest. Paragraphs VI(6) and VII(16) asserts that life settlement investment – though legal in many states – contravenes the traditional purpose of insurance.

14

U.S. Bank claims these paragraphs are irrelevant because Phoenix has not raised an insurable interest defense, and further argues that paragraph VI(6), concerning life settlement is "hypocritical" because Phoenix itself invested in insurance policies. Phoenix argues that these paragraphs respond to an assumption of Foundree's report – that "Phoenix continued to sell policies into the life settlement/non-recourse market knowing that its standard rating assumptions did not fit life settlement/non-recourse business."

Foundree did indeed state that he made the above assumption – he says so explicitly on pages 8-9 of his report. But Foster's *expert* report is not the place to rebut that assumption, which is essentially one of fact. Foster's argument seems to be (it is not completely clear) that because life settlement investment is non-traditional and the policyholders therein have no insurable interest in the named insureds, Phoenix did not know it was selling to that market. This inference itself is absurd. But it is, in any case, not the province of an expert. From what I know of the evidence, it seems obvious that Phoenix knew it was selling policies into the life settlement market, but if Phoenix wants to contest that fact then it should use its fact witnesses – those familiar with Phoenix's business practices – to do so. Paragraphs VI(1-3), (6) and VII(16) are excluded.

Paragraphs VII(6-8) of Foster's report discuss the National Association of Insurance Commissioner's Model Act for unfair trade practices. Foster opines that the Act was designed to provide comprehensive state legislation addressing unfair insurance practices, but that the act was only designed to protect individuals and not businesses that use life insurance as an investment vehicle. U.S. Bank asserts that those paragraphs are completely irrelevant to the issues to be tried in this case. Phoenix claims that these paragraphs respond to Foundree's amorphous IMSA standards of fairness by describing the specific statutes that govern fair insurance practices and showing that those statutes do not call into question Phoenix's practices.

The argument Foster is actually making is not well-described by Phoenix. Foster's discussion of the NAIC Model Act follows her opinions that (1) life settlement investment is not a traditional function of insurance; and (2) IMSA standards are defunct and inapplicable to Phoenix's actions. Foster concludes – as I read her report – that the NAIC Model Act better reflects governing industry standards, and that under the NAIC, Phoenix did nothing wrong because those standards do not protect life settlement investors.

U.S. Bank's motion with respect these paragraphs is denied. Foundree has argued that one set of standards informs the reasonable expectations of policyholders and insurers. Foster has argued for a different set of standards derived from the NAIC Model Act. It does not matter that the Model Act is not the governing law of this case because Foster does not present it as such. Rather, she argues that the Model Act reflects industry practices, which are relevant to U.S. Bank's claim for breach of the covenant of good faith and fair dealing. Any risk of jury confusion can be easily cured by an instruction about the limited purpose of this opinion testimony.

### F.    U.S. Bank's Motion *in Limine* #6

U.S. Bank's sixth motion *in limine* asks the court to preclude Phoenix from eliciting "expert" testimony from witnesses it did not identify as expert witnesses. U.S. Bank identifies nine fact witnesses – eight Phoenix employees and one consultant for Towers Watson – who it claims Phoenix will use to introduce improper expert testimony. The testimony identified includes several of Phoenix's contentions in the JPTO as well as over a dozen designated portions of these witnesses' depositions.

The Federal Rules of Civil Procedure distinguish three categories of witnesses. Fact witnesses "must be disclosed by sending to the opposing party the name, address, and phone number (if known) of each potential witness." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004); *see* Fed. R. Civ. P. 26(a)(1). The Rules distinguish two categories of expert

witnesses. For all expert witnesses, a party must disclose "the identity of [the] witness." Fed. R. Civ. P. 26(a)(2)(A). For expert witnesses retained by a party for the purpose of providing expert testimony the disclosure "must be accompanied by a written report[] prepared and signed by the witness" containing several categories of information. *Id.* R. 26(a)(2)(B). For all other expert witnesses a party must disclose the subject matter of the witness's expert testimony and a summary of the facts and opinions to which the witness is expected to testify. *Id.* R. 26(a)(2)(C).

However, "Where a person's profession necessarily involves scientific, technical, or specialized knowledge—for example, because the person is a physician or an actuary—the line between 'expert' and 'lay' opinion may be difficult to draw." *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, 255 F.R.D. 645, 657 (N.D. Iowa 2009). The line depends, not on the witness's identity or capacity to give expert testimony in the abstract, but on the proposed testimony. "Thus, a treating doctor (or similarly situated witness) is providing expert testimony if the testimony consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation." *Musser*, 356 F.3d at 757 n.2. By contrast, "To the extent a treating physician limits his or her testimony to the patient's care and treatment, the physician is not specially retained despite the fact that the witness may offer opinion testimony under Fed. R. Evid. 702, 703, and 705." *Navrude v. U.S. (USPS)*, No. C01-4039-PAZ, 2003 WL 356091, at *7 (N.D. Iowa Feb. 11, 2003) (quoting *Starling v. Union Pacific R.R. Co.*, 203 F.R.D. 468, 477 (D. Kan. 2001) (internal quotation marks omitted)).

It is undeniable that Phoenix did not disclose any of these nine witnesses as experts as Rule 26 requires. Thus, the admissibility of these witnesses' testimony depends entirely on whether that testimony is expert testimony. *See* Fed. R. Evid. 701, 702.

I agree with Phoenix that Rule 702 permits lay witnesses to offer *opinion* testimony (as opposed to *expert* testimony), provided there is a proper foundation for the introduction of such testimony. I will not preclude Phoenix from eliciting such opinion testimony – certainly not on a motion *in limine*, without having the opportunity to hear a single actual question or to have a foundation laid for the propriety of such testimony. No less than treating physicians, a person who has worked in the insurance industry for 20 or 30 years has undoubtedly developed a certain degree of expertise and has opinions that may be relevant to explaining his or her behavior or the behavior of the company. It is entirely possible that Phoenix could elicit some opinion testimony from such an individual with perfectly proper questioning, and that this opinion testimony would not be expert testimony, but lay opinion testimony. It is not, however, an issue that can be decided in a vacuum.

So while U.S. Bank is correct that these nine witnesses may not be qualified and testify as expert witnesses, *Bharucha v. Holmes*, No. CIV. 09-5092-JLV, 2010 WL 1878416, at *3 (D.S.D. May 11, 2010); *Transamerica Life Ins. Co.*, 255 F.R.D. at 658, I am not going to preclude them from offering testimony otherwise admissible under Rules 702, 703 and 705. Furthermore, at least one of the Towers Watson witnesses – Thomas Buckingham – is the author of a report (Defendant's Exhibit 75), prepared just prior to the imposition of the 2010 COI increase, in which Towers Watson provides actuarial justification for that increase. The existence of the report is a fact, and if Phoenix relied on its contents in deciding whether to impose the 2010 COI rate increase, that, too, is a fact – not an opinion at all. Indeed, Buckingham and his report would appear to be critically important fact witnesses for Phoenix, and this court will certainly not be precluding that testimony – it is precisely analogous to the testimony of a treating physician in a personal injury case.

Since it is undoubtedly the case that Buckingham has a great deal of relevant testimony to offer, I **DENY** the motion *in limine* to preclude his testimony. If Phoenix seeks to introduce impermissible expert testimony through any other witness, U.S. Bank can call its objection to my attention at trial, and I will issue a ruling on a question by question basis. Without in any way constraining myself (since I refuse to rule on this in a vacuum), I offer these guidelines, based on the disputed claims in the JPTO, to guide the parties about how I will rule at trial.

Phoenix's fact witnesses may testify about the following issues:

- Their reasons for increasing COI rates and what purported actuarial justifications underlay those reasons.

- How the CIO rate increases affected particular policyholders (for example whether the same methodology was in fact applied to each policyholder).

- The economic consequences to Phoenix of refraining from imposing a COI rate increase for its policyholders.

- How the rise of life settlement investors and changed policyholder behavior affected Phoenix's profitability and average policy funding.

- Anything having to do with advice they actually provided to Phoenix during the rate-setting process.

Phoenix's fact witnesses may not testify about the following issues:

- The meaning of actuarial standards of practice.

- The actuarially proper interpretation of insurance terms of art such as "class of insureds."

- Whether the COI rate increases did or did not constitute unfair discrimination.

G.      **U.S. Bank's Motion** *in Limine* **#7**

U.S. Bank moves to preclude Phoenix from (a) disparaging U.S. Bank, Fortress, or Lima for investing in life insurance policies; and (b) disparaging those entities for investing in distressed assets. U.S. Bank claims that evidence regarding life settlement investment and investment in distressed entities is irrelevant to any issue at trial and would serve only to inflame the jury's passion and encourage it to render a verdict out of distaste for U.S. Bank's business model.

This motion is **GRANTED IN PART** and **DENIED IN PART.**

It is first necessary to distinguish STOLI evidence – which is not relevant to this case – from life settlement investment, which might be.

A STOLI policy is a life insurance policy, generally with a large face amount, that is procured for the purpose of selling it to investors who have no insurable interest in the life of the insured. Nonetheless, the investors agree to fund the premiums during the life of the insured in exchange for receiving the proceeds of the policy when the insured dies. The life settlement industry has grown, in part, on securitizing such investments.

Historically it was illegal to procure insurance without an insurable interest, and many states – recognizing the financial realities of a STOLI transaction – have declared STOLI policies void for precisely that reason. *See* Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitizations*, 13 U. Pa. J. Bus. L. 173 (2010). In other words, evidence or rhetoric relating to the idea that there is an entire industry built on profiting from death is highly prejudicial – so prejudicial that the very idea of it has been declared void for public policy in many states.

However, in its wisdom, the New York Court of Appeals has declared that STOLI transactions are legal in New York. *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 545, 550-53 (2010). The prejudice from the inflammatory rhetoric U.S. Bank seeks to preclude necessarily

outweighs the probative value of information about the STOLI industry – information that a jury would undoubtedly find distasteful (as indeed does this court, *see, e.g.*, *United States v. Binday*, 908 F. Supp. 2d 485 (S.D.N.Y. 2012); *RCX I, LLC v. Pitter-Nelson*, No. 11 CIV. 03513 CM, 2014 WL 5809514, at *1 (S.D.N.Y. Nov. 6, 2014)), and which perforce results in prejudice that does not derive from proof relevant to the issues in the case – the very sort of prejudice against which Rule 403 guards.

Magistrate Judge Francis previously found that, "the circumstances surrounding the origination of [U.S. Bank's] policies are only relevant if PHL intends to assert a STOLI defense and claim that the policies are void or voidable . . . Unless the defendant affirmatively asserts a STOLI defense, the circumstances surrounding the origination of the policies *are not relevant to this case*." *US Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 288 F.R.D. 282, 286 (S.D.N.Y. 2012) (emphasis added). I agree with his conclusion. The jury will not be informed about the origination of STOLI policies or the many nefarious schemes that have cropped up as a result.

But that does not mean that all evidence about U.S. Bank's investment practices is irrelevant. Phoenix has offered as an actuarial justification for the COI rate increases the fact that its investment expectations changed. And those expectations changed, according to Phoenix, because life settlement investors entered the market and funded their policies at lower levels. The issue, in other words, is whether the behavior of the sophisticated investors who purchased large numbers of PAUL policies with certain characteristics fundamentally altered Phoenix's expectations *in a manner that rendered the rate increases actuarially sound.* To understand that claim, the jury will, of course, need background about life settlement practices – i.e., purchasing and bundling life insurance policies as an investment vehicle.

21

The jury can easily be told that investors were unexpectedly acquiring PAUL policies (which is a perfectly legal event in New York), and Phoenix's witnesses can explain that those investors were less likely to take advantage of certain features of the PAUL policies (notably those relating to funding) without in any way being apprised of the fact that investors were doing things like soliciting impoverished elderly individuals to set up insurances trusts so they could acquire policies they could not afford, and that brokers were providing insurance companies with false information about potential named insureds – the seamier side of the STOLI industry, with which, sadly, this court is all too familiar. I thus grant U.S. Bank's motion to the extent that it seeks to bar inflammatory rhetoric about the life settlement industry. References to "death profiteering" or "inequitable conduct" of using life insurance as an investment clearly fall into this category. Phoenix should only test this ruling to the extent it seeks a mistrial and sanctions against it and its counsel personally.

However, Phoenix must be permitted to provide dry comparisons of differences in the expected behavior of traditional insureds as opposed to investor-owners such as U.S. Bank. It will not be prevented from arguing at trial that it was not Phoenix that blindsided U.S. Bank with a rate increase, but U.S. Bank who blindsided Phoenix with behaviors other than what Phoenix had expected, thereby resulting in legitimate actuarial changes.

With respect to investment and distressed assets, U.S. Bank's motion is granted. Phoenix contends in the JPTO that Fortress is an "opportunistic credit investor," which viewed the seller of the insurance policies at issue as a "distressed seller of an undervalued asset" and that U.S. Bank "violated equitable standards of conduct" by opportunistically investing in undervalued insurance policies. JPTO ¶¶38, 39, 71. These statements are unrelated to any legitimate defense Phoenix could raise in this lawsuit.

22

Phoenix claims that this evidence is relevant for the same reason life settlement evidence is relevant – that it establishes changes in policyholder behavior which contravened Phoenix's original assumptions and led to reduced investment earnings. That is not so. Phoenix needs only to explain the changes in *policyholder* behavior and – it can reasonably be said – explain that the changes in behavior arose from treating life insurance as an investment. But Phoenix need not get into the ultimate investment philosophy of those behind the life settlement investments held by U.S. Bank. It is of no assistance to a jury to know that Fortress chooses to invest in other distressed assets, or that life settlement investment was part of its philosophy of searching for undervalued assets. This evidence is therefore excluded under Rule 401 (irrelevant) and Rule 403 (probative value outweighed by unfair prejudice).

## III.    Phoenix Life's Motions *in Limine*

### A.    Phoenix's Motion *in Limine* #1

Phoenix moves to exclude Plaintiff's Exhibits ##32, 37, 38, 114, 129, 149, 158, 175, 176, and 177, all of which are either (1) communications between Phoenix and its reinsurers or outside consultants, or (2) internal communications from Phoenix's reinsurers or outside consultants. Phoenix objects to these exhibits on various grounds, described below, including hearsay, relevance, and Rule 403. Phoenix also seeks by this motion to exclude the testimony of Jack Gibson, Towers Watson's corporate representative.

This motion is **GRANTED IN PART** and **DENIED IN PART**.

#### 1.    Communications with Reinsurers

Exhibit 149 is an email exchange between Phoenix and its reinsurer describing the 2010 COI rate increase. Phoenix's representative states expressly that "a policy can have different coi increase [sic] each month" and that CO rate increases "depend[] on the relationship between fund value and 'threshold fund value.'" Thus, Exhibit 149 is relevant because it tends to show that

Phoenix targeted policyholders who funded their policies minimally which, at least, is probative evidence that Phoenix breached the covenant of good faith and fair dealing. There is no merit to Phoenix's response that this document would require the jury to understand the differences between reinsurance and primary insurance markets.

Exhibit 37 is an internal email exchange among employees of the Reinsurance Group of America ("RGA"), one of Phoenix's reinsurers. In one of the emails, an RGA employee states that Byron York of Phoenix told him "the COI increases are not mortality related, but funding related." The email exchange is relevant because it tends to refute one of Phoenix's actuarial justifications for the 2010 rate increase.

Phoenix objects that the email exchange is double hearsay. There are indeed two possible levels of hearsay. The outer level is emails by RGA employees, who are not parties. The inner level is purported statements by Phoenix employees as repeated by the RGA employees in their emails. Double hearsay is admissible only if each level of hearsay is independently admissible as an exception to the hearsay rule. *See* Fed. R. Evid. 805. Rule 805's requirement is satisfied here.

The statements by non-party RGA employees fall within the business records exception. RGA's Vice President and Assistant General Counsel – who acts as the custodian of records – certified that these emails satisfied all the criteria for business records. *See* Asudulayev Decl. Ex. C; Ard 4/21/15 Decl. Ex. 1 in *Fleisher*; *see also* Fed. R. Evid. 803(6). Phoenix has "not show[n] that the source of information nor or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(d).

The inner or second level of hearsay consists of statements of Phoenix employees quoted in the emails. These qualify as party admissions. The employees were agents of Phoenix discussing

COI rate increases with their reinsurer. On their fact, the statements were made within the scope of the declarants' employment.

The double-hearsay issue in this case is similar to the issue before the court in *Rodriguez v. Modern Handling Equip. of NJ, Inc.*, 604 F. Supp. 2d 612 (S.D.N.Y. 2009). In *Rodriguez*, the plaintiff was a forklift operator who sued, among others, a company which he alleged had repaired a forklift that injured him on the job. The defendant company sought to admit two reports, one by OSHA and the other by a private workers' compensation insurance carrier, about the accident. Both reports concluded that the defendant had not repaired the forklift that caused the plaintiff's injury. The plaintiff objected that both reports included double hearsay.

The court held that the OSHA report was admissible. The report itself "ha[d] been authenticated as a business record under Federal Rule of Evidence 803(6) by the custodian of records for the Tarrytown Area OSHA office." *Id.* at 622. The report contained an interview with the plaintiff which "would constitute double hearsay . . .." *Id.* The court held, however, that "Since plaintiff is a party to the lawsuit . . . his statements in the OSHA report . . . may come in as a non-hearsay party admission under 801(d)(2)(B)." *Id.*

The private insurer's report, like the OSHA report, was a business record, admissible under Rule 803(6). That report, however, contained statements by non-parties, which were not admissible as non-hearsay or as a hearsay exception. Thus, the court did not admit the insurer's report. *Id.*

In this case, Exhibit 37 is identically situated to the OSHA report – it is a record created and maintained in the ordinary course of RGA's business and it contains party admissions. It is, therefore, admissible.

Exhibit 38 – entitled "Trip Notes" – is a summary of a visit by RGA employees to Phoenix during which various topics were discussed. The visit was obviously taken in the regular course of RGA's business, and Phoenix employees were speaking within the scope of their employment during that visit. The notes record that Phoenix representatives told their RGA counterparts that, "Funding expectations were not being met and this is driving COI increase, not lapse or mortality." That statement is relevant because it tends to refute Phoenix's mortality-related or other actuarial justifications for the 2010 COI rate increase. As with Exhibit 37, Exhibit 38 itself has been certified as an RGA business record. The statement contained in the exhibit by a Phoenix employee is a party admission. Exhibit 38, like Exhibit 37, is not inadmissible hearsay.

### 2. Towers Watson

Exhibit 32 is an internal Towers Watson email from October 26, 2009. The email advises a client – not Phoenix – about the life settlement industry and cost of insurance rate changes. In particular, Towers Watson advises the client that although there is no formal definition of a "class," each insurance plan is typically its own class and an insurance carrier cannot define a subset of a plan as a class or increase COI rates on a policy-by-policy basis.

I agree with U.S. Bank that this evidence is relevant. Whether Phoenix defined a class properly in increasing COI rates is a central question in this case. But the actuarially proper definition of a class is almost exclusively the province of the expert witnesses. Towers Watson, retained as a consultant by Phoenix, might well be qualified to offer an expert opinion. But Towers Watson is a fact witness here; it has not been identified as an expert. The conclusions presented in Exhibit 32 are only bare conclusions. They come with no supporting factual or actuarial analysis. Thus, introducing this exhibit would allow U.S. Bank to, in effect, present untested expert opinions to the jury. For that reason, Exhibit 32 will not be admitted.

Phoenix also seeks to exclude the deposition testimony of Jack Gibson – Towers Watson's 30(b)(6) corporate representative – on the basis that Gibson is within the court's subpoena power (and thus his deposition designations cannot be used at trial) and that the testimony U.S. Bank would seek to elicit from Gibson is irrelevant.

U.S. Bank responds that it intends to call Gibson only in rebuttal in the event that Phoenix introduces Defendant's Exhibit 75. That exhibit is a letter and enclosed report from Towers Watson to Phoenix regarding the 2010 COI rate increase. The report provides some actuarial support for the COI rate increase. U.S. Bank has not objected to this exhibit in the Final Pre-Trial Order, which means it will be admitted without objection at the Final Pre-Trial conference, where the court deals with all objections to the admissibility of documents.

U.S. Bank is correct that the designated portions of Gibson's deposition are relevant; they could be used to discredit the conclusions in Defendant's Exhibit 75 by showing that Towers Watson's limited engagement either failed to consider important relevant issues or else rested on flawed assumptions or bad information provided by Phoenix. However, as Gibson is within the court's subpoena power, he must be subpoenaed and come to court to testify; his non-party deposition testimony would only be admissible if her were beyond the subpoena power of the court. I note that Gibson is on Phoenix's witness list as well; I insist that witnesses testify only once, so if Phoenix calls Gibson, U.S. Bank can elicit its rebuttal testimony from him on cross examination, even if the cross goes beyond the scope of the direct.

### 3.  PricewaterhouseCoopers Documents

Phoenix also seeks to exclude Exhibits ##114, 129, 158, 175, 176, and 177, all arising from PricewaterhouseCoopers' ("PwC") engagement as Phoenix's financial auditor. Phoenix objects to these documents as (1) irrelevant; (2) inadmissible double hearsay; and (3) likely to confuse and mislead the jury.

Exhibits 114, 129, 158, 175, and 176 are all actuarial memoranda filed by PwC. Exhibits 114, 129, and 158 describe declining sales of PAUL policies and/or declining fund balances attributable to the economic downturn. Those facts tend to disprove Phoenix's actuarial justification for the 2010 COI rate increase. Phoenix asserts that the particular policies subject to COI rate increases caused a decline in investment earnings, but these Exhibits tend to show that any change investment earnings had more general economic causes not attributable to particular policies. Declining sales also show Phoenix's motive for changing CIO rates – to recover from the financial hit it at taken – and motive is always a relevant issue even if not part of a cause of action.

Exhibit 175, a 2006 actuarial review memorandum, states that there were "exceptionally high sales of . . . PAUL . . . policies issued at age 70 and above," which were attributable to sales to life settlement investors. That statement tends to refute Phoenix's claim that its original assumptions changed, because U.S. Bank can argue that Phoenix expected low funding levels and life settlement investment from the inception of the PAUL policies.

Exhibit 176, a 2007 actuarial review memorandum, describes a significant increase in "financed" sales. It also refers to Phoenix boosting its reserves in lieu of increasing COI rates, which tends to show that Phoenix knew its sales would be unprofitable without a later rate increase. This fact is relevant to U.S. Bank's "bait and switch" claim that Phoenix breached the covenant of good faith and fair dealing by selling policies to life settlement investors – knowing that it would later suffer losses because of low prices – and recouping the losses by raising rates after the policies were sold.

Exhibit 177, an email exchange between Robert Lombardi of Phoenix and a PwC representative, contains statements by Lombardi which could be interpreted to mean that Phoenix's original premium persistency assumptions were being met for certain PAUL policy blocks. This,

in turn, is relevant to show whether there was an actuarial justification for isolating particular policies within policy blocks and subjecting them to rate increases.

None of these documents appears to be hearsay. The actuarial memoranda appear to satisfy the first three criteria of Federal Rule of Evidence 803(6): contemporaneous authorship, records kept in the regular course of business, and a regular practice of making records. Further, U.S. Bank states in its opposition memorandum that PwC will issue a Rule 902(11) certification that the Actuarial Review Memoranda satisfy the business records exception. I rather imagine the documents so qualify.

Phoenix claims that there is a second level of hearsay in these documents, but it is not clear where. No document written by PwC witnesses purports to summarize statements by anyone from Phoenix (unlike the RGA documents described immediately above) or to quote from any other document.

Phoenix has pointed to nothing in any of these emails or actuarial memoranda indicating lack of reliability. Although one memorandum, Exhibit 129, is a redline draft memorandum, U.S. Bank states that it will only introduce the final language at trial. In any event, the preliminary and allegedly incomplete nature of the reports goes to weight, not admissibility. *Matter of Beery*, 680 F.2d 705, 718 (10th Cir. 1982); *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981); *DL v. D.C.*, 820 F. Supp. 2d 27, 30 (D.D.C. 2011).

As for authorship, "[I]t is irrelevant" for purposes of Rule 803(6) "that the face of the [document] does not identify the document's author." *JPMorgan Chase Bank, N.A. v. Yuen*, No. 11 CIV. 9192 NRB, 2013 WL 2473013, at *6 n.15 (S.D.N.Y. June 3, 2013), *appeal dismissed* (Aug. 20, 2013) (citing *Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013–14 (2d Cir. 1987) (admitting tallies prepared by the "unidentified employees" of a company that provided the

records to the testifying entity)). As long as the other predicates for admitting a document as a business record are satisfied, the failure to identify the author, or even the fact that a document was authored outside a company and later incorporated into its records, affects only the document's weight and not admissibility. *Id.* at *6; *see also United States v. Soape*, 163 F.3d 1354 (5th Cir. 1998); *Matador Drilling Co.*, 662 F.2d at 1199.

Phoenix also argues that the probative value of these documents is outweighed by their prejudicial effect and potential to waste time. I disagree. Indeed, I think these documents have a great deal of probative potential – which is probably why Phoenix wants to keep them out of evidence. Unless Phoenix can identify otherwise inadmissible hearsay at the time of the final pre-trial conference, they are all admitted.

### B.    Phoenix's Motion *in Limine* #2

Phoenix's moves *in limine* to exclude evidence from state regulatory proceedings concerning the COI rate increases. Phoenix raises various objections to specific exhibits and related testimony including that certain evidence should be excluded: [1] as irrelevant; [2] under Rule 403; [3] because it contains inadmissible hearsay; and [4] under Rule 408, as it results from efforts to compromise, settle, or negotiate resolutions to state inquiries.

The motion is **GRANTED IN PART**, specifically as to Exhibits 33, 44, 44A, and 71. It is **DENIED** as to the remaining exhibits.

Exhibit 4 is an email sent by a Phoenix representative to the New York State Insurance Department with an attached cover letter and attached marketing materials. Phoenix objects only to the attached cover letter, which U.S. Bank has withdrawn. The email itself, and the remaining attached marketing materials are admitted without objection.

Exhibit 8 is an email from Byron Frank, a Vice President of Phoenix. It describes how COI rates were calculated before and after the 2010 COI rate increase and compares the results for two

specific policies. Obviously this document provides helpful background for every claim, as all claims require the jury to understand the 2010 COI rate increase. The court cannot discern how this party admission could possibly be unfairly prejudicial or cause confusion, or waste the jury's time. There is no basis for excluding it.

Exhibit 33 is an email from the California Department of Insurance ("CDI") to a Senior VP of Phoenix. The letter states that a complaint filed against Phoenix relating to the 2010 COI rate increase was "justified" because the rate increase unfairly discriminates and violates the express terms of the PAUL policy. The letter specifically concludes that funding ratio is an improper basis for risk classification because it is not related to risk of loss. This Exhibit is plainly relevant but also highly prejudicial. The letter – though based on factual findings by the CDI – offers a legal conclusion on the ultimate issues in the case. It does not relate the factual findings in detail and thus its sole value would be to suggest to the jury that it should reach the same conclusion as did California regulators. It is therefore excluded under Rule 403.

Exhibit 44 is a summary judgment decision by a Wisconsin State Administrative Law Judge in an enforcement action brought by the Wisconsin Office of the Commissioner of Insurance against Phoenix regarding the 2010 COI increase. The decision concerned three issues: two claims that Phoenix's advertisements and policy language were misleading, which is not at issue in this case, and one claim that the 2010 COI rate increase unfairly discriminated among policy holders and violated the express terms of the PAUL policies. The decision denies summary judgment to both sides on the unfair discrimination claim but holds that Phoenix violated the PAUL policy terms by basing rate increases on an impermissible factor (i.e., the funding ratio). Exhibit 44A is a related forfeiture order and notice of appeal concerning the agency's summary judgment decision.

Exhibits 44 and 44A are excluded. Although they contain some relevant information, such information is fairly limited – concerning primarily the mechanics of the COI rate increases, which can be adduced from a good deal of other evidence in this case. (Exhibit 44A has – as far as the court can see – no relevance to any issue to be tried, except that it shows Exhibit 44 to be a final appealable judgment.) Exhibit 44 is, however, highly prejudicial. First, the Exhibit discusses false and misleading advertising and reaches legal conclusions about Phoenix's misrepresentations, which are not at issue in this case but could cause the jury to decide other issues on an impermissible basis. Second, and more important, the administrative law judge expressly rejects this court's conclusion that Phoenix did not rely on impermissible factors to the extent that it took policy values into account when calculating its expectations of investment earnings. The ALJ's conclusion that funding ratio is not related to investment expectations, and that Phoenix therefore could not rely upon it in setting rates, is precisely contrary to an issue already decided by this court. We respectfully disagree with one another. But in my courtroom, my ruling stands, and it will not be undermined by admitting a contrary conclusion of some ALJ in Wisconsin. I recognize that eight of the PAUL III policies here at issue are Wisconsin policies. But I am not bound by the ALJ's determination; indeed, I believe it to be incorrect.

Exhibit 45 is an email exchange between Gina O'Connell, a Senior VP at Phoenix, and the New York Department of Financial Services ("NYDFS"). NYDFS asks whether initial pricing changes for the 2011 increase were made by face amount and why there was no increase for other ages and face amounts. O'Connell describes the three "bands" of policies distinguished by policy face amount, and explains that Phoenix did not see "material deviations from original pricing" factors for lower face amounts and younger ages. This Exhibit is relevant because it includes Phoenix's contemporaneous description of the 2011 rate increase and – as U.S. Bank interprets the

exchange – it shows that Phoenix misrepresented the narrowly targeted increases as relating only to face value. According to U.S. Bank, the Exhibit is therefore relevant to Phoenix's CUTPA and good faith and fair dealing claims. I agree with U.S. Bank. This evidence is relevant – if for no other reason than providing Phoenix's contemporaneous description of the 2011 rate increase. It has little potential to prejudice the jury.

Further, Exhibit 45 is not excludable under Rule 801 because the statements by Phoenix are non-hearsay party admissions and the inquiries by the NYDFS are questions, not statements intended to prove the truth of a matter asserted. "An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) (quoting *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 388 (S.D.N.Y. 1985), *aff'd*, 788 F.2d 3 (2d Cir. 1986)).

Exhibit 54 is a letter and accompanying exhibits (all prepared by Phoenix) from Phoenix VP Frank to the NYDFS. The letter outlines the mechanics of the 2010 COI rate increase, noting that it is based on "funding ratio" and that it applies to policies Phoenix anticipates will affect future profitability. The exhibits attached to Frank's letter are documents from various insurance policies regarding surrender charges, an annual report for a policy subject to the rate increase, and documentation of ASOP compliance. Exhibit 54 – consisting entirely of party admissions – is not hearsay. Although it includes information available in other evidence it is relevant to all claims because it describes the 2010 COI rate increase and Phoenix's justification for imposing it. It is not excluded.

Exhibit 63 is an exchange of several emails between Phoenix Senior VP O'Connell and an employee of the NYDFS. The exchange deals with Phoenix's justifications for the 2010 increase, in particular the changes in persistency and funding levels. O'Connell responds to several inquiries

from NYDFS concerning those issues and further explains various assumptions about investment returns as well as Phoenix's justification for using age 68 as a break point for the COI increase. Although there are some irrelevant hearsay statements in these emails, they are of a *de minimis* nature – for example, the NYDFS employee states that "I took a quick look and the data is all by face amount" – and the inquiries by NYDFS and all of O'Connell's responses are non-hearsay. Thus, this Exhibit is admitted, with redactions for the hearsay.[2] The emails document Phoenix's contemporaneous explanation for the 2010 COI rate increase. The emails discuss premium persistency – a possible actuarial justification for the rate increases – and are thus highly relevant to the issues to be tried. Phoenix has not explained how the admission of this exhibit would be unfairly prejudicial or otherwise justify exclusion under Rule 403.

Exhibit 71 is an email from an Assistant Deputy Superintendent and Chief of the NYDFS to a Phoenix employee, and an accompanying attached letter from the New York Department of Insurance. The letter states the conclusions of NYDFS's investigation into the 2010 rate increase. It specifically concludes that the rate increase violated policy terms by considering funding ratio (a conclusion this court rejected on summary judgment) and states that Phoenix misled policyholders by failing to explain how it interpreted policy terms. The letter advises Phoenix that it must not use policy ratio in setting COI rates in the future and must reverse the 2010 rate increase. This letter is excluded. It contains little factual content but is replete with legal conclusions, whose only value would be to persuade the jury to reach the same conclusion as did the NYDFS. Since

---

[2] Specifically, the following must be redacted: "The original mortality was based on Phoenix experience and reinsurance rates." (Plaintiff's Exhibit 63 at PHL0630574.) "Thanks. I took a quick look and the data is all by face amount." (*Id.* at PHL0630575.) "On 1, we are looking for the experience to date (i.e., the actual data) and how this relates to the assumptions going forward.") (*Id.* at PHL0630577.)

the policies in this case are not governed by New York law, admission of this letter would be inappropriate. Furthermore, the letter is particularly prejudicial because two of the NYDFS's bases for decision – misleading policyholders and considering factors outside those listed in the policy – were rejected by this court and are irrelevant to any claim to be tried.[3] (Excluding this evidence under Rule 403, I need not reach Phoenix's argument that this evidence constitutes settlement communication inadmissible under Rule 408.)

Exhibit 76 is a letter from Phoenix to the New York Insurance Department and accompanying attachments, which mostly list COI rates for various policies. Phoenix does not object to the attachments, which are therefore admitted. The letter itself describes the 2011 COI rate increase, how many policies will be affected, and the methodology for setting the increase. It states that the rate increase was based on premium persistency, mortality, and policy persistency changes and does not recoup past losses. This Exhibit is relevant because it asserts Phoenix's actuarial justifications for the 2011 COI rate increase. The court can find no way in which the letter would prejudice Phoenix – indeed, to the extent that it provides more than background information it appears that the letter would be to Phoenix's benefit as it offers an explanation how the 2011 rate increase comports with the policy terms. Exhibit 76 is therefore admitted in its entirety.

Exhibit 119 is a letter from Phoenix VP Frank to the New York Department of Insurance, including accompanying attachments. Phoenix offers no objection to the attachments, which are admitted. The letter explains the 2010 COI rate increase. It notes that Phoenix sought actuarial guidance, reported the change to the Department of Insurance, and states that the goal of the increase was to match the original projected present value of profits (under original assumptions)

---

[3] The letter also concludes that the rate increase was not uniform within insureds of the same class. That conclusion is relevant to issues to be tried, but NYDFS's bare legal conclusion on this point – not supported by facts described in the letter – is not of value to the fact-finder.

using new mortality, lapse, and premium persistence assumptions from the date of the COI increase. The letter also elaborates a number of fairly minute methodological details. This Exhibit is admitted for substantially the same reasons as several Exhibits already discussed – it provides details about the COI rate increases and Phoenix's actuarial justifications for doing so. It does not appear that Phoenix would be prejudiced by the Exhibit which – if anything – provides a fairly lucid explanation of how Phoenix complied with policy terms and avoided recouping past losses. Exhibit 119 is not excluded.

Exhibit 124 is an email exchange between Phoenix Senior VP O'Connell and an employee of the New York Department of Financial Services together with attached documents summarizing Phoenix's lapse experience. The emails themselves are also part of Exhibit 63 and are admitted (except for the few hearsay portions, which must be redacted in the fashion stated above) for the same reason. The attachments contain very relevant information about lapse rates from Phoenix itself. Because lapse rates are related to several possible actuarial justifications for the 2010 COI rate increase, these attachments are relevant to a jury's determining whether the increases were proper under the PAUL policies. As Phoenix has offered no specific explanation why Exhibit 124 is either not relevant, unfairly prejudicial, or otherwise subject to exclusion under Rule 403, it is not excluded.

Exhibit 128 is an email from the New York State Department of Insurance to Phoenix VP Frank regarding PAUL policy forms U607 NY and 05PAUL NY. The letter requests a great deal of specific quantitative information about the 2010 rate increase to determine if the rate increase complies with New York law. The letter asserts that Phoenix lacked an actuarial memorandum and that it the analysis of profitability applied new assumptions from the original issue date of the policies (which would improperly recoup past losses). The letter also asserts that cells from a table

submitted by Phoenix could not be reconciled with Phoenix's claim that profitability was comparable under its new assumptions after the COI rate increase.

This document is clearly relevant to U.S. Bank's claim that Phoenix used COI increases to recoup past losses, as it explains the relationship between original assumptions, new assumptions, and profitability. It also indicates that Phoenix lacks supporting documentation for the COI rate increase, all of which information could help the jury determine whether Phoenix recouped past losses through the rate increase. The letter itself does not opine on the ultimate issue whether Phoenix breached its obligations under the policies and the risk of unfair prejudice is insubstantial. For the most part, the letter is a description of the evidence supporting the rate increases and the information it provides or fails to provide. To the extent that the jury might infer something about the New York regulatory authority's inadmissible ultimate conclusion regarding the rate increase, that possibility can be cured with a limiting instruction.

Nor is Exhibit 128 excludable as hearsay. Records documenting the determinations of NYSID are not hearsay because they are records of a public agency setting forth matters it observed and factual findings it made during a legally authorized investigation. Fed. R. Evid. 803(8). I decline defendant's invitation to conclude that the NYS Insurance Commissioner is untrustworthy in the same manner as an agency of a foreign country with a very different regulatory and judicial system from ours.

C.    **Phoenix's Motion** *in Limine* **#3**

Phoenix moves *in limine* to exclude certain testimony by U.S. Bank's expert Larry N. Stern. Specifically, Phoenix argues that Stern's opinion that Phoenix "failed to determine rates prospectively and recouped past losses because using data from the date of issue allowed Phoenix to start from a lower profit position due to actual, prior losses – that is retrospective, not

prospective" was not disclosed during discovery and should be excluded. Phoenix argues that this opinion was not disclosed until Stern's rebuttal report and should therefore be excluded.

For substantially the reasons set out in U.S. Bank's response to the motion, the motion is **DENIED**.

I specifically find that Stern's opinion rebuts the opinion offered by Plaintiff's expert, Pfeifer. Pfeifer opines in several paragraphs of his report that the 2010 and 2011 rate increases did not recoup past losses. Stern refutes that conclusion by explaining that Phoenix did not determine rates prospectively. That is quintessential rebuttal testimony. Nor was Stern required to provide greater explanation. Stern stated a conclusion – Phoenix's rate increase recouped past losses – and a reason – Phoenix calculated profitability using its changed assumptions from the inception of the various PAUL policies rather than from the time of the rate increase forward. No more was required.

### D.    Phoenix's Motion *in Limine* #4

Phoenix's moves to preclude U.S. Bank from calling James D. Wehr, Phoenix's current CEO and former Chief Investment Officer, as a witness at trial. As an "apex witness," Phoenix argues that Wehr should only be called to testify if he has unique personal knowledge of relevant facts. Wehr, according to Phoenix, has no such knowledge. He was not involved in the COI rate increases and Phoenix claims that any information he does have could be adduced through the testimony of Phoenix's former CEO Dona Young or other senior executives with actuarial qualifications.

This motion is **DENIED**.

"When considering whether to allow the deposition of a corporate executive, the Court must begin with the proposition that plaintiffs have no burden to show that the deponents have any relevant knowledge. The Court considers the likelihood that the individual possesses relevant

knowledge, whether another source could provide identical information, the possibility of harassment, and the potential disruption of business." *Scott v. Chipotle Mexican Grill, Inc.*, No. 12-CV-08333 ALC SN, --- F.R.D. ----, 2015 WL 868320, at *1 (S.D.N.Y. Feb. 27, 2015) *reconsideration denied*, (S.D.N.Y. Mar. 20, 2015) (internal citations and quotation marks omitted). "Courts have recognized an additional layer of protection for senior corporate executives subject to depositions." *Alex & Ani, Inc. v. MOA Int'l Corp.*, No. 10 CIV. 4590 KMW, 2011 WL 6413612, at *3 (S.D.N.Y. Dec. 21, 2011). Because "permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation . . . where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed executive." *Consol. Rail Corp. v. Primary Indus. Corp.*, No. 92 CIV. 4927 (PNL), 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993).

It is not at all clear that the "apex witness" rule even applies in these circumstances. Every opinion the court has located applies the apex witness rule to depositions, not trial testimony, which makes sense, because the rule finds its origin in Rule 26's limitations on burdensome discovery. *Scott*, 2015 WL 868320.[4]

Even if the apex witness rule did apply here, Phoenix has not established any unique burden that would confront it or Wehr if Wehr were forced to testify. It relies instead on the general proposition that CEOs are busy people. That is undoubtedly true, but insufficient to overcome U.S. Bank's right to call witnesses with relevant testimony.

In any event, U.S. Bank has demonstrated that Wehr can offer relevant testimony on issues as to which he has unique insight. Wehr was CIO at Phoenix between 2004 and 2009. Thus, he was intimately familiar with Phoenix's "investment earnings" and the cause of any reduction in

---

[4] Wehr was not deposed.

those earnings. Phoenix has argued that changes in investment earnings provided an actuarial justification for the COI rate increases. Wehr's testimony about investment earnings could be quite relevant to determining whether Phoenix is correct. In particular, Wehr could testify about how Phoenix identified the policies subject to the COI rate increase as the policies that caused a reduction in investment earnings. As U.S. Bank also notes, if Wehr's testimony showed that the COI rate increases were used to increase profitability at the expense of policyholders that would also support U.S. Bank's claim for breach of the covenant of good faith and fair dealing.

Even if other witnesses could provide testimony about Phoenix's investment earnings, Wehr had great familiarity with Phoenix's high-level decision-making regarding investments. As an official charged with overseeing Phoenix's investments and profitability writ large, Wehr's testimony could be of particular value to a jury, and U.S. Bank is entitled to present it.

### E.    Phoenix's Motion *in Limine* #5

Phoenix moves to preclude testimony of one of U.S. Bank's experts, Bruce Foundree. Foundree is retained as an expert on insurance industry practices. Phoenix argues that his testimony should be excluded for several reasons. First, Foundree is not an actuary; his testimony relates to general industry standards of fairness which – according to Phoenix – are not at issue in this case. Foundree's opinions are based in significant part on standards promulgated by the Insurance Marketplace Standards Association ("IMSA"), which according to Phoenix, is now defunct and in any event governed insurance marketing, not rate-setting. Second, Phoenix maintains that the court's prior rulings make Foundree's opinions irrelevant or inadmissible. In particular, Phoenix asserts that:

-    The court limited U.S. Bank's breach of contract claims to a single question – whether relevant actuarial principles support the COI rate increases. Thus Foundree's opinion about non-actuarial fairness principles is irrelevant;

- The PAUL policy language expressly permits discrimination within classes unless it is "unfair" and thus Foundree may not opine that discrimination within classes is unfair as such;

- The court granted summary judgment in favor of Phoenix on U.S. Bank's claim that Phoenix relied on impermissible factors in setting rates. Therefore Foundree may not opine that Phoenix acted unfairly by setting rates based on funding levels; and

- The court dismissed U.S. Bank's manipulative marketing claim under the CUTPA. Thus Foundree may not opine that the letters describing the 2010 and 2011 rate increases were unfair communications.

Third, Phoenix asserts that Foundree may not opine on recoupment of past losses. Phoenix argues that as a non-actuary opining only on insurance industry practices, his opinion on recoupment is a mere *ipse dixit*. Phoenix also argues that Foundree's opinion on recoupment (which is presented only in Foundree's rebuttal report) is improper rebuttal evidence because the question whether Phoenix impermissibly recouped past losses is part of U.S. Bank's case-in-chief. Further, Foundree assertedly could not be rebutting the opinion of Phoenix's expert, Timothy Pfeifer, because Pfeifer offered an *actuarial* opinion. Fourth, Phoenix argues that Foundree's opinion on Phoenix's financial condition is irrelevant because it goes only to Phoenix's motive, which is not a proper subject for expert testimony.

This motion is **GRANTED IN PART** and **DENIED IN PART**.

As to Phoenix's first objection, Foundree's testimony about insurance industry practice is relevant, as are his opinions on "fair" practices in insurance. Though not an actuarial expert – and thus not permitted to testify to the actuarial propriety of Phoenix's actions – Foundree is a former Commissioner of Insurance for the State of Iowa, with decades of industry experience. Phoenix cites no case law establishing that an expert with Foundree's qualifications may not opine on industry practices. Courts have permitted experts to apply industry standards to evaluate the propriety of insurer actions. *Sieveking v. Reliastar Life Ins. Co.*, No. 4:08-CV-0045-DFH-WGH,

2009 WL 1795090, at *2 (S.D. Ind. June 23, 2009); *Rawlings v. Apodaca*, 726 P.2d 565, 573-74 (Ariz. 1986); *McKeeman v. Gen. Am. Life Ins. Co.*, 899 P.2d 1124, 1130 (Nev. 1995).

Foundree's opinions about fair industry practices have particular relevance to U.S. Bank's breach of the covenant of good faith and fair dealing claim. With respect to the covenant of good faith claims, whether Phoenix breached the covenant depends on whether it violated the reasonable expectations of policyholders by a deliberate act. Foundree's opinions about insurance industry practices can shed light on the expectations of policyholders.

I caution U.S. Bank, however, that Foundree is *not permitted* to offer legal conclusions. For example, he may not opine that Phoenix did breach the covenant of good faith and fair dealing or violate the CUTPA. Rather, he may explain the relevant standards for industry fairness to the jury and offer an opinion whether Phoenix's actions were consistent with those standards. He may say no more.

It is of no moment that Foundree's report relies on IMSA standards, which are not in effect today. U.S. Bank points out that those standards were in effect when the PAUL policies were issued and that Phoenix was a member of IMSA. Thus, IMSA standards provide an arguable basis (one the jury is entitled to consider) for evaluating U.S. Bank's covenant of good faith claim. Even if Phoenix had not been not a member of IMSA, or the standards lapsed well before 2010, those facts would go to weight, not admissibility. Phoenix is free to cross-examine Foundree about IMSA standards, including their applicability to rate increases and their relevance to the policies at issue. That exact conclusion was reached by the federal district court in *Helton v. American General Life Insurance Co.*, No. 4:09-CV-00118-JHM, 2013 WL 2443166, at *4 (W.D. Ky. June 4, 2013), which declined to exclude expert testimony about an insurer's duties arising from IMSA

standards. The *Helton* court held that the voluntary nature of IMSA membership and standards was a proper basis for cross-examining the expert, but not for exclusion. So it is here.

Nor will I preclude Foundree from opining on most of the subjects objected to by Phoenix. Foundree may testify that Phoenix's rate increases recouped past losses. Foundree's opinion – offered in his rebuttal report – responds to the claim made by Phoenix's expert Pfeifer in his response to Foundree's initial report. Pfeifer's opinion may have been based on actuarial principles, but Foundree could and did rebut that conclusion by referring to industry standards of fair practice. Foundree explained if Phoenix forced policyholders to deposit large sums of money after-the-fact to make up for losses that Phoenix knew it would incur when it sold policies to life settlement investors then Phoenix violated industry standards for treatment of losses. There is no reason a jury should not hear Foundree's opinion on that point.

Foundree may also opine about the relationship between Phoenix's financial condition and the fairness of Phoenix's actions. One of the bases for U.S. Bank's claim that Phoenix breached the covenant of good faith is that Phoenix used the COI rate increases to manage its own profitability at policyholder expense. Foundree concluded that if Phoenix used funds from the COI rate increase to offset its dire financial condition then it violated industry standards of fairness. His testimony is therefore relevant to U.S. Bank's breach of the covenant of good faith claim and should be presented to a jury. To the extent that "fairness" is not relevant to the breach of contract claim, the jury can and will be instructed about the difference between the two claims.

I will grant Phoenix's motion to the extent that Foundree may not opine on two issues.

First, Foundree may not testify that Phoenix acted unfairly by setting rates on the basis of impermissible factors. I previously dismissed U.S. Bank's contention that Phoenix relied on an impermissible factor when it took into account policy values as part of its consideration of

"expectations of . . . investment earnings." Foundree's testimony cannot be used to resuscitate this claim.

U.S. Bank's arguments in favor of permitting Foundree to testify about impermissible factors are: [1] the contract did not expressly *permit* Phoenix to rely on policy values in setting COI rate increases; and [2] Foundree's reliance on this point goes to weight not admissibility. The former argument I already rejected when deciding the summary judgment motions. The contract expressly permitted Phoenix to rely on investment earnings expectations, and the policy funding ratio indubitably factors into those expectations. The issue does not go to weight; this court's ruling forecloses the issue, even if Foundree disagrees with me.

Second, Foundree may not testify on U.S. Bank's case-in-chief that Phoenix misrepresented the nature of the rate increases in its marketing materials. That claim, too, was dismissed by the court on Phoenix's motion. U.S. Bank pretty much admits the point, but states that this evidence may be relevant to Phoenix's waiver defense. The solution is to permit U.S. Bank to rebut any evidence of waiver that Phoenix may introduce during its case with Foundree's testimony about Phoenix's misleading marketing materials. On U.S. Bank's case in chief, however, this testimony is inadmissible.

### F.    Phoenix's Motion *in Limine* #6

Finally, Phoenix moves to exclude myriad items of evidence on the ground that they are irrelevant. Phoenix appends to its motion papers a table listing at least 5 dozen exhibits with accompanying objections. I deal here with the objections actually discussed in Phoenix's moving papers – relevance and Rule 403. To the extent that Phoenix has other objections to these 60+ exhibits, we will take them up at the final pre-trial conference.

First, Phoenix argues that U.S. Bank should not be permitted to argue that Phoenix breached its contract by raising COI rates more than once per year. U.S. Bank first argued that the

possible monthly post-COI rate increases breached the terms of the PAUL policy in its motion for reconsideration of the court's summary judgment decision. As I explained in that order, "a motion for reconsideration is not the place for a party to raise arguments that it could and should have made to support its motion for summary judgment in the first instance." (No. 12 Civ. 6811, Docket #362). But that does not foreclose U.S. Bank from raising the issue at trial. All I said, and all I meant, is that U.S. Bank had forfeited its right to use the "more than once a year" argument in order to defeat Phoenix's summary judgment motion and prevail on its own motion. Therefore, this aspect of Phoenix's *in limine* motion is **DENIED**.

Phoenix next argues that the court should exclude evidence, such as Phoenix's 10-K filings, quarterly earning call transcripts, historical stock prices, and related testimony, concerning Phoenix's financial condition. Phoenix argues that such evidence is irrelevant to any issue remaining to be tried.

The motion is **DENIED**. Phoenix's financial condition is evidence of *motive*. It tends to show that Phoenix had a particular need to increase COI rates in order to retain profitability in the wake of the financial crisis. "[E]vidence as to motive is normally admissible in a civil suit." *Richards v. Swanson*, 283 F. Supp. 476, 479 (S.D.N.Y. 1968). Phoenix has not explained why this suit is an exception to the general rule. Similarly, evidence of compensation provided to Phoenix's officers can show bias if those officers testify as witnesses.

Evidence of Phoenix's financial condition is also relevant because it tends to show that the decline in Phoenix's investment earnings was caused by risky investments and falling policy sales. That fact refutes Phoenix's assertion that investment earnings decreased as a result of minimal funding by particular PAUL policyholders and that Phoenix was actuarially justified in imposing a rate increase only on those policyholders. That is, if Phoenix cannot attribute the decline in

investment earnings to any subset of policy holders then it would be unfairly discriminatory to impose the rate increase on those policyholders – in effect punishing them for exercising a contractual right in violation of both the contract itself and the covenant of good faith and fair dealing.

Phoenix next argues that the court should exclude evidence and argument that Phoenix's original assumptions were undocumented and unreasonable. According to Phoenix, the question whether Phoenix's original assumptions were reasonable or documented is not part of this case; this case is about only whether the COI rate increases were unfairly discriminatory or recouped past losses.

Phoenix's motion is **DENIED**. Phoenix is correct that this case is not about whether Phoenix's original assumptions were reasonable *vel non*. Rather the case is – in part – about whether Phoenix's COI rate increases were actuarially proper, i.e., whether Phoenix discriminated unfairly or recouped past losses. That question depends in turn on Phoenix's original assumptions. To prove that it had an actuarial justification for the rate increases, Phoenix must show that its original assumptions, such as assumptions about investment earnings or mortality, changed. Whether those assumptions changed obviously depends on what those original assumptions were. If – as is likely – Phoenix attempts to present original assumptions reconstructed after-the-fact, U.S. Bank is entitled to rebut that evidence with its own evidence of Phoenix's "actual" original assumptions and to show that the reconstructed assumptions are unreasonable fabrications. Further, both sides' experts agree that whether Phoenix recouped past losses depends on the expected profitability under both original and changed assumptions. That, of course, also requires the jury to determine what Phoenix's original assumptions were.

Phoenix also argues that the court should exclude evidence related to Phoenix's marketing of the PAUL policies, in particular marketing material portraying the policies as flexible with a right to minimally fund. Phoenix claims that after the court dismissed U.S. Bank's deceptive marketing claim under the CUTPA this evidence is not relevant to any remaining claim.

Phoenix's motion is **DENIED**. Phoenix is correct that this evidence is not relevant to U.S. Bank's breach of contract or CUTPA claims (the CUTPA claim for deceptive marketing having been dismissed). But this evidence is relevant to U.S. Bank's claim for breach of the covenant of good faith and fair dealing. U.S. Bank argues that Phoenix breached the covenant by punishing policyholders who exercised their right to minimally fund their contracts, by forcing policies to lapse, and by using rate increases to manage its profitability at policyholder expense. To state a claim for breach of the covenant, U.S. Bank must show that a party refused its contractual obligations "not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990), *as modified on denial of reh'g* (Oct. 31, 2001). Phoenix's marketing materials – which emphasize the right to minimally fund the "flexible" PAUL policies – tend to show a "conscious and deliberate act" because they demonstrate that Phoenix was aware of its policyholders' expectations and the rights on which they intended to rely in agreeing to the PAUL policies. Further, this evidence shows that policyholders in fact had such a right or at least reasonably expected to have a right to minimally fund their policies – even if not expressly stated in the contract – which can be protected by the covenant of good faith and dealing.

Phoenix next argues that the court should exclude all evidence relating to the 2006 rate increase proposed but not adopted by Phoenix. Phoenix asserts that this evidence is not probative

of any remaining issue in the case. Specifically, Phoenix claims that the 2006 rate increase was proposed only in response to non-recourse premium funding – which was prohibited in 2006, and that – in any event – it is irrelevant whether Phoenix targeted certain policyholders for a rate increase.

The motion is **DENIED**. The proposed 2006 increase is in fact relevant to the question whether Phoenix targeted life settlement investors for rate increases as it relates both the unfair discrimination aspect of the breach of policy terms claim and to the claim asserted under the covenant of good faith and fair dealing. Targeting would show that Phoenix had punished life settlement investors who aggressively used a minimal settlement feature of the PAUL policies, thereby frustrating their reasonable expectations. It would also evince a lack of proper actuarial justification for the COI rate increases. That the 2006 rate increase relates to non-recourse premium funding, which may be distinct from life settlement investment, goes to weight, not admissibility.

After disputing the relevance of each of the above categories of evidence, Phoenix argues in sweeping terms that the evidence discussed above should be excluded under Rule 403. Except as discussed below, Phoenix has not explained any particular item of evidence that it thinks will confuse the jury or create unfair prejudice. I reject the suggestion that because some of the evidence discussed above is complex, it is beyond the ken of the jury. If the jury can understand the actuarial evidence presented in this case (which it must), then it can understand evidence touching any of the above issues. To the extent Phoenix is worried about wasting time, I have limited the time each side has to present its case. If U.S. Bank chooses to present this probative evidence it may find itself unable to present other probative evidence. That is U.S. Bank's decision to make, not the court's.

Phoenix does discuss specifically the prejudicial effect of evidence that it "fabricated" its original assumptions. Phoenix argues that this evidence would tar it as a bad actor, and that jurors could not compartmentalize this evidence by considering only the narrow issue whether the alleged fabrication tends to show that Phoenix lacked an actuarial justification for the COI rate increases.

I agree that this evidence has some potential prejudicial effect, but it is not unfair prejudice. Any evidence that tends to prove the other side's case is "prejudicial," but that is not the sort of "prejudice" that Rule 403 is designed to cure. Rule 403 is for weeding out "unfair" prejudice – prejudice not related to the actual merits of the case in suit. Here, the challenged evidence is highly probative of issues in the case. The jury will need to carefully consider Phoenix's original assumptions and determine what those assumptions were in order to decide whether a change in those assumptions afforded Phoenix an actuarial justification for the COI rate increases. The court can and will instruct the jury that it may consider evidence of unreasonable or fabricated assumptions only as it applies to the issues to be tried. Phoenix has shown no reason to disregard the "presum[ption]" that juries obey limiting instructions. *James v. Artus*, No. 03 CIV.7612(AJP), 2005 WL 859245, at *12 n.26 (S.D.N.Y. Apr. 15, 2005) (collecting cases).

Phoenix also argues that the testimony of two witnesses – Edward Humphrey and Steven Lockwood – should be excluded. Humphrey is a former Phoenix salesperson who was fired in 2008. He was not deposed. Lockwood is an independent insurance broker who sued Phoenix after being fired "for cause." Phoenix argues that testimony from these witnesses would serve only to impugn Phoenix as a company, as they cannot testify to any relevant issue in dispute.

Phoenix's motion is **DENIED**. U.S. Bank intends to offer the testimony of both witnesses to establish Phoenix's practices of selling into the life settlement market. As noted above, Phoenix's sales and marketing practices are relevant to U.S. Bank's claims. Phoenix is free to

49

impeach both witnesses and to reveal their alleged bias by questioning them about the termination of their employment and lawsuits they personally filed against Phoenix. But their alleged bias against their former employer is not a reason to preclude these witnesses from offering relevant testimony.

Phoenix moves to strike new allegations made in the JPTO that:

- The addition of a five-year no-lapse guarantee in the PAUL III policies shows Phoenix targeted life settlement investors;

- The 2010 rate increase was discriminatory, and recouped past losses because it sought immediate, large premium payments, as supported by the testimony of U.S. Bank's experts Browne and Foundree;

- Phoenix was motivated to recoup past losses because it structured PAUL to earn profits in earlier periods and take losses in later periods; and

- Phoenix's original assumptions were unreasonable because the expectation of level funding was inconsistent with the extended maturity feature of PAUL III.

This motion is **DENIED**. Phoenix has not explained its argument, but simply states that these allegations are new. They are not. I agree with U.S. Bank that these allegations are fairly encompassed by the complaint. They may be presented at trial.

## CONCLUSION

For the reasons stated above:

- Phoenix's motion for judgment on the pleadings is **DENIED**;

- U.S. Bank's first motion *in limine* is **DENIED**;

- U.S. Bank's second motion *in limine* is **GRANTED**;

- U.S. Bank's third motion *in limine* is **DENIED**;

- U.S. Bank's fourth motion *in limine* is **DENIED**;

- U.S. Bank's fifth motion *in limine* is **GRANTED IN PART** to the extent that ¶¶ III(1), VI, VI(1-3), VI(6), and VII(16) of Foster's report and related testimony are excluded and is otherwise **DENIED**;

- U.S. Bank's sixth motion *in limine* **DENIED** without prejudice to renewal at trial;

- U.S. Bank's seventh motion *in limine* is **GRANTED IN PART** and **DENIED IN PART** as set forth more fully in the opinion;

- Phoenix's first month *in limine* is **GRANTED IN PART** to the extent that Plaintiff's Exhibit #32 is excluded and is otherwise **DENIED**;

- Phoenix's second motion *in limine* is **GRANTED IN PART** to the extent that Plaintiff's Exhibits ##33, 44, 44A, and 71 are excluded and is otherwise **DENIED**;

- Phoenix's third motion *in limine* is **DENIED**;

- Phoenix's fourth motion *in limine* is **DENIED;**

- Phoenix's fifth motion *in limine* is **GRANTED IN PART** and **DENIED IN PART** as set forth more fully in the opinion;

- Phoenix's sixth motion *in limine* is **DENIED**.

The Clerk of the Court is directed to remove the motions as Docket ##179, 182 in No. 13 Civ. 1580 and Docket ##386, 389, 398 in No. 12 Civ. 6811 from the court's list of pending motions.

Dated: June 22, 2015

_____
U.S.D.J.

BY ECF TO ALL COUNSEL